UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------x
 N.P., JACK JASKARAN, AVERY TOLEDO,
PETER ARETE, R.L,

Docket No.:

**COMPLAINT**

Plaintiff,

-against-                                                    JURY DEMAND

THE CITY UNIVERSITY OF NEW YORK, CHERYL HOWARD.
Individually, RODNEY PEPE-SOUVENIR, Individually

Defendants.
-------------------------------------------------------------------------------x

The plaintiffs, N.P., JACK JASKARAN, AVERY TOLEDO, PETER ARETE, and R.L. (hereinafter collectively referred to as "CUNY 5"), by their attorneys THE LAW OFFICE OF JOHN A. SCOLA, PLLC., as and for their  complaint against defendants THE CITY UNIVERSITY OF NEW YORK, CHERYL HOWARD, Individually and RODNEY PEPE-SOUVENIR, Individually.

## JURISDICTION AND VENUE

1.  This Court has original jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C. §1331, in that certain of the Plaintiffs' claims arise under the laws of the United States, namely Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq. ("Title IX"), 42 U.S.C. §1981(a), 42 U.S.C. §1983 and supplemental jurisdiction over the Plaintiffs' claims under New York State Executive Law §296(4) and New York State Civil Rights Law §40-c(2) pursuant to 28 U.S.C. §1367.

2.  Venue is proper under 42 U.S.C §2000e-5(f)(3) and 28 U.S.C §1391(b) because the acts giving rise to this Complaint occurred within the Eastern District of New York.

## PLAINTIFFS

3.      Plaintiff  N.P.  is a female Indian-American citizen of the United States of America, over twenty-one (21) years of age, resident of Queens County, New York and was a student at CUNY Law School from 2015 until 2018.

4.      Plaintiff JACK JASKARAN is a male Indian-American citizen of the United States of America, over twenty-one (21) years of age, resident of Queens County, New York and was a student at CUNY Law School from 2015 until 2018. Prior to enrolling in CUNY Law School, JASKARAN, a Harvard graduate, was a decorated New York City Police Captain with an unblemished career. While in the rank of sergeant, he was a World Trade Center First-Responder that was injured in the line-of-duty when the towers collapsed. Despite his injuries, he remained at the WTC site to continue to aid in the rescue and recovery efforts until nightfall and then returned each day for 12-hour shifts for the next two months until he was promoted to the rank of lieutenant. During his 20 years of service to the City of New York as a police officer, he received 35 medals before he retired and went to law school.

5.      Plaintiff AVERY TOLEDO is a male Hispanic-American citizen of the United States of America, over twenty-one (21) years of age, resident of Bronx County, New York and was a student at CUNY Law School from 2015 until 2018.

6.      Plaintiff R.L., is an Asian female resident of the United States of America, Citizen of China, over twenty-one (21) years of age, resident of Queens County, New York and was a student at CUNY Law School from 2015 until 2018.

7.      Plaintiff PETER ARETE is a male Native-American citizen of the United States of America, over twenty-one (21) years of age, resident of New York County and was a student at CUNY Law School from 2015 until 2018. Prior to attending law school, ARETE served in the Peace Corp.

**<u>DEFENDANTS</u>**

8.   Upon information and belief, Defendant THE CITY UNIVERSITY OF NEW YORK (hereinafter referred to as "CUNY") is an educational institution, providing post-secondary, graduate and doctoral level academic instruction to students.

9.   The City University of New York School of Law (hereinafter referred to as "CUNY Law School") is senior college under the umbrella of CUNY.

10.  CUNY Law School provides legal academic instruction to students, culminating in a Juris Doctorate degree.

11.  Defendant CHERYL HOWARD was at all times herein the Associate Dean of Student Affairs for CUNY Law School and an employee of CUNY.

12.  Defendant RODNEY PEPE-SOUVENIR was at all times herein the Title IX Director for all of CUNY and an employee of CUNY.

## STATUTORY AND REGULATORY FRAMEWORK

### Title IX of the Education Amendments of 1972

13.  Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ." 20 U.S.C . §1681 et seq.

14.  Peer-to-peer sexual harassment and sexual assault that is motivated by a student's gender is considered discrimination under Title IX.[1] Under the requirements of Title IX, schools

---

[1] Sexual harassment is defined as "unwelcome conduct of a sexual nature," U.S. Dep 't of Educ., Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employee s, Other Students or Third Parties, 66 Fed. Reg. 5512, (Jan. 19, 2001), available at https:/ /www2.ed.gov /about/offices/list/ocr/docs/shguide. pdf [hereinafter "2001 Guidance"]. "[S ]exual harassment prohibited by Title IX can include conduct such as touching of a sexual nature ; making sexual comments, jokes or gestures ; writing graffiti or displaying or distributing sexually explicit drawings or, pictures, or written materials; calling students sexually charged names; spreading sexual rumors; rating students on sexual activity or performance; or circulating , showing, or creating e-mails or Web sites of a sexual nature ." U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Oct. 26, 2010) , https://www2.ed.gov/about /offices/list/ocr/letters/colleague-201010 .html.

that receive federal funds have a legal obligation to protect students from such gender-based violence, including sexual assault and harassment. [2]

15.   Title IX's private right of action encompasses claims of retaliation against an individual because he or she has complained about sex discrimination.

16.   Title IX is implemented by the United States Department of Education ("USDOE"), which oversees enforcement of, and compliance with Title IX through its Office for Civil Rights ("OCR").

17.   OCR has issued a series of guidance and letters further addressing Title IX's protections against sexual harassment and bullying, including the 2001 Revised Sexual Harassment Guidance , the 2010 Dear Colleague Letter on bullying , the 2013 Dear Colleague Letter on retaliation, and the 2015 Dear Colleague Letter on Title IX Coordinators. [3]

18.   The 2001 Guidance states that schools must address student-on-student harassment if any employee knows or, in the exercise of reasonable care should have known, about the harassment.

19.   Upon learning of harassment, the employee must report it to the Title IX Coordinator, an individual tasked with responding to discrimination complaints, or an appropriate school official. The school must then conduct a prompt and thorough investigation of the incident and take appropriate steps to resolve the situation.[4]

---

[2] Sex-Based Harassment, U.S. Dep't of Educ. (Sept. 25, 2018),
https ://www2. ed. gov /about/offices /list/ ocr/frontpage /pro-students /issues/sex -issue0 1 .html; Sex Discrimination: Frequently Asked Questions, U.S. Dep't of Educ. (Sept. 25, 2018) ,
https ://www2. ed. gov /about/ offices/list / ocr/frontpage/faq / sex.html.
[3]  Department of Education Issues New Interim Guidance on Campus Sexual Misconduct, U.S. Dep't of Educ. (Sept. 22, 2017), https ://www.ed.gov/news/press-relea ses/department-education-issue s-new-interim-guidance-campussexual-misconduct ; 2001 Guidance , supra note 3; U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter on Harassment and Bullying (Oct. 26, 2010) , https://www2 .ed.gov/about /offices/list/ocr /letters/colleague-201010 .html; U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter on Retaliation (Apr. 24, 2013), https ://www2.ed .gov/about/offices/list/ocr/letters/colleague-201304 .html [hereinafter "2013 Guidance on Retaliation "]; U.S. Dep't of Educ. Office for Civil Rights, Dear Colleague Letter on Title IX Coordinators 3 (Apr. 24, 2015), available at https://www2.ed.gov/about/offices /list/ocr/letters/colleague-201504-titl e-ix-coordinators .pdf [hereinafter 2015 Guidance on Title IX Coordinators].
[4] See 2001 Guidance , supra note 3, at 13.

20.     Interim measures may include counseling, extensions of time or other course related adjustments, modifications of work or class schedules, restrictions on contact between the parties, leaves of absence, and other similar accommodations.[5]

21.     Once a student complains, either formally or informally,  to their school that a potential Title IX violation has occurred , the school may not retaliate against the student for their complaint or participation in the complaint process. [6]

22.     Federal regulations require every school district receiving federal funding to designate at least one full-time Title IX coordinator. The Coordinator is responsible for training faculty, staff, and students on rights and obligations under Title IX, and for receiving and evaluating complaints of discrimination and overseeing schools' responses to such complaints.

23.     The Title IX Coordinator should not have any other job responsibilities that may create a conflict of interest.[7]

24.     The OCR has stated that "it may be a good practice" for larger school districts to designate multiple Title IX Coordinators , such as one for each school or school campus. [8]

25.     Title IX requires that Universities make the role of the Title IX Coordinator(s) visible to the school community. The school district "must always notify students and employees of the name, office address, telephone number, and email address of the Title IX Coordinator." [9]

**New York Laws and Regulations**

26.     The New York State Executive Law §296 et. seq. prohibits sexual harassment, sex discrimination and retaliation for complaint of said harassment and discrimination.

---

[5] U.S. Dep't of Educ., Office for Civil Rights, Questions and Answers on Campus Sexual Misconduct (Sept. 2017), available at https://www2.ed .gov/about/offices/list/ocr /docs/qa-title-ix-201709.pdf.
[6] 2013 Guidance on Retaliation, supra note 5.
[7] 2013 Guidance on Retaliation, supra note 5.
[8] Id.
[9] Id . at 5.

27.   The New York City Human Rights Law ("NYCHRL") prohibits sexual harassment, sex discrimination and retaliation for complaint of said harassment and discrimination.

**New York City Human Rights Law**

28.   The NYCHRL prohibits prejudice, intolerance, bigotry, discrimination, sexual harassment and bias-related violence. N.Y.C. Admin. Law§§ 8-101 et seq.

29.   The NYCHRL also prohibits the denial or withholding of public facilities and accommodations from someone on the basis of a person's disability, whether actual or perceived. N.Y.C. Admin . Law§ 8-107(4)(a).

**BACKGROUND RELEVANT TO ALL CAUSES OF ACTION**

30.   The CUNY 5 commence law school at CUNY Law School in 2015.

31.   Student Jamie Sahagian (hereinafter referred to as "Sahagian") a white male also commences law school at CUNY Law School in 2015.

32.   Unbeknownst to Plaintiffs at the time, Sahagian was admitted into CUNY Law School despite a documented history of psychiatric problems associated with violence.

33.   More specifically, Sahagian was admitted to CUNY Law School, after attempting to burn down his parent's home in Florida, assaulting his father, over three (3) separate arrests and while he was still on probation in Florida.

34.   In a written statement to the Alachua County, Florida Court, Sahagian's father, a medical doctor, informed the court that Sahagian "had a long history of psychiatric problems and associated violent outbursts with destructive and aggressive behaviors."

35.   CUNY Law School either chose to ignore the recent violent history of Sahagian or failed to do their due diligence prior to admitting Sahagian into their law school.

36.   CUNY's Policy on Sexual Misconduct on page 22 under the "Investigation" section states:

>        The college Title IX Coordinator is responsible for conducting any
>        investigation in a prompt, thorough, and impartial manner and may

designate another appropriately trained administrator to conduct all or part of the investigation. Whenever an investigation is conducted, the Title IX Coordinator shall:

- coordinate investigative efforts with other appropriate offices;
- inform the complainant that an investigation is being commenced and that the respondent will receive a written summary of the allegations;
- inform the respondent that an investigation is being commenced and provide the respondent with a written summary of the allegations of the complaint. A respondent employee who is covered by a collective bargaining agreement may consult with and have a union representative present at any interview of that employee conducted as part of such investigation;
- interview witnesses who might reasonably be expected to provide information relevant to the allegations, and review relevant documents and evidence. Both the complainant and respondent shall be informed that they have the right to provide relevant documents and to propose for interview witnesses whom they reasonably believe can provide relevant information.

Neither the complainant nor the respondent is restricted from discussing and sharing information related to the complaint with others who may support or assist them. This does not, however, permit unreasonable sharing of private information in a manner intended to harm or embarrass another, or in a manner that would recklessly do so regardless of intention. Such unreasonable sharing may constitute retaliation under this Policy. (THIS SECTION WAS ADDED SUBSEQUENT TO THE COMPLAINTS CONTAINED HEREIN)

The college Title IX Coordinator shall maintain all documents of the investigation in accordance with the CUNY Records Retention and Disposition Policy.

The college shall make reasonable efforts to ensure that the investigation and resolution of a complaint are carried out as timely and efficiently as possible. However, the college may need to temporarily delay the fact-finding portion of its investigation during the evidence-gathering phase of a law enforcement investigation. Temporary delays will generally not last more than ten days except when law enforcement specifically requests and justifies a longer delay. While some complaints may require more extensive investigation, when possible, the investigation of complaints should be completed within sixty (60) calendar days of the receipt of the

complaint. If there is a delay in completing the investigation, the
Title IX Coordinator shall notify the complainant and the respondent
in writing.

37.   The Process for Review of Interim Measures, including "No Contact" Orders and Interim

Suspensions. ( Page 18 CUNY Handbook) Upon request, the complainant and the respondent

shall each be afforded a prompt review of the need for and terms of restrictive interim

measures, including "no contact" orders and interim suspensions. Issues that may be raised

include possible modification or discontinuance of a "no contact" order. Complainants and

respondents shall be allowed to submit evidence to support their request. The request shall

be made to the college's Chief Student Affairs Officer, if either the complainant or the

respondent is a student, or to the college's Human Resources Director, if neither the

complainant nor the respondent are students. If a request is made in a case involving both a

student and an employee, the Chief Student Affairs Officer shall consult with the Human

Resources Director. The Chief Student Affairs Officer or Human Resources Director may

consult with the Title IX Coordinator and other relevant officials regarding the request. If

appropriate and possible, the college may establish an appropriate schedule for the

complainant and the respondent to access college facilities when they are not being used by

the other party to enable both parties to use college facilities to the maximum extent feasible,

without violation of the "no contact" order.

38.   CUNY's Policy on Retaliation is as follows: (Page 16 CUNY HANDBOOK): a. An

individual may file a complaint with the Title IX Coordinator if the individual has been

retaliated against for reporting sexual misconduct, opposing in a reasonable manner an act or

policy believed to constitute sexual misconduct, assisting someone making such a report, or

participating in any manner in an investigation or resolution of a sexual misconduct

complaint. All retaliation complaints will be investigated in accordance with the investigation

procedures set forth in Section XI of this policy, and individuals who are found to have engaged in retaliation will be subject to disciplinary action. b. "Responsible" Employees – Private, but not confidential; c. "Responsible" employees have a duty to report incidents of sexual misconduct, including all relevant details, to the Title IX Coordinator.

39.   Such employees are not permitted to maintain a complainant's confidentiality, except that the Title IX Coordinator may honor a request for confidentiality under the circumstances described in Section VII above. However, these employees will maintain a complainant's privacy to the greatest extent possible, and information reported to them will be shared only with the Title IX Coordinator and other people responsible for handling the college's response to the report. To the extent possible, before a complainant reveals any information to a responsible employee, the employee shall advise the complainant of the employee's reporting obligations—and if the complainant wants to maintain confidentiality, direct the complainant to confidential resources identified above. CUNY has designated the following individuals as "responsible" employees.

40.   Complainants who wish to report sexual violence are encouraged to speak with one of the responsible employees marked.

41.   The defendants were each "Responsible Employees". The following CUNY employees are also Responsible Employees: the Title IX Coordinator and her/his staff (Raquel Gabriel), Office of Public Safety employees (all) (Steve Katz plus all his staff),  Vice President for Student Affairs or Dean of Students and all staff housed in those offices (Dean Howard), College President, Vice Presidents and Deans (Dean Bilek), University Office of the General Counsel employees (all) -Daniel Simonette/Yvette Santana-Prado/Rodney Pepe-Souvenir, College/unit attorney and her/his staff (Lori Fox).

42.     Pursuant to CUNY's Policy on Sexual Misconduct, only where the President of the College (Mary Lu Bilek) is a respondent, is the investigation to be handled by the University Title IX Coordinator (Defendant RODNEY PEPE-SOUVENIR), otherwise, the investigation is to be conducted by the college (CUNY Law School).

43.     Throughout the course of the below described events CUNY and CUNY Law School failed to follow their own procedures and policies when it came to any of the CUNY 5.

44.     The CUNY 5, following the procedures set forth by CUNY for reporting sex discrimination and retaliation,  on multiple occasions spoke with each and every one of the people listed in Paragraph 41.

45.     The CUNY 5 complained to the defendants herein when their complaints were not investigated.

46.     The CUNY 5 were subjected to retaliation for making these protected complaints, and for voicing concern when these complaints were not investigated,  as they were the target of a frivolous investigation which spanned over the majority of their time in  law school and continued even after they graduated.

47.     Sahagian, the subject of the many sex discrimination complaints which included accusations of harassment, stalking, and sexual harassment which CUNY and CUNY Law School failed to investigate after learning of each complaint.

48.     The retaliatory and meritless investigation into the CUNY 5, which lasted 449 days, caused severe mental and emotional distress in each of the CUNY 5, which materially affected their ability to participate in their schooling and forced them to seek outside therapy to help complete law school.

49.     On August 27, 2016, Plaintiff  N.P. was sexually assaulted by fellow CUNY Law School student Daniel Cho.

50.     Plaintiff N.P. together and with the help of Plaintiff ARETE met with Associate Dean of Student Affairs CHERYL HOWARD to report the sexual assault.

51.     Cho then had a conversation with Plaintiff JASKARAN where Cho admitted to assaulting Plaintiff N.P.

52.     Plaintiff JASKARAN recorded Cho's  admissions and provided it to CUNY School of Law, the Yonkers Police Department, the Westchester District Attorney's Office and also to CUNY Central's Office of General Counsel (hereinafter referred to as "CUNY's OGC") upon the request of Daniel Simonette, an attorney from CUNY's OGC.

53.     CUNY Law School commences a Title IX investigation against Cho, which in September of 2016, concludes in Plaintiff N.P.'s favor.

54.     Cho  is arrested by the Yonkers Police Department and then takes a leave of absence from CUNY Law School and the Title IX hearing is put on hold as essentially moot.

55.     Cho remained a defendant in a criminal matter in connection with his assault of Plaintiff N.P.

56.     During the investigation into Cho, Sahagian is interviewed by CUNY Law School as part of that investigation.

57.     Sahagian states that he is not a material witness and possesses no information about the Cho incident.

58.     In December of 2016, Plaintiff R.L. became terrified of Sahagian after he engaged in unwelcomed behavior towards her, which included aggravated harassment, sexual harassment and harassment.

59.     On December 30, 2016, Plaintiff R.L. told Sahagian to "just stop texting me, I am physically afraid of you."

60.     Sahagian's unwelcomed conduct continued towards Plaintiff R.L.

61.    In early February 2017, Plaintiff R.L., aware that Plaintiff JASKARAN was a retired police officer, approached him and sought his advice as to what to do to have Sahagian discontinue his unwelcomed behavior towards her.

62.    Plaintiff JASKARAN informed Plaintiff R.L. that she could file a police report against Sahagian with the New York City Police Department ("NYPD") for the crime of aggravated harassment or file a complaint with the law school by informing Defendant HOWARD of Sahagian's unlawful conduct.

63.    Plaintiff R.L. chose to make her complaint with Defendant HOWARD. Specifically, Plaintiff R.L. complained to Defendant HOWARD that Sahagian was engaging in the course of sexual harassment against her.

64.    Further Plaintiff R.L., with the help of Plaintiff JASKARAN, inform CUNY Law School that Sahagian committed the crimes of stalking and aggravated harassment against her.

65.    The acts that Plaintiff R.L. alleged against Sahagian are against the law and are unlawful acts under CUNY's policy.

66.    Plaintiff R.L. further informed Defendant HOWARD and later, Defendant PEPE-SOUVENIR, that she was a Deferred Action Childhood Arrival (DACA) student and was worried about reporting the complaint, for fear of it adversely affecting her immigration status and future in this country, as well as her lawyering career. Despite this, she asked Defendant HOWARD to protect her from Sahagian.

67.    Plaintiff R.L. later provided evidence in the form of text messages to Defendant HOWARD and further stated that Sahagian had said that he was "obsessed" with her (R.L).

68.    Defendant HOWARD after being informed of Sahagian's conduct, failed to investigate, take any appropriate action to stop Sahagian's unlawful behavior or protect Plaintiff R.L.

69.   Plaintiff JASKARAN is a retired Captain in the NYPD and assists the other members of the CUNY 5 throughout this process given his two decades of police experience.

70.   Sahagian next targeted CUNY Law School student Jane Doe 1 who is a minority woman in her mid-twenties.

71.   Sahagian stalked and sexually harassed Jane Doe 1.

72.   On one occasion, Sahagian followed Jane Doe 1 in close physical proximity in one of the hallways in the law school, while shouting sexually explicit comments at her, to intimidate and humiliate her.

73.   Jane Doe 1, terrified and crying, was forced to flee the law school to get away from Sahagian.

74.   Jane Doe 1 confides in Plaintiff R.L. what Sahagian has been doing to her. Plaintiff R.L. advises Jane Doe 1 to speak with Plaintiff JASKARAN for advice. Jane Doe 1 asks Plaintiff R.L. to introduce her to Plaintiff JASKARAN since he didn't really know him well.

75.   On or about April 17, 2017, Plaintiff R.L. arranges for JANE DOE 1 to sit with Plaintiff JASKARAN to explain what Sahagian has been doing at which time Plaintiff JASKARAN advises Jane Doe 1 that she can file a police report with the NYPD or file a complaint with the law school by reporting Sahagian's unlawful behavior to Defendant HOWARD.

76.   Jane Doe 1 asks Plaintiff JASKARAN to accompany her to see Defendant HOWARD and Plaintiff JASKARAN agrees to do so.

77.   On or about April 18, 2017, Plaintiff JASKARAN accompanies Jane Doe 1 to speak with Defendant HOWARD.

78.   During the meeting with Defendant HOWARD, Jane Doe 1 has difficulty speaking because she is crying profusely. Eventually, Jane Doe 1 is able to explain precisely what Sahagian has been doing to her and clearly articulates the crimes of stalking and sexual harassment. Plaintiff JASKARAN is present during this conversation.

79.   Jane Doe 1 and Plaintiff JASKARAN see Sahagian observing them as they leave Defendant HOWARD's office.

80.   The acts that Jane Doe 1 alleged against Sahagian are crimes under the penal law and are unlawful acts under CUNY policy.

81.   Defendant HOWARD, after being informed of Sahagian's conduct against Jane Doe 1, failed to take any appropriate action to stop Sahagian's unlawful behavior or to protect Jane Doe 1 from further threat of harm by Sahagian.

82.   Defendant HOWARD also failed to conduct an investigation into Sahagian's unlawful conduct.

83.   Jane Doe 1 is so frightened of Sahagian, that after making her complaint to Defendant Howard,  Jane Doe 1 spends much of her law school days for the next year and a half until she graduates, hiding in a room located at CUNY Law School, that was only for members of a certain law school team, because that room had a lock and required a key card to gain entry, which Jane Doe 1 possessed, as a member of that certain law school team.

84.   Sahagian next targets Jane Doe 2, who is an African-American female law student in her mid-twenties.

85.   Plaintiff JASKARAN brings this information to Defendant HOWARD's attention and after doing so, learns that Defendant HOWARD is already aware that Sahagian has been engaged in unwelcomed behavior towards Jane Doe 2.

86.   Again, Defendant HOWARD, despite knowing of this additional victim, took no action.

87.   On or about July 15, 2017, Plaintiff N.P. is approached by Sahagian and asked to step into an isolated office before.

88.   Plaintiff N.P. concerned for her safety, records this conversation.

89.   While in the isolated office, Sahagian informed Plaintiff N.P. that he had been tasked by a private investigator hired by Cho's defense attorney Mr. Michael P. Romano, to find out disparaging information about her including her sexual history and prior boyfriends, to which, Sahagian proceeded to do.

90.   Moreover, Sahagian continued that he planned on sending people to find out such information about Plaintiff N.P.

91.   Additionally, Sahagian tells Plaintiff N.P. that he believed that there was a "group of students out to get him," and that Defendant HOWARD had informed him of such, though he had no evidence to support his claims aside from the alleged statements of Defendant HOWARD.

92.   This whole event frightens Plaintiff N.P., causing her to suffer an anxiety attack during this conversation with Sahagian.

93.   During this conversation, Sahagian informs Plaintiff N.P. that he is going to be a witness for the defense in the Cho criminal case.

94.   Prior to this, neither Plaintiff N.P., nor any member of the CUNY 5 were aware that Sahagian would be a witness in the criminal case, after all, CUNY Law School had determined that Sahagian had no material information in regard to the assault against Plaintiff N.P.

95.   On July 17, 2017, Plaintiff N.P. meets with Defendant HOWARD.

96.   At this meeting, Plaintiff N.P. turns over the July 15, 2017 audio recording of the conversation between Sahagian and herself in which Sahagian spoke with her about her criminal matter involving Cho.

97.   More specifically, in that meeting, Plaintiff N.P. explained that the tape showed that Sahagian brought her into an isolated office at night where he stated to her that he had been tasked by Cho's defense attorney, Mr. Romano's private investigator James Dowd, to find out disparaging information about her including her sexual history and prior boyfriends, to

which, Sahagian proceeded to do and that Sahagian said that the private investigator would send people to find out such information about her, and that he (Sahagian) was willing to fabricate evidence in the criminal case against Cho.

98.    Plaintiff N.P. tells Defendant HOWARD that she is afraid of Sahagian and asks Defendant HOWARD to keep Sahagian away from her.

99.    Plaintiff N.P. specifically states that Sahagian was tampering with her as a witness in Cho's criminal matter and this was all because she made a complaint about Cho.

100.   Additionally, Defendant HOWARD takes the opportunity to chastise Plaintiff N.P., a sexual assault victim, by telling her that the CUNY's OGC would formally charge her, for recording Sahagian attempting to intimidate her to end the criminal matter against Cho.

101.   At the same time, Defendant HOWARD calls Plaintiff JASKARAN to her office and takes the opportunity to chastise Plaintiff JASKARAN for recording Cho's confession, which he turned over to Defendant HOWARD, more than nine months earlier.

102.   No action is taken against Sahagian and no investigation is started.

103.   CUNY Law School takes no action to protect Plaintiff N.P. against Sahagian for witness tampering.

104.   Following this incident, Plaintiff N.P. is scared to study alone at school and feels like she cannot use the privileges and facilities offered by CUNY Law School out of fear of more harassment.

105.   Plaintiff N.P. isolates herself to a small study room in the law school, which she only studied there with Plaintiff ARETE, in fear of further action from Sahagian.

106.   Sometime in the week following, Defendant HOWARD informs Plaintiff N.P. that she and CUNY Law School's Public Safety Director, Mr. Steve Katz, reviewed said audio recording and agreed that Sahagian was trying to intimidate her.

107.    In a later meeting with Plaintiffs N.P. and ARETE, Defendant HOWARD states, on an audio recording, that prior to Title IX, she was able to "sweep [claims of sexual assault] under the rug" but Title IX "clamped down" and has created "more of a pain in the ass."

108.    True to her word, at all times herein, Defendant HOWARD failed to report the sexual harassment allegations against Sahagian and failed to document the allegations of criminal acts against Sahagian in the law school's Daily Crime Log, which under the Jean Clery Act, is mandatory. Failure to report crimes/allegations of criminal acts can result in fines of over $50,000 per violation.

109.    Following the recorded meeting, CUNY Law School takes no action against Sahagian in response to N.P's, R.L.'s, or Jane Doe 1's complaints.

110.    Plaintiff N.P tells Defendant HOWARD that she is afraid of Sahagian and asks Defendant HOWARD to keep Sahagian away from her.

111.    Defendant HOWARD would later summon Plaintiffs JASKARAN and N.P. to her office and again chastise Plaintiff N.P, a sexual assault victim, for recording Sahagian attempting to intimidate her to end the criminal matter into Cho. Defendant HOWARD then tells Plaintiff JASKARAN that his recording of Cho (nearly nine months prior) where Cho admitted to sexually assaulting Plaintiff N.P., was in violation of CUNY Law School's policy.

112.    There is no specific prohibition against one student recording another student.

113.    Plaintiff JASKARAN's recording of Cho's admission of sexually assaulting Plaintiff N.P. was not in violation of CUNY Law School's policy.

114.    This is even further evidenced by the fact that, subsequent to the events herein, including Plaintiff JASKARAN's explanation to the law school that they were misinterpreting their own policy, CUNY Law School amended their recording policy.

115.    After chastising Plaintiff N.P. for recording Sahagian intimidating her, Defendant HOWARD then informs Plaintiff JASKARAN that CUNY's OGC wants to bring him up on charges for recording  Cho admitting to the sexual assault.

116.    After Plaintiff N.P.'s complaint to Defendant HOWARD about Sahagian's intimidation tactics, CUNY Law School takes no action to protect Plaintiff N.P. from further harm by Sahagian, nor do they take any action against Sahagian for witness tampering.

117.    Upon information and belief, Defendant HOWARD informs Sahagian of Plaintiff N.P.'s complaint and also informs Sahagian of the recording that Plaintiff N.P. made of him intimidating her.

118.    On July 30, 2017, two weeks after Plaintiff N.P.  met with Defendant HOWARD to complain of Sahagian's unlawful conduct, and after Sahagian was informed by Defendant HOWARD of Plaintiff N.P.'s  complaint against him, Sahagian sends a "cease and desist" email to the CUNY 5 and three other law school students.

119.    In his July 30, 2017 email, Sahagian carbon copies the Dean of the Law School Mary Lu Bilek, Defendant HOWARD,  as well as Raquel Gabriel, Steve Katz, as well as Cho's defense attorney Michael Romano and the private investigator James Dowd.

120.    In the abovementioned email, Sahagian makes false accusations against Plaintiff N.P., the sexual assault victim he intimidated, Plaintiff R.L, the female student who he sexually harassed and stalked, Jane Doe 1, the other female student he sexually harassed and stalked, Plaintiff ARETE, who assisted Plaintiff N.P. in make her complaint to Defendant HOWARD, Plaintiff TOLEDO, who assisted Plaintiff R.L, and Plaintiff  JASKARAN, who assisted Plaintiff N.P  and Jane Doe 1 with making their complaints to Defendant HOWARD, and who also cooperated with and assisted CUNY School of Law in the Cho sexual assault matter. Sahagian's false accusations were also directed at other three law students. He falsely

accused the eight law students, all of whom were students of color, of unlawfully accessing his email, texts, phone calls and roaming location, and taking photos of him. He demanded that they cease and desist the aforementioned actions which he claimed harassed and intimidated him and further claimed, caused him to seek removal from the witness list in the criminal case against former CUNY Law Student, Cho.

121.   It must be noted that Sahagian's July 30, 2017 email does not contain any allegation involving retaliation under Title IX, a fact that CUNY's Title IX Director (Defendant PEPE-SOVENIR) later concedes to. CUNY also acknowledges that under Title IX, they had no jurisdiction over Sahagian's false allegations.

122.   Unbeknownst to Plaintiffs, the following day, Mr. Michael P. Romano, Esq., Cho's criminal defense attorney, emailed a letter to Defendant HOWARD reporting that Sahagian had indicated that he "is being harassed and intimidated by certain students and others in connection with his potential testimony on behalf of [Cho] at the upcoming hearings/trial." The email mentions no particular student by name.

123.   Defendant HOWARD would later deny the existence of this letter, despite the fact that it was addressed to her, sent to her, received by her and remained in her possession.

124.   The letter never identified any member of the CUNY 5, nor did it request a Title IX Retaliation investigation against the CUNY 5, yet according to Defendant PEPE-SOUVENIR, the letter was what caused CUNY Law School to initiate a Title IX Retaliation investigation against the Plaintiffs herein. This would be one of the different and conflicting reasons that Defendant PEPE-SOUVENIR would offer as an explanation as to why the Title IX Retaliation investigation was initiated against the Plaintiffs.

125. Defendant HOWARD will later deny Defendant's PEPE-SOUVENIR's claim that the defense attorney's letter is what caused CUNY Law School to initiate a Title IX Retaliation investigation against the Plaintiffs.

126. Defendant HOWARD would later assert that the Plaintiffs were subjected to the Title IX Retaliation investigation as a result of Sahagian's July 30, 2017 email to the law school, which contained no allegations against them within the scope of Title IX.

127. Defendant PEPE-SOUVENIR would later deny Defendant's HOWARD's claim that the Sahagian's July 30, 2017 email is what caused CUNY Law School to commence a Title IX Retaliation investigation against the Plaintiffs.

128. Defendant PEPE-SOUVENIR would later assert that neither Sahagian's July 30, 2017 email to the law school, nor the defense attorney's (Michael Romano) letter were the basis for commencing the Title IX Retaliation investigation against the Plaintiffs.

129. CUNY has yet to inform the Plaintiffs of any valid reason for placing them under a Title IX Retaliation investigation.

130. The CUNY 5 did not become aware of defense attorney Michael Romano's email/letter until October of 2018, more than a year after it was sent to and received by Defendant HOWARD.

131. CUNY takes no immediate action in regard to either Sahagian's July 30, 2017 email to the law school or defense attorney Michael Romano's July 31, 2017 email/letter to Defendant HOWARD.

132. In regard to defense attorney Michael Romano's email/letter to Defendant HOWARD, CUNY Law School never attempted to determine who the "certain students" were, nor did they ever attempt to determine who the "others" (presumably non-students) were.

133. Following Sahagian's cease and desist letter, and on numerous other occasions, the CUNY 5 complained to Defendant HOWARD that Sahagian's false allegations were made in

retaliation against them because of their complaints to the law school about his unlawful behavior, which included sexual harassment against female students and that they (CUNY 5) did not feel safe at school and were afraid of further retaliatory action from Sahagian.

134.    The CUNY 5 also filed complaints with Defendant HOWARD, concerned about Sahagian's false allegations and the possible adverse consequences to their legal careers.

135.    Defendant HOWARD assured each of the CUNY 5 that no action would be taken regarding Sahagian's July 30, 2017 email to the law school.

136.    Defendant HOWARD told Plaintiffs N.P. and ARETE that Sahagian's email was not a complaint, that Sahagian had never spoken to her about those allegations and that she did not plan to do anything regarding those allegations and classified Sahagian's July 30, 2017 email as "mindless ravings to the wind."

137.    Defendant HOWARD took no action to address the complaints made to her by the CUNY 5.

138.    In regard to Sahagian's July 30, 2017 email, Defendant HOWARD would later state that she "knew [Sahagian] was lying," and that she knew that "he was setting y'all up" and "he was manipulating the system." These statements by Defendant HOWARD are recorded.

139.    On August 2, 2017, Plaintiff TOLEDO met with Defendant HOWARD in her office because of his concerns over Sahagian's false allegations.

140.    Subsequent to this meeting, Plaintiff TOLEDO sent an email to the CUNY 5 with Defendant HOWARD cc'd on the email. In the email Plaintiff TOLEDO states that Defendant HOWARD assured him that Sahagian's false accusations will not be a part of the CUNY 5's academic records and will not be an issue to be concerned about in regard to the Character and Fitness, "so long as the situation stays the way it is."

141.    During the month of August 2017, Plaintiff JASKARAN met with Defendant HOWARD to ascertain whether Sahagian's false accusations would adversely affect his review process for

Character and Fitness. Defendant HOWARD assured him that it would not adversely affect his Character and Fitness review process.

142.   Plaintiff JASKARAN then informed Defendant HOWARD that he is concerned about his safety within the law school because, in his opinion, which was based on his training and experience as a police officer, Sahagian is psychologically unstable and is a threat to the law school community.

143.   Defendant HOWARD informed Plaintiff JASKARAN that he had nothing to be concerned about, that Sahagian is just awkward and that socially, he's "playing checkers" while everyone else is "playing chess." Defendant HOWARD's statements are later corroborated in an email.

144.   Defendant HOWARD informed Plaintiff JASKARAN that Sahagian claimed that there was a conspiracy against him that involved a group of students in the law school who would whisper about him (Sahagian) in the hallways.

145.   Plaintiff JASKARAN then shared with Defendant HOWARD that Sahagian had once stated in the classroom that the rape of a woman is not a crime unless the perpetrator was holding a gun to the woman.

146.   Further, upon information and belief, Sahagian's roommate Justin Kilborne had complained to Defendant HOWARD that he (Kilborne) was not comfortable with Sahagian after Sahagian stated to him that there is nothing wrong with the crime of pedophilia. Defendant HOWARD did nothing in regard to that complaint.

147.   Plaintiff JASKARAN advised Defendant HOWARD that, based on his training and experience as a police office, he believed that Sahagian's abhorrent behavior, coupled with the false allegations, sexual harassment and stalking of female students and imagined conspiracy, should cause the law school to be concerned about the safety of its students.

148.  At this point, neither Plaintiff JASKARAN nor any other member of the CUNY 5 are aware of Sahagian's documented history mental illness associated with violence.

149.  Plaintiff JASKARAN asked Defendant HOWARD to assist him in transferring from the law school because he did not feel physically safe in the school because of Sahagian's presence and he also did not want to be the subject of any other false accusations from Sahagian. The remaining members of the CUNY 5 felt similarly.

150.  Plaintiff JASKARAN expressed to Defendant HOWARD that he was aware that he would likely have to repeat one extra year at whichever law school he transferred to, but that he was willing to accept that based on the circumstances.

151.  Defendant HOWARD informed Plaintiff JASKARAN that the law school's clinical program was just a month away and that students will be so busy, that he will not have any encounters with Sahagian.

152.  Plaintiff JASKARAN asked Defendant HOWARD to ensure that he is not in any upcoming class with Sahagian, because he does not feel physically safe when Sahagian is near. Plaintiff JASKARAN informed Defendant HOWARD that whenever Sahagian is in his presence, he is forced to focus his attention on Sahagian's hands out of fear of being physically attacked.

153.  Defendant HOWARD replied to Plaintiff JASKARAN and told him that she would personally reach out to Assistant Dean Allie Robbins and request that Allie Robbins ensure that Sahagian is not in any upcoming class with JASKARAN or any other member of the CUNY 5.

154.  After the above described meeting, JASKARAN continued to converse with either Defendant HOWARD or Steve Katz throughout the weeks and months that followed as to whether the law school was taking steps to address the complaints made by Plaintiffs N.P. and R.L and Jane Doe 1, as well as Sahagian's abhorrent behavior and false accusations.

155. Defendant HOWARD repeatedly told Plaintiff JASKARAN that "things were being done behind the scenes" to address the sexual harassment complaints and Sahagian's behavior, but that she could not share with Plaintiff JASKARAN what was being done. It would turn out that nothing was being done.

156. CUNY Law School's Public Safety Director Steve Katz echoed Defendant HOWARD and once added that Sahagian's behavior will result in him being "self-deported" out of the law school.

157. In a meeting with Defendant HOWARD in around August of 2017, JASKARAN inquired as to why the law school had not taken appropriate steps to address the sexual harassment claims of Plaintiff R.L  and Jane Doe 1 and the intimidation of Plaintiff N.P.

158. Contrary to CUNY policy, Defendant HOWARD explained to Plaintiff JASKARAN that Plaintiff R.L.  and Jane Doe 1 did not make "formal" complaints and as such, the law school could not act.

159. Plaintiff JASKARAN, unaware at this time, of the reporting requirements of Title IX or CUNY's Policy on Sexual Misconduct, believed Defendant HOWARD's false statement that a complainant needed to make a "formal" sexual harassment complaint before the law school could act.

160. On September 5, 2017, Plaintiff JASKARAN met with Defendant HOWARD and Steve Katz in HOWARD's office to once again inquire as to what the law school was doing to address the complaints of Jane Doe 1 and Plaintiff R.L., as well as Sahagian's abhorrent behavior and false accusations.

161. Defendant HOWARD had previously informed the members of the CUNY 5 that Sahagian's accusations were nothing to be concerned about.

162. Further, in a conversation recorded by Plaintiff JASKARAN, Defendant HOWARD informed JASKARAN that she knew that Sahagian was lying and trying to set up the CUNY 5 when he made the false allegations in his July 30, 2017 email.

163. During the September 5, 2017 meeting with Defendant HOWARD and Steve Katz, Plaintiff JASKARAN inquired as to what the law school was doing to address the complaints made by Plaintiff R.L  and Jane Doe 1, as well as Sahagian's' abhorrent behavior and false accusations against the CUNY 5.

164. Defendant HOWARD, with Steve Katz present, informed Plaintiff JASKARAN that she could not disclose what was being done, but that "things are being done behind to the scenes" and that "people are being moved around," all supposedly to address the issues that Plaintiff JASKARAN raised to Defendant HOWARD and Steven Katz.

165. JASKARAN informed Defendant HOWARD and Katz that he (JASKARAN) did not believe them and felt as though they were trying to sweep the sexual harassment complaints of Plaintiff R.L  and Jane Doe 1 under the rug.

166. Public Safety Director Steve Katz objected to JASKARAN's statement and attempted to analogize JASKARAN's request that they take steps to address the sexual harassment complaints of Plaintiff R.L  and Jane Doe 1  – with establishing probable cause for an arrest, an analogy that made no sense.

167. JASKARAN informed Defendant HOWARD and Steven Katz that they were failing in their obligations to protect their students from Sahagian.

168. JASKARN also informed them that they were violating federal law [Title IX], New York State law [Enough is Enough] and CUNY's Policy on Sexual Misconduct, by their willful failure to address the sexual harassment complaints made by R.L.  and Jane Doe 1.

169.    Defendant HOWARD, informed Plaintiff JASKARAN that her (HOWARD) hands are tied and that she cannot address the sexual harassment complaints of Plaintiff R.L  and Jane Doe 1 unless the women make "formal" Title IX complaints against Sahagian.

170.    Defendant HOWARD's assertion is neither supported by CUNY's Policy on Sexual Misconduct, nor supported by the law.

171.    In October of 2017, which was shortly after Plaintiff JASKARAN had informed Defendant HOWARD and Steven Katz that they were violating the law in their failure to address the sexual harassment complaints of R.L. and Jane Doe 1, Plaintiffs N.P.  and ARETE meet with Defendant HOWARD to discuss their Mock Trial team, during that meeting, Defendant HOWARD informs Plaintiffs N.P.  and ARETE and that Sahagian "went over [her] head" and "filed a Title IX Retaliation complaint against the CUNY 5" with CUNY's Central Office.

172.    This was later determined to be false because Sahagian never made any such complaint to CUNY's Central Office.

173.    In the same conversation, Defendant HOWARD falsely told Plaintiffs N.P.  and ARETE that in the complaint he filed with CUNY's Central Office, Sahagian accused her (Defendant HOWARD) of being in the imagined conspiracy against him and therefore, there was a conflict of interest prohibiting her from investigating Sahagian's complaint.

174.    Defendant HOWARD asks Plaintiffs N.P. and ARETE to inform the rest of the CUNY 5 that they were all under a Title IX Retaliation investigation.

175.    In fact, Sahagian neither visited CUNY's Central Office to file a Title IX Retaliation complaint, nor did he ever accuse Defendant HOWARD of being a part of any conspiracy against him.

176.   The CUNY 5  would later learn that Defendant HOWARD asked CUNY's OGC to launch the investigation against the CUNY 5, shortly after Plaintiff JASKARAN protested CUNY's failure to handle the sexual harassment complaints of Plaintiff R.L and Jane Doe 1. CUNY's OGC would then turn over the investigation against the CUNY 5 (which had been launched against them despite there being no complaint from anyone, involving an allegation of retaliation under Title IX) to Defendant RODNEY PEPE-SOUVENIR, who is the Director of Title IX for the entire University.

177.   Defendant PEPE-SOUVENIR will proceed to conduct a 449-day Title IX Retaliation investigation against the CUNY 5 based on a fraudulent claim by Sahagian that the CUNY 5 were attempting to "dissuade him from testifying" in the criminal defense of Cho.

178.   At no point throughout the entire process did Sahagian ever allege that he was being tampered or intimidated with on the basis of Title IX, but rather the criminal case against Cho, where Sahagian alleged that he would be a witness in the criminal trial against Cho.

179.   CUNY undertakes this sham investigation against the CUNY 5 despite already knowing that Sahagian does not possesses any actual knowledge related to the Cho incident.

180.   Upon information and belief, the CUNY 5 are subjected to this investigation as a result of their complaints that their sex discrimination complaints have gone uninvestigated by CUNY.

181.   The CUNY 5 awaited formal notice from CUNY in regard to the Title IX investigation against them, but months went by without any such notice.

182.   The CUNY 5, both in person and through electronic mail, complained to Defendant PEPE-SOUVENIR that Sahagian's allegations were made in retaliation because of the sexual harassment complaints against him by Plaintiff R.L and Jane Doe 1.

183.  The pending investigation hung over the heads of the CUNY 5 for the remainder of their schooling which caused severe anxiety and had an adverse impact on their schooling.

184.  In the Spring semester of the CUNY 5's 3L year, they were each enrolled in the same CORE class as Sahagian, despite assurances from the Defendants that they CUNY 5 would not have to interact with Sahagian.

185.  The CUNY 5 were unable to drop this class as it was a part of CUNY Law School's core curriculum.

186.  In February of 2018, after not receiving any notice or contact from CUNY in regard to the alleged Title IX Retaliation investigation against the CUNY 5, and with the Bar Exam on the horizon, Plaintiff JASKARAN reached out to CUNY's OGC to ascertain the status of the Title IX Retaliation investigation against him and the other students.

187.  CUNY Central's OGC responded to Plaintiff JASKARAN's email five days later and informed him that "[i]n response to [his] inquiry, please note that the Title IX complaint filed against [JASKARAN] and the other students was referred to the University's Title IX Director, Rodney Pepe-Souvenir.  I have cc'd her on this email in the hope that she will be able to provide [JASKARAN] with a status update." *Id.* (emphasis added).

188.  The following day, Defendant PEPE-SOUVENIR emailed JASKARAN and stated

> Dear Mr. Jaskaran:
>
> I do apologize that there has been a delay in hearing from me. Ms. Santana-Prado is correct. *The case has been given to me to investigate.* Unfortunately, due to a death in my family I was unable to reach out to all the parties involved. If you would forward to me your availability I will make all efforts to meet with you.

189.  JASKARAN then shared this information with the CUNY 5, who thereafter made every effort to accommodate Defendant PEPE-SOUVENIR so as to participate fully in the investigation.

190.   On February 22, 2018, Plaintiff N.P  would send an email to Defendant PEPE-SOUVENIR

complaining of retaliation, stating:

> I was encouraged to reach out to you  regarding a Title IX
> complaint that I made after being sexually assaulted while
> unconscious and a Title IX retaliation complaint that was
> filed against me in response to the Title IX complaint that I
> made. Having to go through this process while in law school
> has been a nightmare and I look forward to this matter
> getting resolved to help me put this trauma behind me. If
> possible, can we speak in person,"

191.   Plaintiff N.P. would receive no response until March 16, 2018.

192.   Defendant PEPE-SOUVENIR scheduled her interview of Plaintiff JASKARAN and other

CUNY 5 members, including Plaintiff N.P., on March 22, 2018, the same day of the New

York State Law Exam (NYLE).

193.   After taking the NYLE, Plaintiff JASKARAN as well as Plaintiff N.P.  rushed to the law

school so that they could be interviewed by Defendant PEPE-SOUVENIR.

194.   During the interview JASKARAN informed Defendant PEPE-SOUVENIR that Sahagian is

alleged to have recently committed an off-campus sexual assault of yet another female law

student.

195.   Defendant PEPE-SOUVENIR informed JASKARAN that she was only there to conduct the

Title IX investigation stemming from the allegations contained within Sahagian's July 30,

2017 email to the law school and nothing subsequent to that date.

196.   Defendant PEPE-SOUVENIR never mentioned anything in regard to the letter that defense

attorney Michael Romano sent directly to Defendant HOWARD, which at this time, was still

unknown to the CUNY 5.

197.   Defendant PEPE-SOUVENIR also informed Plaintiff JASKARAN that Sahagian was

uncooperative and had not returned any of her calls, so since she has not been able to

interview him, she decided to interview the respondents (the CUNY 5) and will close out the

investigation before the July 2018 Bar exam so that the investigation is not hanging over JASKARAN's head during Bar Exam prep time.

198.    Plaintiff N.P. meets with Defendant PEPE-SOUVENIR for the first time, on March 22, 2017, where she is informed that she is under investigation for retaliation under Title IX.

199.    Defendant PEPE-SOUVENIR falsely informs Plaintiff N.P. that only her (N.P.) and Plaintiff JASKARAN were respondents in the Title IX Retaliation investigation. Plaintiff N.P. informs Defendant PEPE-SOUVENIR that she believes that Sahagian was harassing her as a witness and that Sahagian's complaint of witness tampering against her is an act of retaliation (a sentiment shared and expressed by the CUNY 5).

200.    Plaintiff N.P. then gave Defendant PEPE-SOUVENIR the audio recording of Sahagian's harassment and witness tampering against  Plaintiff N.P., informing Defendant PEPE-SOUVENIR that the tape would exonerate her of any and all claims.

201.    While the CUNY 5 were placed under a Title IX Retaliation investigation allegedly based on Sahagian's false accusations of witness tampering, Defendant PEPE-SOUVENIR agreed that Sahagian was attempting to intimidate  Plaintiff N.P. but then failed to investigate Sahagian for retaliation or witness tampering.

202.    Defendant PEPE-SOUVENIR informs  Plaintiff N.P. that if she wants to initiate a complaint against Sahagian she would have to go to Raquel Gabriel's (CUNY Law School's Title IX Coordinator) office and file an "official" complaint.

203.    Plaintiff N.P., in fact, made her initial complaint to Defendant HOWARD for the sexual assault by Cho verbally and an investigation was undertaken without  Plaintiff N.P. needing to speak to CUNY Law School's Title IX Coordinator, Raquel Gabriel, contrary to Defendant HOWARD's repeated assertions that a "formal" complaint is required.

204. Plaintiff R.L. during her interview, tells Defendant PEPE-SOUVENIR that she is afraid for her life, her personal safety, and informed Defendant PEPE-SOUVENIR that she had told her fellow classmates and non-plaintiffs that, should anything happen to her (specifically if she went missing or was found dead), that they should go to the police and alert them of Sahagian's prior stalking and obsession.

205. Plaintiff R.L. told Defendant PEPE-SOUVENIR that Sahagian's false allegations were made against her in retaliation for making a complaint against him for stalking and sexual harassment.

206. On April 19, 2018 CUNY Law School's Title IX Coordinator, Raquel Gabriel, sends an email to Plaintiff ARETE stating that Defendant PEPE-SOUVENIR would like to speak with him, "in [his] role as a witness" in a "Title IX retaliation investigation."

207. In Plaintiff's ARETE's interview, Defendant PEPE-SOUVENIR asks Plaintiff ARETE whether it is true that he is a feminist, whether he has "testicles" and if it is true that Plaintiff ARETE has had a vasectomy and whether it was true that he had an "open marriage" and whether Plaintiff ARETE's wife was having sex with or dating other men.

208. Defendant PEPE-SOUVENIR also asked Plaintiffs N.P. and ARETE whether Plaintiff R.L. had committed marriage fraud by either getting married to obtain a green card or planning to get married to obtain a green card.

209. Defendant PEPE-SOUVENIE asked Plaintiffs R.L. and N.P. whether they had sex with or dated Sahagian or Plaintiff JASKARAN.

210. These questions were all irrelevant, intrusive and humiliating, and only asked to punish Plaintiffs.

211. During the month of April of 2018, Plaintiff JASKARAN, through the submission of several Freedom of Information requests, obtained records from several police departments in

Florida, as well as records from the Alachua County Court in Florida. All of these records were in regard to Sahagian's previously described run-ins with the police or court.

212.  On April 4, 2018, Plaintiff JASKARAN, in an effort to demonstrate to Defendant PEPE-SOUVENIR that Sahagian had a history of dishonesty and violence, submitted the records that he had obtained to Defendant PEPE-SOUVENIR via email.

213.  As a respondent in the Title IX investigation against him, Plaintiff JASKARAN was permitted to provide Defendant PEPE-SOUVENIR with information that he felt would be useful in establishing his innocence.

214.  In response to receiving the email from Plaintiff JASKARAN, Defendant PEPE-SOVENIR replied and stated:

> …I will ask that you do not send me any information you have gathered. Let me assure you I am an experienced investigator and know what I need. Thank you for providing me with the information I previously requested. Should I need any further information from you or the other respondents I will request it.

215.  Based on his own extensive investigative background, Plaintiff JASKARAN arrived at the conclusion that CUNY's Title IX Retaliation was a sham, and its sole purpose was to attempt to intimidate him and the other members of the CUNY 5 into remaining silent and discontinue their protests of CUNY's failures to handle the sexual harassment complaints of Plaintiff R.L. and Jane Doe 1.

216.  Concerned now about CUNY's true intent for launching a baseless Title IX Retaliation investigation against him, Plaintiff JASKARAN expended $10,000 of his savings to retain an attorney to represent him.

217.  On or about April 11, 2018, Defendant HOWARD, via email, summoned Plaintiff JASKARAN to her office.

218.  Upon his arrival to Defendant HOWARD's office, she was not present, so JASKARAN waited outside for several hours.

219.  Steve Katz stated to JASKARAN that JASKARAN did not look well (sleep deprived) and that he should go home.

220.  Plaintiff JASKARAN informed Steve Katz that he had not slept in two days because he is extremely stressed out by what CUNY Law School has been doing.

221.  Defendant HOWARD arrived later and summoned Plaintiff JASKARAN to her office.

222.  Realizing now that the entire Title IX Retaliation investigation against him and the other members of the CUNY 5 was a sham, Plaintiff JASKARAN recorded his interaction with Defendant  HOWARD.

223.  Defendant HOWARD demanded to know why Plaintiff JASKARAN shared Sahagian's publicly available criminal records with a fellow law student (J.F.).

224.  Plaintiff JASKARAN informed Defendant HOWARD that several students have claimed that Sahagian recently committed an off-campus sexual assault of a female law student.

225.  Defendant HOWARD, apparently also aware of the incident, and identity of the victim who was still a student at the law school, told JASKARAN that he should have the victim come forward and make a "formal" complaint so that the law school can handle the matter. Defendant HOWARD's statements are recorded.

226.  The latest sexual assault, which occurred two months earlier, and which Defendant HOWARD was aware of, garnered no investigation or protective action by CUNY Law School.

227.  During this April 2018 meeting, Defendant HOWARD informs Plaintiff JASKARAN that she has been protecting him from CUNY's Central Office, because they want to bring

JASKARAN up on charges for the 2016 recording of Cho admitting to the sexual assault of Plaintiff N.P.

Defendant HOWARD said that when CUNY's Central Office informed her of their intent to bring JASKARAN up on charges, she in turn replied to them that, they were "going to have to come through me," to get to JASKARAN. Upon information and belief, this is a lie. Defendant HOWARD's statements are recorded.

228.   After informing Plaintiff JASKARAN that she has been protecting him from CUNY's Central Office, Defendant HOWARD then tells JASKARAN that if he speaks again of Sahagian or Cho, then  she (HOWARD) is "gonna step back." Defendant HOWARD then leaned back in her chair and crossed her arms.

229.   Defendant HOWARD's threat to Plaintiff JASKARAN to remain silent is recorded.

230.   Plaintiff JASKARAN informed Defendant HOWARD that while a police captain, he spoke out within the NYPD when the agency wrongfully accused a Muslim police officer of being a terrorist. JASKARAN informed Defendant HOWARD that after he spoke up for the officer, JASKARAN was told to "stand down," but he refused, and it didn't do anything good for his career. JASKARAN had also spoken out against the NYPD's CompStat program and the NYPD's Stop, Question and Frisk policy.

231.   Plaintiff JASKARAN informed Defendant HOWARD that he did not stand down while in the NYPD and he most certainly would not stand down now.

232.   JASKARAN, despite being injured in the line-of-duty as a result of his response to the World Trade Center on September 11, 2001, remaining after surviving the collapse of both towards, suffered adverse treatment by the NYPD because of his ethnicity and belief by officers that he was Muslim. In one of several incidents, following the attacks on 9/11, JASKARAN,

while in full police uniform and driving a marked NYPD vehicle, was stopped at gun point near Foley Square, while driving to Manhattan Criminal Court to testify in a criminal case.

233.  During the April 2018 meeting with Defendant HOWARD, Plaintiff JASKARAN had a mental and emotional breakdown. He knew that he did nothing wrong, yet CUNY was treating him as though he were a perpetrator, while coddling and protecting Sahagian, a male White individual, that was preying upon several minority female CUNY Law School students.

234.  Later in the month of April 2018, JASKARAN submitted an email to Defendant HOWARD and Steve Katz, wherein he requested to meet with them. Both individuals ignored his request.

235.  In an April meeting between Plaintiffs N.P. and ARETE, where Plaintiffs N.P. and ARETE informed Defendant HOWARD that after learning about Sahagian's violent history, they were afraid for their physical safety and did not feel safe at school. Defendant HOWARD stated, in response, in sum and substance, "you kids and your political correctness, filing complaints. Back in my day, we wouldn't make complaints and whatever, we'd handle our own problems ourselves. If it was me and my friends, we would have just caught Jamie outside in the parking lot with baseball bats and settle it ourselves."

236.  CUNY Law School continues to keep the CUNY 5 in the dark regarding the investigation despite repeated inquiries asking for the details of the investigation and CUNY policy to disclose the details of said investigation.

237.  Defendant PEPE-SOUVENIR would regularly tell the CUNY 5 that the investigation would be completed shortly. One occasion she states that she "keeps going down rabbit holes and it's all too much, this is crazy, I can't do this, this isn't even my job."

238. This continues from March 2018 to October 2018, during which, the Plaintiffs had final exams, graduation, Bar Exam study, the Bar Exam, employment searches, and Character and Fitness on the horizon.

239. On April 24, 2018, Sahagian is arrested by the NYPD Special Victims Unit for an off-campus sexual assault of female CUNY Law School student Jane Doe 3 (not involved in this matter).

240. It was learned that Sahagian began stalking and sexually harassing Jane Doe 3 in the fall of 2017, which continued into 2018, leading the sexual assault.

241. This may have been prevented if CUNY Law School acted in accordance with the law as well as their own internal policies.

242. Jane Doe 3 reported the crime to CUNY Law School's Public Safety Director, Mr. Steve Katz, he told her that she should "take up self-defense classes." Later when Jane Doe 3 requested a copy of the incident report from him in regard to her complaint, he could not provide it.

243. The same day of his release, Sahagian filed a false complaint with the Administration for Children's Services (ACS) against Jane Doe 3, claiming that the single mother who worked full-time while attending law school and caring for her special needs son, was a sex-worker who injected heroin into her child and performed sex acts in front of the child.

244. When ACS and the NYPD arrived at Jane Doe 3 's home around midnight, to investigate Sahagian's false claims, the victim's special-needs son became so afraid that he was about to be taken from his mother, that he began having seizures and was taken to the hospital.

245. Jane Doe 3, the victim of a sexual assault perpetrated by Sahagian, was then subjected to an investigation by ACS, which included being tested for drugs. Jane Doe 3 was ultimately exonerated by ACS of the false allegations.

246. Sahagian was suspended from the law school and not permitted to graduate at this point.

247.   Sahagian then attempted to make a second false ACS complaint against Jane Doe 3, but the responding police officers were aware of what had transpired before and Jane Doe 3 was not subjected again to the same adverse treatment.

248.   Sahagian then filed a false police report against Jane Doe 3, claiming that she sexually assaulted him. The matter was investigated by the NYPD's Special Victims Squad in Queens, who concluded that Sahagian was lying and summarily closed the complaint against Jane Doe 3.

249.   In the beginning of May of 2018, Plaintiff JASKARAN sent another email entitled "2nd Request to Meet," to Defendant HOWARD and Steve Katz. This time Defendant HOWARD responded and stated:

> Dear Jack
> As you have told Steve Katz you were filing a complaint under EIE, I am referring your questions to Dan Simonette at the CUNY Office of General Counsel. He is cc'd above. You or your attorney should forward any requests related to Title IX matters at the Law School to him.

250.   Defendant HOWARD refused to meet with Plaintiff JASKARAN after learning that he intended to file a complaint.

251.   Defendant HOWARD would regularly meet with students, a right denied to Plaintiff JASKARAN.

252.   On May 22, 2018, Mr. Townsend, Plaintiff JASKARAN's attorney, conversed with Defendant PEPE-SOUVENIR over the phone at length so as to ascertain why JASKARAN was placed under a Title IX Retaliation investigation even though Sahagian never alleged retaliation under Title IX in his July 30, 2017 email to CUNY Law School.

253.   Contrary to what Defendant PEPE-SOUVENIR asserted to Plaintiff JASKARAN and the other students in March of 2017, that the Title IX investigation against them was commenced as a result of Sahagian's allegations in his July 30, 2017 email to the law school, Defendant

PEPE-SOUVENIR now informed Mr. Townsend that the investigation was not commenced against Plaintiff JASKARAN and the other students because of Sahagian's July 30, 2017 email.

254.    Defendant PEPE-SOUVENIR asserts to Mr. Townsend that the Title IX investigation was launched against JASKARAN and the other students because of the letter that Cho's defense attorney, Mr. Romano wrote to Defendant HOWARD.

255.    Defendant PEPE-SOUVENIR falsely claimed that Mr. Romano's letter requested the Title IX Retaliation investigation be commenced against Plaintiff JASKARAN and the other students, even though no student was named in Mr. Romano's letter, nor was there any reference to any allegation of retaliation under Title IX. Further,  CUNY never interviewed Sahagian to determine which specific students were allegedly conspiring to harass and intimidate him.

256.    In October of 2017, Defendant HOWARD had informed Plaintiff N.P.  that she  and the other members of the CUNY 5 were under a Title IX Retaliation investigation, but on May 22, 2018, Defendant PEPE-SOUVENIR informed Mr. Townsend that the investigation was not assigned to her until November of 2017.

257.    In October of 2017, Defendant HOWARD informed Plaintiff N.P. that N.P. and the other members of the CUNY 5 were respondents in a Title IX Retaliation investigation because Sahagian "went over her [HOWARD] head" to CUNY's Central Office and filed a Title IX Retaliation against her (HOWARD) and the members of the CUNY 5.

258.    In March of 2018, Defendant PEPE-SOUVENIR informs JASKARAN and the other members of the CUNY 5, that the reason that they placed under a Title IX investigation in November of 2017, is because of the accusations Sahagian made in his July 30, 2017 email he sent to the law school.

259. On May 22, 2018, after Mr. Townsend informed Defendant PEPE-SOUVENIR that Sahagian's accusations were not within the scope of Title IX, Defendant PEPE-SOUVENIR asserts that Plaintiff JASKARAN and the other students were not placed under investigation because of Sahagian's false accusations in the July 30, 2017 email, but were subjected to the Title IX Retaliation investigation because of the email/letter that the defense attorney (Michael Romano) sent to Defendant HOWARD.

260. This is first time since the CUNY 5 were placed under investigation that Mr. Romano's email/letter to Defendant HOWARD is mentioned.

261. A day or so after, Plaintiff JASKARAN provides this new information (the Romano letter) to Plaintiff N.P. and ARETE and shares with them his belief that the entire Title IX Retaliation investigation against them is frivolous and being done solely as a means to attempt to silence their protests against CUNY's failures to adhere to the mandates of Title IX.

262. That same week, N.P. and ARETE visit Defendant HOWARD in her office and inquire from Defendant HOWARD about the existence of the Romano email/letter.

263. Plaintiffs N.P. and ARETE inform Defendant HOWARD that Defendant PEPE-SOUVENIR asserted that they (CUNY 5) were under investigation as a result of defense attorney Michael Romano sending a letter to the law school asking that the law school to conduct the Title IX Retaliation investigation against them.

264. Defendant HOWARD became speechless and then asserted that she did not know anything about such a letter.

265. Defendant HOWARD specifically stated that "this is the first I'm hearing of such a letter."

266. Defendant HOWARD then goes on to assert that CUNY could not have commenced the Title IX Retaliation investigation against the CUNY 5 based on any letter written by Mr. Romano,

because Romano did not have standing to request that a Title IX Retaliation investigation be initiated against the CUNY 5. Defendant HOWARD further asserted that only Sahagian himself had standing to make a retaliation claim under Title IX.

267.   Defendant HOWARD's statements were recorded.

268.   In May of 2018, all members of the CUNY 5 completed law school and graduation was set for May 11, 2018 at the Kupferberg Center at Queens College.

269.   Concerned that Sahagian would show up at the graduation and potentially engage in violence towards members of the CUNY 5 and other students, CUNY Law School had its own uniformed security staff at the graduation, as well as additional uniformed CUNY Public Safety Officers patrolling  the vicinity of the entrance to the auditorium.

270.   Plaintiff JASKARAN, proud of the fact that at age 46, he was graduating from law school, something he waited more than 20 years to accomplish, could not have his children and family present at his graduation because of the fear that Sahagian could potentially show up and engage in violence.

271.   On June 6, 2018, Defendant PEPE-SOUVENIR informed CUNY Law School student Michael Perez, one of the other three law students place under the frivolous Title IX Retaliation investigation, that she had concluded her investigation and is working on typing up the final report.

272.   After 3L year is completed, CUNY Law School's policy and practice is to permit its graduates to remain on campus to utilize the numerous empty classrooms during the summer, to prepare for the July Bar Examination.

273.   Additionally, CUNY Law School pairs its graduates with faculty members who assist the graduates to prepare for the Bar Exam.

274. The law school permitted its graduates to monopolize a room of their choosing so that the students can leave their study material, food, etc., in the room. The school kept track of which students were using each room.

275. Plaintiff JASKARAN attempted to settle into different classrooms throughout the law school, but each time he settled in, a few days later, he would be informed that the school needed the classroom for some reason or another.

276. Plaintiff JASKARAN accepted the reasons and would always comply and remove his belongs and seek out another classroom.

277. This happened on more than six separate occasions and he noticed that it never happened to any other student.

278. While sitting in one of the school's hallways attempting to study, he saw Jane Doe 1 who inquired as to why he wasn't situated in a classroom. He explained that once he settled into any room, a few days later, the law school seemed to need that particular room.

279. Jane Doe 1 then told JASKARAN that she had a room that the school had assigned to her and that he could use it, because she would relocate to a larger room that Plaintiff R.L. and another female student were using. JASKARAN thanked her and relocated to the room that Jane Doe 1 had been using and a room that Jane Doe 1 was never previously asked to leave.

280. Soon after relocating, JASKARAN saw Plaintiff R.L. and informed her about the constant ousting that the law school kept doing whenever he would settle in. JASKARAN told Plaintiff R.L. that maybe it's just in his imagination, because he didn't think that the law school would be so petty as to constantly harass him during his preparation for the July Bar Examination, by moving him out of whichever room he settled into.

281.    On or about the morning of June 17, 2018, Plaintiff JASKARAN received a text message from R.L. advising him in substance that – "you're not crazy, CUNY took your room again, they posted a letter on the door."

282.    Upon arrival at the law school, JASKARN observed that there was a letter on the door to the room he had settled into. The letter was addressed to "Dear Student," even though CUNY Law School knew that JASKARAN was using the room, especially since the room was within sight of Defendant HOWARD's office.

283.    The letter informed JASKARAN that he needed to remove all of his belonging from the room because the Student Affairs Office needed the room for the afternoon.

284.    JASKARAN complied but felt that this was retaliatory because there were multiple empty rooms, both adjacent and in front of the one that he had been using, yet the law school, once again, singled out his room to oust him.

285.    JASKARAN walked around the law school to determine whether any other student was ousted in the way he was and observed numerous empty rooms in addition to the ones near his room and further observed that no other student studying for the Bar Exam was ousted.

286.    The letter was written by a staff member from the Student Affairs Office, who is supervised by the Associate Dean of Student Affairs, Defendant HOWARD.

287.    JASKARAN reached out to a professor in the law school whom he trusted and informed the professor of what was happening and showed the professor the other empty classrooms that were not being used. He also showed the professor the letter that was posted on the door.

288.    The professor informed JASKARAN that they have been working at CUNY Law School for over a decade and had never seen the school draft such a letter, much less post such a letter on the door of a classroom being used by a student to prepare for the Bar Exam.

289.    After cleaning out the room, JASKARAN sat outside in the hallway to observe whether the law school would actually use the classroom. As the evening came closer to an end, no one used the room.

290.    On  June 11, 2018, Plaintiffs N.P.  and ARETE met with the Dean of CUNY Law School, Bilek. Plaintiffs N.P. and ARETE informed Bilek that Defendant HOWARD had done nothing regarding all of their Title IX complaints. Bilek  informed  Plaintiffs N.P. and ARETE that Defendant HOWARD acted contrary to her duties, as she had a duty to report such complaints as a "responsible" employee to CUNY Law School's Title IX Coordinator, Raquel Gabriel, so that an investigation could be rendered, and there was no such thing as a "formal" complaint and that the standard was "knew or should have known." Despite this, Bilek  does not intervene or aid the CUNY 5.

291.    On June 18, 2018, JASKARAN submitted a Freedom of Information Law ("FOIL") request to CUNY Law School's Records Access Officer (Professor Jean Zorn, Esq.) wherein he requested a copy of the letter written by defense attorney Romano and sent directly to Defendant HOWARD that Defendant PEPE-SOUVENIR, contrary to what Defendant HOWARD had asserted, now claimed was the reason that the investigation against the CUNY 5 was initiated.

292.    In the FOIL request, JASKARAN informed Zorn that the individual that will be in possession of the letter at CUNY Law School will be Defendant HOWARD.

293.    Upon information and belief, on June 19, 2018, at approximately 10:11 am, Zorn opened JASKARAN's email containing the FOIL request.

294.    Upon information and belief, on June 19, 2018, Jane Doe 1 went to the office of Steve Katz to inquire as to whether a certain classroom was available for her to utilize. The door to Steve

Katz's office was closed and as   Jane Doe 1 approached the door to knock, she heard

Defendant HOWARD screaming at Steve Katz - "This is not supposed to be happening!"

295.    HOWARD had previously lied to Plaintiffs N.P. and ARETE and asserted that she had never

heard of the letter from Romano that was addressed and sent directly to her.

296.    Upon information and belief, on June 19, 2018, at approximately 11:25 am, Defendant PEPE-

SOUVENIR opened an old email that JASKARAN had sent to her asking that she call him,

she never did. The email contained his cell phone number.

297.    On June 19, 2018, at approximately 12:01 pm, after having told more than one person that

the investigation against the CUNY 5 was concluded on June 6, 2018, Defendant PEPE-

SOUVENIR called JASKARAN on his cell phone as he was attempting to study for the Bar

Exam and began to berate him.

298.    Defendant PEPE-SOUVENIR, after asserting that the investigation against JASKARAN and

the others had concluded on June 6, 2018, angrily demanded to know why JASKARAN

shared Sahagian's publicly available criminal records with another student (J.F.) at the law

school, in April of 2018.

299.    JASKARAN informed her that he had shared this information with her (Defendant PEPE-

SOUVENIR) on April 4, 2018 and she rejected it. He shared the information with CUNY's

Public Safety Department (Steve Katz) and they never acknowledged it, nor would speak of

it. He shared the information with CUNY Law School's Admissions Department, and they

did nothing about it. He even brought it to Defendant HOWARD's attention, who threatened

him to remain silent about it or face charges for an unrelated matter.

300.    JASKARAN explained to Defendant PEPE-SOUVENIR that he shared Sahagian's publicly

available criminal history with J.F. (a new roommate of Sahagian's) to warn J.F. that

Sahagian has the propensity for violence and if there is an altercation between J.F. and Sahagian, that J.F. should walk away, report it to the police and to the law school.

301.   JASKARAN explained to Defendant PEPE-SOUVENIR that he felt bad for J.F. and offered to pay for a hotel for J.F. to stay in so that he (J.F.) would not have to return back to the apartment. J.F. declined and slept the night in the student lounge at the law school.

302.   Defendant PEPE-SOUVENIR who had previously informed JASKARAN that she could no longer speak to him because he was represented by counsel, then questioned JASKARAN as to how he obtained Sahagian's criminal records.

303.   JASKARAN informed her that every document he possessed was obtain either through a Freedom of Information request or was readily available on the internet through a records search in the appropriate court in Florida.

304.   Defendant PEPE-SOUVENIR, after claiming that the investigation had concluded on June 6, 2018, and after telling JASKARAN that she could no longer correspond with him because he was represented by counsel, then demanded that he send her proof that he obtained Sahagian's criminal records lawfully.

305.   Defendant PEPE-SOUVENIR informed JASKARAN that she felt that he unlawfully used his police connections to obtain copies of Sahagian's publicly available criminal records. JASKARAN told her that was not the case, that he had been retired from the NYPD for over five years and didn't have any such "connections." More importantly however, JASKARAN informed Defendant PEPE-SOUVENIR that all of the records were from courts or police agencies in Florida, where JASKARAN never worked, lived or knew anyone in the employ of a governmental agency.

306.   Aware that he had done nothing wrong, JASKARAN forwarded to Defendant PEPE-SOUVENIR proof that every document he obtained, was done so lawfully. He provided her

with copies of the Freedom of Information requests he submitted to various law enforcement agencies in Florida along with the responses from the agencies, and payment receipts for some of the records where certain agencies required payment.

307. JASKARAN believed that Defendants HOWARD, and PEPE-SOUVENIR wanted the Romano letter to not be disclosed for some reason and were fishing to see if JASKARAN had done anything improper in obtaining the criminal history of Sahagian, so as to have something over him to silence any further protest.

308. Zorn failed to respond to JASKARAN's FOIL request for Romano's letter within the statutorily mandated time period.

309. In July of 2018, approximately two weeks before the Bar Exam, JASKARAN saw Zorn in the elevator banks of the law school and inquired of her as to the status of his FOIL request. In response, Zorn asks him if he's been studying for the Bar Exam.

310. JASKARAN informs her that he has not been able to study because of the investigation hanging over his head, which he believes to be a frivolous investigation meant to silence him and the other students from protesting CUNY Law School's failures to protect its female students and that whenever he tries to settle into a room to study, he is told to relocate.

311. Zorn tells JASKARAN that he still has two weeks left before the Bar Exam and that it's not too late for him to start studying. JASKARAN again inquires as to when Zorn will provide him with a response to his FOIL request. Zorn replies that "we're working on it."

312. On July 17, 2018, Zorn, an attorney admitted to practice in New York State, responded to JASKARAN's FOIL request and stated that "I have reviewed the files. There are no records responsive to your request."

313.  Zorn's willful concealment of Romano's letter was a violation of the New York State Penal Law (§ 240.65),[10] a sanctionable offense.

314.  After taking the July 2018 Bar Exam and then waiting for the results, JASKARAN began searching for employment. One job that he wanted to apply for was that of Police Captain in the Port Authority Police Department (PAPD). Unlike the NYPD where one has to enter and work their way up the ranks to captain, because of the structure of the police unions in the PAPD, the agency hires retired or former police officials directly into the rank of captain.

315.  The position only required a minimum of a minimum of 60 college credits from an accredited college or university, toward a major in criminal justice, law, social science, or related field with ten years of law enforcement experience with a sizeable uniformed work force. And a minimum of five years supervisory experience as a police commander of a sizeable uniformed workforce.

316.  JASKARAN, a retired NYPD Captain with 20 years of police experience, 10 of which were as a police commander in the NYPD, 35 medals, two Master's degrees and now a Juris Doctorate, and former Commander Officer of the NYPD's elite Grand Larceny Task Force, felt that he would be an ideal candidate for the position of Police Captain in the PAPD.

317.  PAPD Police Captains earn close to $200,000 on an annual basis.

318.  JASKARAN could not apply for the position because of the investigation still hanging over his head.

319.  Upon application to any law enforcement agency, including the PAPD, the agency, in carrying out its due diligence, will inquire as to whether the applicant was ever, under an

---

[10] Under Public Officers Law § 89(8), "[a]ny person who, with intent to prevent the public inspection of a record pursuant to this article, willfully conceals or destroys any such record shall be guilty of a violation," and under New York State Penal Law § 240.65 "[a] person is guilty of unlawful prevention of public access to records when, with intent to prevent the public inspection of a record pursuant to article six of the public officers law, he willfully conceals or destroys any such record."

investigation, was ever arrested, terminated from a job, rejected/disqualified from applying to a job, etc. This is similar to the review process for Character and Fitness.

320.   On August 22, 2018, Plaintiff JASKARAN called Defendant PEPE-SOUVENIR to inquire as to when the CUNY 5 may be able to obtain the disposition letter for the investigation.

321.   JASKARAN explained to Defendant PEPE-SOUVENIR that he wanted to apply for the position of PAPD Police Captain but could not do so because she had not finalized her investigation. And that he would be required to inform the PAPD that he is the subject of an investigation, even if it is a Title IX Retaliation investigation.

322.   Defendant PEPE-SOUVENIR then informed JASKARAN that he did not need to disclose the Title IX Retaliation investigation because agencies are only concerned with criminal and civil type matters, not something like the investigation that was still opened against him. Plaintiff JASKARAN disagreed with her.

323.   The issue is that disclosure of the investigation is required and similar to the Character and Fitness review process, if an applicant fails to truthfully disclose a matter that should have been disclosed, its subsequent revelation could and has led to the employee being terminated, regardless of tenure.

324.   JASKARAN and the other members of the CUNY 5 were under a Title IX investigation for "witness tampering." It cannot be argued that the PAPD might have still hired him while he was under such an investigation.

325.   As a matter of municipal/organization liability, no law enforcement agency is going to hire a person for the position of police officer (PAPD Police Captains are police officers) who is currently being investigate for the crime of witness tampering.

326.   Had Plaintiff JASAKRAN applied to the PAPD, the police agency would have rejected him because he was under an investigation for "witness tampering."

327.    Once rejected by one police agency, that rejection follows an applicant for the rest of their life and must be disclosed to any subsequent police agencies applied to and the reason for rejection must be provided.

328.    Plaintiff JASKARAN was prevented from applying to the PAPD for the position of police captain, because of the still ongoing frivolous investigation against him and the other members of the CUNY 5.

329.    Had JASKARAN applied to the PAPD for the position of police captain when the opportunity availed itself, he would have been rejected because of CUNY's investigation against him and even after being cleared of any wrong doing, the PAPD rejection would have been something that he would be required to disclose to any future potential employer that would have inquired about job rejections, which nearly every police agency inquires of applicants.

330.    Defendant PEPE-SOUVENIR was aware of the hinderance to employment that the investigation created for the CUNY 5, and on more than one occasion, told the CUNY 5 and the three other students, that they did not need to report the Title IX investigation to their potential employers.

331.    Both Defendants HOWARD and PEPE-SOUVENIR informed the members of the CUNY 5 that they did not need to report CUNY's Title IX investigation against them to the Character and Fitness Committee.

332.    Plaintiff JASKARAN told the other members of the CUNY 5 that they should not believe Defendants HOWARD and PEPE-SOUVENIR and that they should disclose the investigation to Character and Fitness and fully explain what happened.

333. During the August 22, 2018 phone conversation, JASKARAN informed Defendant PEPE-SOUVENIR that contrary to what she had informed his attorney, Zorn has asserted in response to his (JASKARAN) FOIL request, that the Romano letter does not exist.

334. Defendant PEPE-SOUVENIR responded by stating that the letter does exist and that she has a copy of it.

335. In the August 22, 2018 phone conversation, Defendant PEPE-SOUVENIR also clarified that during her investigation, Sahagian never once made any allegation of retaliation under Title IX.

336. Defendant PEPE-SOUVENIR stated that the Title IX case involving the sexual assault of N.P., that CUNY asserted as the basis for the Title IX Retaliation investigation launched against the CUNY 5 in November 2017, had been closed since September of 2016, a full nine months prior to Sahagian's July 30, 2017 email that contained no allegations of retaliation within the scope of Title IX. Plaintiff N.P. received the disposition letter of that Title IX matter in October of 2016.

337. With the existence of the Romano letter now confirmed by Defendant PEPE-SOUVENIR, Plaintiff JASKARAN confronted CUNY with the inconsistency of Jean Zorn's response to his FOIL request.

338. Shortly thereafter, CUNY provided Plaintiff JASKARAN with a copy of the Romano letter.

339. The letter was dated July 31, 2017 and addressed to Defendant HOWARD and submitted "VIA EMAIL: howard@law.cuny.edu & U.S. MAIL."

340. Plaintiff JASKARAN had informed Zorn in writing that Defendant HOWARD would be in possession of the letter, yet Zorn states that the letter did not exist.

341. Upon information and belief, Jean Zorn and Defendant HOWARD have worked together at CUNY Law School for more than a decade.

342.    After Plaintiff JASKARAN brought to light Zorn's concealment of the Romano letter, she resigned from CUNY Law School a few days later.

343.    The Romano letter establishes that Defendant HOWARD was in possession of both Sahagian's July 30, 2017 email to the law school that did not contain any allegation against the CUNY 5 related to Title IX and the July 31, 2017 Romano letter that also did not contain any allegation against the CUNY 5 that was related to Title IX.

344.    During the entire month of August of 2017 and the entire month of September 2017, Defendant HOWARD did not take any action in regard to the Sahagian July 30, 2017 email or the Romano July 31, 2017 letter.

345.    However, after Plaintiff JASKARAN confronted Defendant HOWARD and Katz on September 5, 2017, in regard to their failures to adhere to Title IX and Enough is Enough, Plaintiff JASKARAN and the other members of the CUNY 5 were then placed under a frivolous Title IX Retaliation investigation that was allegedly based on Sahagian's July 30, 2017 email that contained no allegations within the scope of retaliation under Title IX, and the Title IX case that CUNY alleged was related to the non-existence retaliation claims, had been closed approximately nine months earlier.

346.    As the Bar Exam results neared, all members of the CUNY 5 became extremely anxious because Defendant PEPE-SOUVENIR had not finalized her investigation and had not provided them with a disposition letter, even though she had verbally explained to them that the allegations against them were meritless and they need not have any worries.

347.    Frustrated by CUNY's, now 449-day frivolous Title IX Retaliation investigation, Plaintiff N.P. threatened to bring a suit against CUNY and Plaintiff JASKARAN threatened to go to the media. Within days, the Dean of CUNY Law School, Bilek, provided the CUNY 5 with

their disposition letters which indicated that all of the allegations made against them by Sahagian were "unfounded."

348. In the sexual assault by Sahagian against Jane Doe 3, a bystander at the location came to her aid, and several of the Jane Doe 3's classmates witnessed some of the altercation.

349. Sahagian, as he had done before to the CUNY 5, when they reported his criminal acts to Defendant HOWARD, wrote the witnesses in the Jane Doe 3 sexual assault incident, a "Cease and Desist" email, once again accusing these witnesses of a series of false allegations.

350. Sahagian went so far as to accuse the witnesses in the Jane Doe 3 case, of sexually assaulting him and made a veiled threat in regard to them being able to graduate as a result of his allegations.

351. Sahagian subsequently pled guilty in court to the sexual assault of Jane Doe 3, but to a lesser charge, which resulted in the sealing of the matter.

352. Sahagian then commenced a defamation suit against Jane Doe 3 in Kings County Court, which was ultimately discontinued after his attorneys requested to be removed as his counsel.

353. The Title IX Retaliation investigation that the CUNY 5 were subjected to was frivolous.

354. Upon information and belief, the actual reason that CUNY Law School subjected the CUNY 5 and the three other law students to the frivolous Title IX Retaliation investigation was because, in addition to their failure to handle the sexual harassment complaints of Plaintiff R.L and Jane Doe 1, the law school was concealing crimes against female law students by willfully omitting reports of crimes against women in its Daily Crime Log.

355. Under the Jean Clery Act, CUNY Law School is required to document all crimes reported to the institution in law school's Daily Crime Log.

356. Then each year, the law school, as with other educational institutions receiving federal funding, is required to publish their crime statistics on the internet for everyone to see.

357.   Plaintiff R.L. reported Sahagian's stalking, which is a crime and his sexual harassment, to CUNY Law School, the law school (specifically Steve Katz) willfully failed to document R.L.'s report, as mandated, in the Daily Crime Log.

358.   When Jane Doe 1 reported Sahagian's stalking, which is a crime and his sexual harassment, to CUNY Law School, the law school (specifically Katz) willfully failed to document her report, as mandated, in the Daily Crime Log.

359.   On September 5, 2017, when JASKARAN protested the law school's failure to properly handled the sexual harassment complaints of R.L. and Jane Doe 1, this was nearly nine months after R.L.'s stalking and sexual harassment complaint to the law school and nearly five months after Jane Doe 1's stalking and sexual harassment complaint to the law school.

360.   The law school had not documented R.L.'s and Jane Doe 1's complaints in the law school's Daily Crime Log.

361.   In 2017, each such omission could result in a fine by the U.S. Department of Education of over $50,000 if discovered and would expose CUNY Law School's statistical manipulation of its crime figures, which parents and students rely on in selecting a college based on campus safety.

362.   On April 25, 2018, Plaintiff JASKARAN submitted a request to Katz to review the law school's Daily Crime Logs.

363.   While granting access to review the law schools Daily Crime Log,  Katz instructed his security staff to ensure that JASKARAN did not take any photographs of the pages of the log.

364.   The law school's security staff apologized to JASKARAN and informed him that they were instructed by Katz to not permit him (JASKARAN) to take any photographs of the pages of the logs.

365.   JASKARAN viewed the log and then wrote a letter to the law school wherein he protested the prohibition and provided multiple examples of other colleges, including CUNY senior colleges, that posted their Daily Crime Logs on the internet for the world to view, copy or print.

366.   After JASKARAN sent the letter, Katz contacted JASKARAN and asked him who told him that he could not take photographs of the pages of the log. JASKARAN after explaining that the entire staff had mandated he did not take pictures initially, was thereafter permitted to take photographs of the pages of the law school's Daily Crime Log.

367.   JASKARAN discovered that the law school had willfully omitted multiple reports of crimes against women.

368.   One example was a complaint from a Jane Doe 4, a professor at the law school, who had informed Katz that she was being repeatedly stalked by one of his security guards in the law school.

369.   Steve Katz and the law school failed to document Jane Doe 4's complaint in the Daily Crime Log, but later fired the security guard, allegedly based on an unrelated reason.

370.   Another example included an October 31, 2017 domestic violence incident in the law school, wherein a male student allegedly choked his girlfriend (also a law student). This specific crime (strangulation) was not documented in the Daily Crime Log.

371.   The law school also willfully omitted one of Sahagian's crimes against Jane Doe 3 in its Daily Crime Log and the stalking of a Jane Doe 5, a female law student, by her ex who allegedly had a history of mental illness and violence.

372.   In one incident that was photographed, this individual showed up at the law school and the police were called, who then had to surround him and place him into custody.

373.    In June of 2018, JASKARAN had a telephone conversation with Katz, where he confronted Katz about the willful omissions of crimes against women in the Daily Crime Log. Katz responded by blaming Defendant HOWARD.

374.    Katz claimed that the omissions of crimes against women at the law school were at Defendant HOWARD's command.

375.    Katz attempted to explain to JASKARAN that JASKARAN should understand that he (Katz) was essentially just following orders and while JASKARAN had the luxury of being able to speak up because he's no longer a police officer, he (Katz) does not have that luxury because he needs his job.

376.    CUNY attempted to silence the CUNY 5 in an effort to conceal their willful omission of crimes against women, and their failure to handle the sexual harassment complaints made by R.L and Jane Doe 1, by subjecting the law students to a frivolous Title IX Retaliation investigation in the hopes that the students would remain silent and just graduate.

377.    On October 12, 2018 Defendant PEPE-SOUVENIR concedes that Sahagian never filed a Title IX Retaliation complaint, yet the CUNY 5 were investigated for 449 days.

378.    CUNY has never provided the CUNY 5 with details of Defendant PEPE-SOUVENIR's final report.

379.    JASKARAN submitted numerous FOIL requests (as PEPE-SOUVENIR had directed) for a copy of the final report, even including FERPA waivers from the other students that were respondents in the frivolous investigation, but CUNY denied access.

380.    In October of 2019, after submitting a request under FERPA to view the final report, JASKARAN was permitted to read certain parts of Defendant PEPE-SOUVENIR's final report, but not the entire report. The portions that he was permitted to read have been mentioned herein.

381.    In this final report, Defendant PEPE-SOUVENIR concedes that Sahagian never filed a Title IX Retaliation complaint against the CUNY 5.

382.    Defendant PEPE-SOUVENIR admits that they in fact only spoke with Sahagian once during this investigation in April of 2018, nine (9) months after his cease and desist email.

383.    Further, despite conducting a 449 day investigation into the CUNY 5, Defendant PEPE-SOUVENIR concedes in her final report that Title IX Retaliation investigation should not have occurred because Sahagian never engaged in a "protected activity" and that even if Sahagian did try to allege discrimination stemming from any Title IX complaint, he could not use Plaintiff N.P.'s Title IX complaint against Cho because that investigation concluded in September 2016 (9 months before Sahagian's email).

384.    It was the Defendants that used Plaintiff N.P.'s Title IX complaint against Cho as the basis for the frivolous Title IX Retaliation investigation against the CUNY 5.

385.    Defendant PEPE-SOUVENIR admits on August 22, 2018 that none of the allegations Sahagian put forth were by any means actionable, as none of the allegations could be considered by any rational trier of fact to be harassing or intimidating, nor were any of the allegations on point for Title IX retaliation or witness tampering under the penal law.

386.    Defendant PEPE-SOUVENIR states that CUNY should have read Sahagian's email more carefully and simply referred his false accusations to local law enforcement.

387.    The investigation continues for another 100 days following despite Defendant PEPE-SOUVENIR's admission.

388.    In Defendant PEPE-SOUVENIR's final report, the CUNY 5 first learn what the allegations made against them actually were as stated by Sahagian. The accusations are as follows:

      a.    Plaintiff N.P.: [N.P.] studies on the fourth floor, but sometimes, she comes up to the fifth floor where I am and walks by in the hallway or uses the stairwell. I feel like she is watching me, wanting me to know that she is there. I always see her using a cubicle on the fifth floor. Her presence makes me physically

                sick and I feel like I want to throw up. [N.P.] and I were paired as partners in our trial advocacy class and one day, she spoke to our professor after class.

    b.    Plaintiff R.L.: [R.L.] and I were intimate. I had asked her to marry me and she did not want to. She then got close to JASKARAN. R.L. and I had a fight because I told her that I did not believe that N.P. was sexually assaulted and R.L. told me that it wasn't my business and that I should stay out of it. R.L. won't have sex with me. R.L. purchased mace.

    c.    Plaintiff JASKARAN: - JASKARAN used to be a cop. He's like a bad cop. I heard a rumor that he told [R.L.] that he was going to get her mace. He also told someone that I am welcome to sleep in a dumpster.

    d.    Plaintiff ARETE- Arete and I were such good friends, he told me intimate details of his life. Like that he has no testicles. ARETE once told me to stop referring to women as sluts and bitches. He threatened to report my behavior against women to Dean Howard. He told me that [R.L.] did not owe me sexual favors because I bought her lunch.

    e.    Plaintiff TOLEDO- TOLEDO told a woman in our school that he would not let his daughter near me.

    f.    They're all in a conspiracy against me, they have a Prosecutors Club.

389.    Defendant PEPE-SOUVENIR further states in her report that Sahagian admits that none of the CUNY 5 nor the other students being investigated ever told him not to testify in the Cho criminal matter and that CUNY interviewed Sahagian as part of the Cho Title IX investigation and stated that he (Sahagian) had no substantive knowledge of the sexual assault on Plaintiff N.P..

390.    Despite CUNY policy stating that the CUNY 5 were entitled to notice of the claims against them and a copy of the complaints against them, and numerous complaints from all CUNY 5, CUNY never provided this information.

391.    Plaintiffs N.P., ARETE, R.L., and TOLEDO, as a result of the investigation hanging over their head and concern over the Character and Fitness review, fail the New York State Bar Examination.

392.   The pending investigation acted as a distraction and caused severe emotional distress, preventing Plaintiffs from being able to properly prepare for the Bar Examination.

393.   Many of the CUNY 5 were seeking employment in City and State agencies, which would call for a more extensive background check.

394.   The career path and earnings of the CUNY 5 has been and is marred, delayed or otherwise thwarted by CUNY and CUNY Law School's baseless investigation against them, causing them economic loss throughout the trajectory of their careers.

395.   Throughout the course of the investigation, the CUNY 5 sent various emails, as well as spoke to various CUNY officials, namely CUNY Title IX Director Defendant PEPE-SOUVENIR, Associate Dean of Students Defendant HOWARD, Dean of CUNY Law Mary Lu Bilek, Public Safety Director Steve Katz, CUNY Law Title IX Coordinator Raquel Gabriel, Chair of Disciplinary Conduct and Sexual Harassment Chair Beryl Blaustone, University Associate Director of Student Conduct Yvette Santana-Prado, Associate General Counsel Daniel Simonette, asking for reasons as to the investigation and to answer questions related to why they were under investigation. However, despite these numerous questions posed in writing to all of the above named, the CUNY 5 would receive no response.

396.   The investigation against Plaintiffs constituted an adverse action against them which was a result of their filing of lawful complaints of sex discrimination and resulted in substantial emotional distress which the CUNY 5 were forced to seek medical treatment to try to counteract.

397.   The complainants and those assisting with these complaints of sexual harassment (i.e. the CUNY 5), was at all times a protected activity.

398.   CUNY Law School breached numerous internal CUNY Law School policies which the CUNY 5 relied on upon entering CUNY Law School.

399.   Defendant PEPE-SOUVENIR's own admission that CUNY Law School lacked jurisdiction over the Title IX Retaliation investigation is chief among them.

400.   Plaintiff N.P. , a sexual assault survivor, was subjected to the investigation based on the false accusation of her assailants' witness.

401.   Plaintiff N.P.  was denied the right to a fair and impartial adjudication and resolution of her Title IX complaint against Cho, as required by the policy.

402.   Upon information and belief, N.P.'s Family Educational Rights and Privacy Act (FERPA) privacy rights and rights to privacy under the Rape Shield Act were violated when CUNY gave Michael Romano information regarding N.P.  to aid in the defense of Cho.

403.   Plaintiff R.L., a victim of Sahagian, was subjected to an investigation based on the false accusation of her harasser.

404.   Plaintiff JASKARAN, a former Captain in the New York City Police Department and confidant of Plaintiffs N.P. and R.L.,  was subjected to an investigation of their abuser after he tried to report Sahagian's wrongdoing and protested the law school's failure to adhere to the mandates of Title IX.

405.   CUNY conducted a 449-day investigation into Plaintiffs which conflicts with their policy directly.

406.   More specifically CUNY's policy states that they cannot conduct criminal investigations, unless the criminal conduct being investigated constitutes a "violent felony offense", as defined in the New York State Penal Law.

407.   Under New York Penal Law, the sexual assault of Jane Doe 3 by Sahagian would fall within this scope, yet after becoming aware of the assault, CUNY chose not to investigate Sahagian for more than two months, until JASKARAN protested in April of 2018.

408. CUNY, rather than informing the Westchester District Attorney's Office who was prosecuting the criminal case against Cho, or even the Yonkers Police Department who effectuated Cho's arrest, chose to handle the matter internally and against CUNY policy.

409. CUNY's failure to notify the police and district attorney's office suggests that the investigation into the CUNY 5 was undertaken as a form of retaliation against the CUNY 5 for their lawfully protected complaints of sex discrimination.

410. The Plaintiff's herein and the three (3) other students investigated, were either victims of sexual assault or sexual harassment or assisted reporting said unlawful acts and as a result, their allegations were never investigated and instead were retaliated against for protesting CUNY's failure to handle said complaints by being subjected to a frivolous Title IX investigation.

411. The CUNY 5 complained of the sexual misconduct of Sahagian, a matter over which CUNY Law School had jurisdiction and discretion to investigate, yet CUNY Law School chose not to pursue said investigation which resulted in multiple other students being victimized by Sahagian.

412. Rather, upon information and belief, Defendant HOWARD, swept the complaints under the rug so as to not have to report the sexual assault on the mandatory statistics CUNY Law School needs to report to Federal officials at the end of each school year.

413. This was a direct breach of CUNY and CUNY Law School policy as well as a violation of Title IX.

414. Meanwhile, and in retaliation for said complaints, CUNY Law School pursued an investigation into the CUNY 5 for "witness tampering" a claim they had no jurisdiction over which Defendant HOWARD stated on multiple occasions that she knew to be false.

415. CUNY Law School's failure to adhere to its own policies include, but are not limited to, CUNY Law School's failure to investigate Sahagian for his repeated sexual harassment,

harassment, stalking, and sexual assault and failed to protect the Plaintiffs from retaliation for their lawfully protected complaints, prompt investigations, violating their internal policies to protect harassment of students, failure in their due diligence in admitting Sahagian, failure to follow Title IX, the Dear Colleague Letter, and the other Office of Civil Rights regulations as well as standards set forth in New York's Enough is Enough law.

416.  Instead CUNY's 449 day investigation extended beyond the Plaintiffs' herein graduation and sitting for the New York State Bar Examination.

417.  CUNY Law School breached even the most expansive Office of Civil Rights 60-day rule and CUNY's promise to keep investigations prompt as stated on page 22 of their Police Handbook.

418.  CUNY Law School further breached their own investigatory protocols as promised to CUNY 5.

419.  The investigation of the CUNY 5 was handed over to Defendant PEPE-SOUVENIR, an administrator helping to run the entire University's Title IX complex.

420.  The investigation into the CUNY 5 was unlawful and retaliatory.

421.  Defendant PEPE-SOUVENIR's willful and/or negligent failure to appoint adequate staff to conduct the investigation in a prompt manner is in violation of CUNY's internal policies.

422.  The CUNY 5 each suffered severe emotional distress as a result of the actions of the Defendants which required psychological therapy.

423.  Plaintiff JASKARAN exacerbated and otherwise had a reoccurrence of Post-Traumatic Stress Disorder which originated during his time as a police officer at the World Trade Center during the terrorists attacks on September 11, 2001.

424.  Plaintiff N.P. exacerbated and otherwise had a reoccurrence of Anxiety Disorder, stemming from her sexual assault by Cho.

425.   The CUNY 5 would throughout their ordeal, be afraid for their physical safety and would experience more harassment as a result of defendants' actions.

426.   CUNY Law School also acted contrary to Federal Office of Civil Rights Regulations including the Dear Colleague Letter and New York State's Enough is Enough law.

427.   CUNY Law School failed to provide the CUNY 5 with a meaningful opportunity to be heard and did not allow them to review the documents and tangible evidence despite Plaintiff JASKARAN's attempt to exercise his right to request that student conduct charges be filed against Sahagian pursuant to Education Law §6444 et. seq. and CUNY Policies.

428.   Instead CUNY improperly used a two-step process that separates the investigation from a hearing process thus sidestepping its duty to allow the CUNY 5 to participate in a process that was "thorough and impartial" and failed to provide adequate notice and a meaningful opportunity to be heard in violation of New York CLS Educ. §6443-44.

429.   All CUNY 5 engaged in protected activity when they filed or help to file complaints of sex discrimination.

430.   The CUNY 5 filed both formal and informal complaints of sex discrimination, either of which is covered within the scope of CUNY Law School policies on sex discrimination at Title IX.

431.   The CUNY 5 was retaliated against by the Defendants herein for making that complaint through the conduction of a sham investigation in an effort to hide the Defendants refusal to investigate legally protected claims.

432.   CUNY Law School and the Defendants herein, chose to ignore the valid complaints made by the CUNY 5, and the other three law students, all of whom were minority students, asserting sex discrimination against the White student, Sahagian, yet chose to investigate the CUNY 5, and three other law students, all of whom are minority students.

433.    Due to the disparate application of CUNY policies, in that the Defendants ignored the complaints of the minority students and the Plaintiffs herein against the White Sahagian and instead undertaking a retaliatory investigation into the minority students and Plaintiffs, it can be inferred that race was a factor in CUNY's decision to subject the CUNY 5 to the frivolous Title IX Retaliation investigation.

<u>**COUNT I**</u>
**SEX DISCRIMINATION IN VIOLATION OF TITLE IX AGAINST ALL DEFENDANTS**

434.    Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

435.    Defendants operate programs in receipt of federal funds and are thus covered by Title IX's prohibition on sexual discrimination.

436.    Plaintiffs were victims of repeated assault harassment because of their gender.

437.    Defendants possessed actual knowledge of the numerous acts of sexual assault and harassment directed towards Plaintiffs while they were on school property.

438.    At all relevant times, Defendants exercised substantial control over the sexual harassers and assailants who, at all relevant times, were students enrolled at CUNY.

439.    The harassment and assaults suffered by Plaintiff were so severe, pervasive, and objectively offensive that they effectively denied Plaintiffs equal access to educational opportunities or benefits.

440.    Defendants acted with deliberate indifference to the acts of harassment by failing to take any action to prevent them, to deter the students responsible, or to protect Plaintiffs from sexual harassment while they were involved in school programs and activities.

441.    Defendants failed to conduct investigations into allegations of gender-based violence and failed to prepare written reports as to whether the complaints were substantiated in each instance.

442.   Defendants failed to provide interim or permanent measures to ensure that Plaintiffs could continue to enjoy access to educational opportunities and benefits.

443.   These failures arose from Defendants' systemic failure to provide sufficient training to educators and administrators at their schools regarding their obligations under Title IX, including how to identify and address sexual harassment among students and how to respond to a peer report of harassment or assault.

444.   Defendants failed to adequately staff the Title IX Coordinator position.

445.   Defendants failed to promulgate and/or implement a policy that affirmatively provides notice of its Title IX obligations and responsibilities to educators and administrators at their schools. Defendants have also failed to provide notice to students and parents about how to report a Title IX violation when there is an allegation of gender-based violence.

446.   As a result of Defendants acts of omissions, Plaintiffs continued to experience harassment and assault.

447.   By virtue of the above, Defendants acted intentionally and with deliberate indifference to the systemic denial of Plaintiffs' access to educational opportunity or benefit. Defendants' violation of their duty to Plaintiffs arises from Defendants' systemic failure to properly implement Title IX.

448.   The acts, conduct, and behavior of Defendants caused Plaintiffs to suffer actual damages including, but not limited to, medical expenses associated with mental health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, and other economic or non-economic damages.

## COUNT II
## RETALIATION IN VIOLATION OF TITLE IX AGAINST ALL DEFENDANTS

449.   Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

450.   Plaintiffs, the CUNY 5,  engaged in protected activity by making complaints to their schools' personnel about the sexual harassment that they themselves or friends experienced.

451.   Defendants were aware that the CUNY 5 engaged in protected activity.

452.   Plaintiffs, the CUNY 5, suffered adverse educational action when they were subjected to a hostile school environment, forced to obtain outside counsel, forced to drop classes, were subjected to ridicule from other students, were the focus of a sham investigation that lasted through two of the three years they were in school and continued after they graduated adversely affecting their ability to study for the New York State Bar Examination.

453.   There was a causal connection between Plaintiffs complaints of sex discrimination and sexual harassment complaints and Defendants' choice to impose adverse educational action upon them.

454.   By virtue of the above, Defendants retaliated against the CUNY 5 in violation of Title IX.

455.   Plaintiffs suffered the adverse actions associated with the deliberate and willful indifference of CUNY when reporting their numerous complaints of sexual harassment and witness tampering, which subjected Plaintiffs to further harassment and intimidation, as well as put their physical safety in jeopardy.

456.   The acts, conduct, and behavior of Defendants caused Plaintiffs to suffer actual damages including, but not limited to, medical expenses associated with mental health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, and other economic or non-economic damages.

**COUNT III**

**42 U.S.C. SECTION 1983 AGAINST ALL DEFENDANTS**

457.   Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

458.   Plaintiffs allege  that defendants' CITY UNIVERSITY OF NEW YORK, CHERYL HOWARD  and RODNEY PEPE-SOUVENIR engaged in various retaliatory actions against the CUNY 5 acting individually and in their official capacities as public officials of defendant THE CITY UNIVERSITY SCHOOL OF NEW YORK for complaints of gender and sex discrimination.

459.   Plaintiffs allege that Defendants CITY UNIVERSITY OF NEW YORK, CHERYL HOWARD  and RODNEY PEPE-SOUVENIR acted to deprive the CUNY 5 of their civil rights, by repeated and insidious acts of harassment, sham investigations, intimidation, bad faith and threats.

460.   Plaintiffs allege that Defendants CITY UNIVERSITY OF NEW YORK, CHERYL HOWARD  and RODNEY PEPE-SOUVENIR caused the Plaintiffs herein to lose compensation, loss of job opportunities, suffer emotional distress.

## COUNT IV
## MONELL CLAIM
## 42 U.S.C. SECTION 1983 AGAINST ALL DEFENDANTS

461.   Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

462.   Plaintiffs allege defendant THE CITY UNIVERSITY OF NEW YORK through its agents CHERYL HOWARD  and RODNEY PEPE-SOUVENIR caused them injuries.

463.   Plaintiff allege defendant THE CITY OF NEW YORK actions of implementing 'official and un-official' policies of gender discrimination and retaliation through its agents were under color of law.

464.   Plaintiff alleges defendant THE CITY UNIVERSITY OF NEW YORK through its agents caused the Plaintiffs to sustain damages.

## COUNT V
## VIOLATION OF 42 U.S.C. §1981(a) AGAINST ALL DEFENDANTS

465.   Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

466.   Defendants have violated Section 1981 by subjecting Plaintiff to retaliation for their protected complaints and opposition and complaints of sex discrimination and retaliation.

467.   Defendants chose to ignore the complaints of the Plaintiffs made against a White student.

468.   In retaliation for these Complaints, the Defendants conducted an investigation into the Plaintiff's herein due to their race and ethnicity, by, inter alia, by harassing and trying to intimidate them through this shame investigation.

469.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiffs have suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

470.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiffs have suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

471.   Defendants' unlawful retaliatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Plaintiffs, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiffs to an award of punitive damages.

## COUNT VI
## RETALIATION IN VIOLATION OFNEW YORK STATE
## EXECUTIVE LAW § 296 AGAINST ALL DEFENDANTS

472.   Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

473.   Plaintiff alleges that New York State Executive Law §296, makes it unlawful to discriminate on the basis of gender.

474.   Plaintiffs were victims of repeated assault harassment because of their gender.

475.   Defendants possessed actual knowledge of the numerous acts of sexual assault and harassment directed towards Plaintiffs while they were on school property.

476.   At all relevant times, Defendants exercised substantial control over the sexual harassers and assailants who, at all relevant times, were students enrolled at CUNY.

477.   The harassment and assaults suffered by Plaintiffs were so severe, pervasive, and objectively offensive that they effectively denied Plaintiffs equal access to educational opportunities or benefits.

478.   Defendants acted with deliberate indifference to the acts of harassment by failing to take any action to prevent them, to deter the students responsible, or to protect Plaintiffs from sexual harassment while they were involved in school programs and activities.

479.   Defendants failed to conduct investigations into allegations of gender-based violence and failed to prepare written reports as to whether the complaints were substantiated in each instance.

480.   Defendants failed to provide interim or permanent measures to ensure that Plaintiffs could continue to enjoy access to educational opportunities and benefits.

481.   These failures arose from Defendants' systemic failure to provide sufficient training to educators and administrators at their schools regarding their obligations under New York

State Executive law §296, including how to identify and address sexual harassment among students and how to respond to a peer report of harassment or assault.

482.   As a result of Defendants acts of omissions, Plaintiffs continued to experience harassment and assault.

483.   By virtue of the above, Defendants acted intentionally and with deliberate indifference to the systemic denial of Plaintiffs' access to educational opportunity or benefit. Defendants' violation of their duty to Plaintiffs arises from Defendants' systemic failure to properly implement anti-discrimination laws.

484.   The acts, conduct, and behavior of Defendants caused Plaintiffs to suffer actual damages including, but not limited to, medical expenses associated with mental health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, and other economic or non-economic damages.

## COUNT VII
## RETALIATION IN VIOLATION OF NEW YORK STATE
## EXECUTIVE LAW § 296 AGAINST ALL DEFENDANTS

485.   Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

486.   Plaintiff alleges that New York State Executive Law § 296, makes it unlawful to retaliate against any individual in the terms, conditions, or privileges of employment because of their complaints of gender discrimination .

487.   Plaintiffs suffered adverse school actions as a result of their complaints of gender discrimination in that they were subjected to a hostile school environment, forced to obtain outside counsel, forced to drop classes, were subjected to ridicule from other students, were the focus of a sham investigation that lasted through two of the three years they were in

school and continued after they graduated adversely affecting their ability to study for the New York State Bar Examination.

488.   Plaintiff alleges defendants' CUNY, CHERYL HOWARD, Individually and RODNEY PEPE-SOUVENIR engaged in various discriminatory actions against them in retaliation for their complaints of gender discrimination.

489.   Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of defendants' CUNY, CHERYL HOWARD, Individually and RODNEY PEPE-SOUVENIR, Plaintiffs incurred significant legal costs, emotional distress, and damage to their personal and professional reputation.

## COUNT VIII
## GENDER DISCRIMINATION IN VIOLATION OF NEW YORK STATE EXECUTIVE LAW § 296 AGAINST ALL DEFENDANTS

490.   Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

491.   Plaintiff alleges that New York State Executive Law § 296, makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment because of their gender.

492.   Plaintiffs suffered adverse school actions as a result of their gender in that they were subjected to a hostile school environment, forced to obtain outside counsel, forced to drop classes, were subjected to ridicule from other students, were the focus of a sham investigation that lasted through two of the three years they were in school and continued after they graduated adversely affecting their ability to study for the New York State Bar Examination.

493.    Plaintiff alleges defendants' defendants' CUNY, CHERYL HOWARD, Individually and RODNEY PEPE-SOUVENIR engaged in various discriminatory actions against them based as a result of her gender which equates to gender discrimination.

494.    Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of defendants' CUNY, CHERYL HOWARD, Individually and RODNEY PEPE-SOUVENIR, Plaintiffs incurred significant legal costs, emotional distress, and damage to her personal and professional reputation.

### COUNT IX
### RETALIATION IN VIOLATION OF NEW YORK CITY
### ADMINISTRATIVE CODE § 8-107 AGAINST ALL DEFENDANTS

495.    Plaintiffs incorporate and reiterate each and every paragraph above as though fully set forth herein.

496.    Defendants constitute a "public accommodation" within the meaning of the New York City Human Rights Law ("NYCHRL"), as they provide services to the public.

497.    Defendants have failed to take reasonable steps to provide appropriate notice and training on, investigation of, and response related to retaliation against students who make legally protected complaints of Sex Discrimination.

498.    Defendants have failed to take appropriate measures to safeguard the health and well-being of Plaintiffs in school.

499.    Defendants have retaliated against plaintiffs on the basis of their sex discrimination complaints by denying Plaintiffs the full and equal enjoyment, on equal terms and conditions, of the accommodations, advantages, services, facilities or privileges of the CUNY school system.

500.    Plaintiffs, the CUNY 5, suffered adverse educational action when they were subjected to a hostile school environment, forced to obtain outside counsel, forced to drop classes, were subjected to ridicule from other students, were the focus of a sham investigation that lasted

through two of the three years they were in school and continued after they graduated adversely affecting their ability to study for the New York State Bar Examination.

501.    The acts, conduct, and behavior of Defendants caused Plaintiffs to suffer actual damages including, but not limited to, medical expenses associated with mental health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, and other economic or non-economic damages.

## JURY TRIAL

502.    Plaintiff demands a trial by jury of all issues in this action that are so triable.

## PRAYER FOR RELIEF

Wherefore, PLAINTIFFS'   N.P. , JACK JASKARAN, AVERY TOLEDO, PETER ARETE, and R. L. demands compensatory and punitive damages from defendants' CUNY, CHERYL HOWARD, Individually and RODNEY PEPE-SOUVENIR, Individually and  jointly and severally, in an amount to be determined at trial, plus any and all available statutory remedies, both legal and equitable, including but not limited to compensatory damages, emotional distress damages, punitive damages, attorney's fees and interests and costs.

 Dated: July 8, 2020,

        New York, NY

                                Respectfully submitted,

                                By:____/s/_____
                                        John Scola

                                Law Office of John A. Scola, PLLC
                                Attorneys for Plaintiff
                                30 Broad Street Suite 1424
                                New York, New York 10004
                                (917) 423-1445
                                jscola@johnscolalaw.com