UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

N.P., JACK JASKARAN, AVERY TOLEDO,
PETER ARETE, R.L.,

                    Plaintiffs,

     vs.

THE CITY UNIVERSITY OF NEW YORK, CHERYL
HOWARD, Individually, and RODNEY PEPE-
SOUVENIR, Individually,

                    Defendants.

Case No. 1:20-cv-03059-NGG-CLP

## MEMORANDUM OF LAW IN SUPPORT OF CUNY'S MOTION TO DISMISS

**WARD GREENBERG HELLER & REIDY LLP**
1800 Bausch & Lomb Place
Rochester, New York 14604
(585) 454-0700

*Attorneys for defendant The City University
of New York*

Date Served: July 6, 2021

TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..................................................................................................iii

**PRELIMINARY STATEMENT** ..........................................................................................1

**STATEMENT OF THE CASE** ............................................................................................1

**STATEMENT OF ALLEGED FACTS** ...............................................................................4

   Plaintiff N.P.'s Fall 2016 Report Regarding Daniel Cho ....................................................5

   Plaintiff R.L.'s Report Regarding Jamie Sahagian ............................................................5

   Jane Doe 1's April 2017 Report Regarding Sahagian ........................................................6

   Jaskaran's Report Regarding Sahagian's Treatment
     of Non-Party Jane Doe 2..............................................................................................7

   Plaintiff N.P.'s Report of "Witness Tampering" by Sahagian ..........................................8

   Sahagian's July 30, 2017 "Cease and Desist" Letter.......................................................10

   Plaintiff Jaskaran's Alleged Safety Concerns...................................................................11

   CUNY's Investigation into Complaints about the "CUNY 5" ........................................12

   Fantasy and Fact Regarding N.P. and Arete's Spring 2018
     Meeting with Dean Howard..........................................................................................13

   Sahagian's Suspension and Plaintiffs' Graduation...........................................................14

**PROCEDURAL HISTORY** ................................................................................................15

**ARGUMENT** .......................................................................................................................15

POINT I .....................................................................................................................................15

    SOVEREIGN IMMUNITY BARS MOST OF THE CLAIMS AGAINST CUNY ...................................15

POINT II ....................................................................................................................................17

    THE CLAIMS BARRED BY SOVEREIGN IMMUNITY FAIL
     FOR ADDITIONAL REASONS ...............................................................................................17

POINT III .................................................................................................................19

  PLAINTIFFS FAIL TO STATE A CLAIM FOR TITLE IX DELIBERATE INDIFFERENCE ...................19

  A. Conduct Toward the Group Does Not Support a
     Deliberate Indifference Finding .........................................................................21

     1. Sahagian's "Cease-and-Desist" Letter is Not
        Gender-Based Conduct ................................................................................21

     2. Sahagian's "Cease-and-Desist" Letter is Not
        Severe and Pervasive Conduct .....................................................................22

     3. Sahagian's "Cease-and-Desist" Letter Did Not
        Cause Educational Deprivation ....................................................................23

  B. The Three Male Plaintiffs Do Not Individually
     State Viable Title IX Claims .............................................................................24

  C. R.L. Does Not Individually State a Claim ...........................................................24

  D. N.P. Also Does Not Individually State a Title IX Claim .......................................25

POINT IV ..................................................................................................................26

  PLAINTIFFS ALSO FAIL TO STATE A CLAIM FOR TITLE IX RETALIATION ..............................26

  **CONCLUSION** ....................................................................................................28

**TABLE OF AUTHORITIES**

**CASES**                                                                                                          **PAGE**

*AA v. Hammondsport Cent. Sch. Dist.*, 2021 U.S. Dist. LEXIS 52999
(W.D.N.Y. Mar. 22, 2021) ........................................................................................22, 23

*Allen v. St. Cabrini Nursing Home, Inc.*, 198 F. Supp. 2d 442
(S.D.N.Y. 2002) ........................................................................................................26, 27

*APWU v. Potter*, 343 F.3d 619 (2d Cir. 2003) ............................................................15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................20, 24

*Blamah v. New York*, 2020 U.S. Dist. LEXIS 62319
(S.D.N.Y. April 8, 2020) ................................................................................................16

*Bryan v. City Univ. of N.Y.*, 2020 U.S. Dist. LEXIS 51180
(S.D.N.Y. Mar. 23, 2020) ..............................................................................................16

*Carabello v. New York City Dep't of Educ.*, 928 F. Supp. 2d 627
(E.D.N.Y. Feb. 19, 2013) ..........................................................................................24, 25

*Carpenter v. City of Mt. Vernon*, 2018 U.S. Dist. LEXIS 176195
(S.D.N.Y. Oct. 11, 2018) ................................................................................................26

*Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363 (S.D.N.Y. 2013) ..............8

*Chichester v. N.Y. State Dep't of Educ.*, 2017 U.S. Dist. LEXIS 93248
(E.D.N.Y. June 15, 2017) ...............................................................................................16

*Clissuras v. City Univ. of N.Y.*, 359 F.3d 79 (2d Cir. 2004) ........................................16

*Collins v. City of New York*, 156 F. Supp. 3d 448 (S.D.N.Y. 2016) ..............................8

*Comcast Corp. v. Nat'l Association of African American-Owned Media*,
140 S. Ct. 1009 (2020) ...................................................................................................18

*Condit v. Dunne*, 317 F. Supp. 2d 344 (S.D.N.Y. 2004) ...............................................8

*Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999) .....................20, 23

*D.S. v. Rochester City Sch. Dist.*, 2020 U.S. Dist. LEXIS 223647
(W.D.N.Y. Nov. 30, 2020) .......................................................................................21, 23

iii

*Feibleman v. Trs. of Columbia Univ.*, 2020 U.S. Dist. LEXIS 31499
(S.D.N.Y. Feb. 24, 2020) ...................................................................................8, 21, 23, 24, 25

*Garcia v. Clovis Unified Sch. Dist.*, 2009 U.S. Dist. LEXIS 83352
(E.D. Cal. Sep. 14, 2009) .................................................................................24

*Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684 (2d Cir. 1998) ...............................17

*HB v. Monroe Woodbury Cent. Sch. Dist.*, 2021 U.S. Dist. LEXIS 141252
(S.D.N.Y. Sep. 27, 2012) .................................................................................26

*Hoffman v. City Coll.*, 2021 US. Dist. LEXIS 62594
(S.D.N.Y. Mar. 30, 2021) ................................................................................17

*Hollander v. American Cyanamid Co.*, 895 F.2d 80 (2d Cir. 1990) ..........................27

*Jordan v. City of New York*, 2017 U.S. Dist. LEXIS 112625
(S.D.N.Y. July 17, 2017) .................................................................................18

*Kajoshaj v. City of New York*, 2013 U.S. Dist. LEXIS 9138
(E.D.N.Y. Jan. 23, 2013) .................................................................................19

*Makarova v. U.S.*, 201 F.3d 110 (2d Cir. 2000) .....................................................15

*Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431
(S.D.N.Y. 2015) ..............................................................................................19

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1977) .............................................18

*Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345
(S.D.N.Y. Mar. 24, 2017) .......................................................................18, 22, 26

*Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81
(2d Cir. 2011) .................................................................................................26

*Patterson v. Cnty. of Oneida*, 375 F.3d 206 (2d Cir. 2004) ....................................18

*Perry v. NYSARC, Inc.*, 424 Fed. App'x 24 (2d Cir. 2011) .....................................27

*Powell v. Merrick Acad. Charter Sch.*, 2018 U.S. Dist. LEXIS 32810
(E.D.N.Y. Feb. 28, 2018) .................................................................................20

*Ripa v. Stony Brook Univ.*, 808 Fed. Appx. 50 (2d Cir. June 9, 2020) .....................16

*R.S. v. Bd. of Educ.*, 371 Fed. Appx. 231 (2d Cir. 2010) ...................................24, 25

*Snider v. Dylag*, 188 F.3d 51 (2d Cir. 1999) ........................................................18

*Stinson v. City Univ. of N.Y.*, 2019 U.S. Dist. LEXIS 121517
(S.D.N.Y. July 19, 2019) ........................................................................................17

*Transitional Servs. of N.Y. for Long Island, Inc. v. N.Y. State Ofc. of Mental Health*,
91 F. Supp. 3d 438 (E.D.N.Y. Mar. 20, 2015) ...............................................18

*Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429 (S.D.N.Y. 2014) ................................25

*Vega v. State Univ. of N.Y. Bd. of Trustees*, 67 F. Supp. 2d 324
(S.D.N.Y. Sept. 28, 1999) ....................................................................................17

*VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372
(S.D.N.Y. 2014) ...................................................................................................20

*Walker v. N.Y. City. Dep't of Corr.*, 2008 U.S. Dist. LEXIS 97109
(S.D.N.Y. Nov. 18, 2008) ....................................................................................17

*Wang v. Office of Prof'l Med. Conduct*, 354 Fed. Appx. 459
(2d Cir. 2009)........................................................................................................16

*Weiss v. City Univ. of N.Y.*, 2019 U.S. Dist. LEXIS 43869
(S.D.N.Y. Mar. 18, 2019) ...............................................................................16, 17

*Welcome v. N.Y. City Dep't of Educ.*, 2018 U.S. Dist. LEXIS 190716
(E.D.N.Y. Nov. 5, 2018) .......................................................................................20

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)..............................................16

## PRELIMINARY STATEMENT

Defendant The City University of New York ("CUNY" or "the University") submits this Memorandum of Law in support of its motion, pursuant to Rules 12(b)(1) and 12(b)(6), seeking dismissal of plaintiffs' Amended Complaint ("AC"). In an effort to eliminate redundancy, the separate submissions of co-defendants Cheryl Howard ("Dean Howard") and Rodney Pepe-Souvenir ("Ms. Pepe-Souvenir") will incorporate portions of CUNY's arguments where applicable and set forth additional grounds for dismissal applicable to them as individuals. For the reasons that follow, defendants' motions should be granted and the AC dismissed.

## STATEMENT OF THE CASE

Despite plaintiffs' prior request to amend, purportedly to address defendants' objections that the original Complaint violated Rule 8's "short and plain" requirement (*see* Dkt. 19, 23-27), the instant 81-page, 522-paragraph AC (Dkt. 28) actually *expands* the allegations, but does nothing to cure the pleading deficiencies identified by defendants in their pre-motion letters. Plaintiffs' inordinately lengthy AC, being anything but short or plain, instead seems designed to evade meaningful pre-Answer review. But plaintiffs' prolixity is ineffective and self-defeating.

As a threshold matter, the bulk of plaintiffs' claims against the University are barred by Eleventh Amendment sovereign immunity because, as the Second Circuit has held, CUNY is an "arm of the State" of New York, and Congress has not abrogated (nor has New York waived) that immunity for claims based on 42 U.S.C. §§ 1981 or 1983, or on the state anti-discrimination statutes. On this basis, Counts III through XI must be dismissed as against CUNY. *See* Point I, at 15-16, *infra*. Those Counts, moreover, fail to state a claim. *See* Point II, at 17-19, *infra*.

As for plaintiffs' remaining claims for Title IX "deliberate indifference" (Count I) and Title IX "retaliation" (Count II), the expanded pleading fares no better than the original. A Title IX deliberate indifference claim requires a *gender*-based act of misconduct, yet plaintiffs pursue their

claim, collectively, as the "CUNY 5"—a group of three men and two women. The gender composition of (and disparity within) this group belies any claim for *gender*-based discrimination, and is just one of many reasons plaintiffs fail to state a claim for Title IX deliberate indifference.

The underlying conduct toward which CUNY allegedly was "deliberately indifferent" occurred at the hands of plaintiffs' primary antagonist, former CUNY law student Jamie Sahagian. The AC references several alleged acts by Sahagian—some directed at individual plaintiffs, one at the "CUNY 5" as a group, and others at various non-party "Jane Does." But the AC skirts the fundamental question that plaintiffs must—but do not—address: which act(s) by Sahagian, *if any*, do plaintiffs contend give rise to a deliberate indifference claim on behalf of plaintiffs as a group?

If Sahagian's conduct could trigger a deliberate indifference claim against CUNY and in favor of *all five* plaintiffs, by definition that conduct must have been directed against those five plaintiffs. The AC in this regard identifies only one act by Sahagian against all five plaintiffs: a July 2017 "cease-and-desist" letter that Sahagian emailed to plaintiffs and others, directing them to stop harassing him. That letter cannot serve as the predicate to a deliberate indifference claim, for several reasons.

First, as noted, Sahagian's letter to three male plaintiffs, two female plaintiffs, and several male and female non-party students cannot plausibly be claimed to constitute *gender*-based conduct given the gender composition of the group to which Sahagian sent his letter. Second, Sahagian's single letter—in which he directs plaintiffs and others to stop harassing him—does not come close to the "severe and pervasive conduct" threshold necessary to state a Title IX deliberate indifference claim. Third, there is no plausible, non-conclusory allegation that Sahagian's letter itself resulted in any educational deprivation for plaintiffs—a separate and independent precondition to Title IX liability. For these reasons, plaintiffs as a group do not state a claim for deliberate indifference.

*If* plaintiffs contend that Sahagian's separate acts against them as individuals form the basis for five separate claims—and it does not appear that this is their theory—the end result is the same, for several reasons. First, certain of those acts fall outside the applicable limitations period. Second, the AC lacks any non-conclusory factual averments from which the Court could even begin to evaluate whether plaintiffs can plausibly allege severe and pervasive gender-based harassment. Third, no individual plaintiff sufficiently alleges educational deprivation resulting from any purported harassment by Sahagian. In fact, plaintiffs plead themselves out of the "educational deprivation" element of a deliberate indifference claim by asserting that CUNY's subsequent retaliation—*not* Sahagian's misconduct—caused their purported educational deprivation. On these grounds, the deliberate indifference claim (Count I) must be dismissed. *See* Point III, at 19-26, *infra*.

Plaintiffs also fail to state a claim for Title IX "retaliation" (Count II). Plaintiffs allege that CUNY commenced a prolonged, sham investigation of them in "retaliation" for their prior reports about Sahagian's alleged misconduct and their efforts to uncover CUNY's alleged "burying" of sexual misconduct reports. AC, ¶¶ 172, 176, 180. Plaintiffs deride CUNY's investigation into their behaviors vis-à-vis Sahagian as a "sham," principally because they claim Sahagian never made a complaint about them. But Sahagian's July 2017 "cease and desist" letter directly accused plaintiffs, and others, of a "campaign of harassment" against him, and Sahagian copied members of the CUNY administration on the email transmission of that letter. Ex. A;[1] *see also* AC, ¶¶ 118-120. Similarly implausible is plaintiffs' assertion that CUNY sought to "bury" Title IX reports. As an illustrative example, the AC itself alleges that when plaintiff N.P. reported an alleged sexual assault by classmate Daniel Cho in the fall of 2016, CUNY and Dean Howard immediately

---

[1] "Ex." refer to the Exhibits submitted with the July 6, 2021 Declaration of Thomas S. D'Antonio ("D'Antonio 7/6/21 Dec."), submitted in support of CUNY's motion to dismiss.

"commence[d] a Title IX investigation" that "conclude[d] in Plaintiff N.P.'s favor" just weeks after the event. *Id.* at ¶ 53. The notion that the University and Dean Howard efficiently and properly handled plaintiff N.P.'s 2016 Title IX complaint, but then retaliated against N.P. and her classmates shortly thereafter for other, unspecified reports they purportedly had made, is simply implausible.

Plaintiffs' litany of attacks on Dean Howard, if anything, undermine the inference they wish the Court to accept, and actually implicate Rule 11 misconduct. Plaintiffs allege that "Howard states, on an audio recording, that prior to Title IX, *she was able to 'sweep [claims of sexual assault] under the rug'* but Title IX 'clamped down' and has created 'more of a pain in the ass.'" AC, ¶ 107 (emphasis supplied). This is a demonstrably false charge. In the audio recording (*see* note 4 at page 8 *infra*) Dean Howard *actually states*: "I'm going to tell you what happened. They tightened up on Title IX stuff. And really *I understand*, *because schools were really like sweeping stuff under the rug*." What cannot be "swept under the rug" is plaintiffs' effort to twist objective fact into self-serving fantasy, and to mislead this Court in the process. Count II fails for these reasons, amplified below. *See* Point IV at 26-28, *infra*. The AC, as against CUNY, should be dismissed in its entirety.

## STATEMENT OF ALLEGED FACTS

With the cautionary observation that the AC is far from a model of clarity, and is laced with implausible, objectively disprovable, and inherently contradictory allegations and conclusory averments that this Court is free to disregard, CUNY will briefly summarize the operative allegations in the AC, and the many reasons those allegations fail to state a claim.

Plaintiffs confer upon themselves the self-aggrandizing title of the "CUNY 5." They are five former CUNY Law School students who matriculated in 2015, and graduated in May 2018. AC, ¶¶ 41, 268. Two members of the "CUNY 5" are female, and three are male. *Id.*, ¶¶ 3-7. Jamie

4

Sahagian—plaintiffs' primary antagonist as they tell it—was also a male CUNY Law School student, in the same class-year as plaintiffs.

**Plaintiff N.P.'s Fall 2016 Report Regarding Daniel Cho**

On August 27, 2016, plaintiff N.P. claims she was sexually assaulted by another classmate, Daniel Cho. AC, ¶ 49. Plaintiff N.P., with the assistance of plaintiff Arete, reported the assault to the Associate Dean of Student Affairs, Cheryl Howard. *Id.*, ¶ 50. CUNY commenced a Title IX investigation, interviewed witnesses, and found "in Plaintiff N.P.'s favor" in September 2016—just weeks after the assault allegedly occurred. *Id.*, ¶¶ 53, 56. The Yonkers Police Department arrested Cho (*id.*, ¶ 54) and the District Attorney brought criminal charges against him. (*Id.*, ¶ 408).[2]

**Plaintiff R.L.'s Report Regarding Jamie Sahagian**

Later that year, in December 2016, plaintiff R.L. allegedly "became terrified" of Sahagian due to his "unwelcomed behavior towards her, which included aggravated harassment, sexual harassment and harassment." AC, ¶ 58. Beyond conclusory labels, the AC does not particularize this purportedly "unwelcomed behavior," nor did R.L. contemporaneously report it to anyone at CUNY. Months later, R.L. approached plaintiff Jaskaran—her law school classmate and a retired police officer—to seek counsel regarding Sahagian's "unwelcomed behavior towards her." *Id.*, ¶ 61. With Jaskaran's assistance, R.L. "complained to Defendant Howard that Sahagian was engaging in the course of sexual harassment against her." *Id.*, ¶ 63. Again, the AC does not articulate any specific conduct that R.L. and Jaskaran reported to Dean Howard, nor does the AC identify the date of this alleged report to the Dean. *Id.*

---

[2] Plaintiffs do not appear to allege that Dean Howard or CUNY mishandled plaintiff N.P.'s Title IX complaint against Cho. And, in all events any claim arising from these events in 2016 would be time-barred. *See* Point III at 25-26, *infra*.

The AC does not describe what R.L. told Dean Howard regarding the "sexual harassment," whether the harassment was verbal, physical, or something else, when the harassment occurred, whether the harassment was a one-time incident or an ongoing course of conduct, or facts suggesting Sahagian's conduct constituted "*sexual* harassment." Nor is there any indication whether R.L. made any request of Dean Howard at the time of her alleged report. The AC, in short, omits all detail necessary to plausibly plead severe and pervasive sex-based harassment.

Sometime later—the AC does not say when—plaintiff R.L. allegedly "provided evidence in the form of text messages to Defendant Howard and further stated that Sahagian had said he was 'obsessed' with her. AC, ¶ 67. The AC does not describe the content of these text messages; does not provide context for Sahagian's alleged declaration of his obsession; and does not indicate when, where, to whom, or in what manner Sahagian allegedly declared his "obsession." In fact, the carefully crafted AC assiduously avoids any factual averment that would be necessary to evaluate whether plaintiff R.L. plausibly alleged severe and pervasive sex-based harassment.

### Jane Doe 1's April 2017 Report Regarding Sahagian

Plaintiffs next allege that on or about April 18, 2017, non-party Jane Doe 1—accompanied by plaintiff Jaskaran—reported to Dean Howard that Sahagian had "stalked" and "sexually harassed her."[3] AC, ¶¶ 77-78. The AC does not identify, in factual terms, the conduct that Jane Doe 1 allegedly reported to Dean Howard. *Id.*, ¶ 78 (characterizing Sahagian's conduct as "stalking" and "sexual harassment"). The AC also does not state how many times, in what manner, when, where or how Sahagian allegedly engaged in this conduct toward Jane Doe 1. The only specific allegation describing Sahagian's alleged conduct states, "[o]n one occasion, Sahagian followed Jane Doe 1 in close physical proximity in one of the hallways in the law school, while

---

[3] Non-party Jane Doe 1 is not identified other than by pseudonym.

6

shouting sexually explicit comments at her, to intimidate and humiliate her." *Id.*, ¶ 72. The AC does not detail the content of these alleged comments, indicate how they were intended to intimidate and humiliate, or allege facts suggesting they were sexual in nature.

The AC also does not identify any request made by Jane Doe 1 to the Dean as part of her April 2017 report, nor does it assert that Jane Doe 1 requested any remedial measure, sought to have CUNY pursue any investigation, or was dissatisfied with the University's response. Even if Jane Doe 1 were a party to this case (which she is not), allegations bereft of factual support, such as these, do not come close to stating a deliberate indifference claim.

**Jaskaran's Report Regarding Sahagian's Treatment of Non-Party Jane Doe 2**

Plaintiffs allege that Jaskaran somehow learned Sahagian had "targeted" Jane Doe 2. The AC does not describe the nature of Sahagian's alleged "targeting," or how Jaskaran learned of it. Plaintiffs then allege that Jaskaran brought "this information" to Dean Howard, but the AC does not identify the nature or content of "this information." *See* AC, ¶¶ 84-85. Plaintiffs aver that Dean Howard acknowledged she was "already aware" that Sahagian had engaged in "unwelcomed behavior" toward Jane Doe 2, but again the AC does not describe, in *factual* terms, Sahagian's alleged misconduct, or any request that may (or may not) have been made with respect to that alleged misconduct. *Id.*, ¶ 85.

Although plaintiffs may seek to imply that Dean Howard's response—that she was "already aware" of the concern—indicated that Jane Doe 2 (or someone on her behalf) had reported this concern to the University previously, plaintiffs do not allege that Jane Doe 2 ever made a report to Dean Howard or anyone else at the University, or that she ever asked CUNY to investigate Sahagian's conduct or pursue remedial action. This pleading omission is important because even if Jane Doe 2 were a party to this case (she is not), it would have been *her* choice—not Jaskaran's— whether she wanted CUNY to investigate, or pursue any remedial action.

7

**Plaintiff N.P.'s Report of "Witness Tampering" by Sahagian**

On or about July 15, 2017, Sahagian approached plaintiff N.P. and asked her to step into an isolated office. Sahagian then purportedly threatened N.P. by telling her that: (a) Cho's private investigator directed Sahagian "to find out disparaging information about [N.P.] including her sexual history and prior boyfriends" (AC, ¶ 89); (b) Sahagian "planned on sending people to find out such information about Plaintiff N.P." (*id.*, ¶ 90); (c) Sahagian intended "to be a witness for the defense in the Cho criminal case" (*id.*, ¶ 93); and (d) Sahagian "was willing to fabricate evidence in the criminal case against Cho" (*id.*, ¶ 97). Plaintiffs, finally, allege that Sahagian's threats to unearth N.P.'s sexual past and testify for Cho constituted "witness tampering" with N.P.—an act that, ironically, does not constitute *sex*-based misconduct but rather a criminal act designed to impact pending criminal proceedings.

Plaintiffs' curious characterization of this as "witness tampering" aside, N.P.'s recording directly contradicts their allegations regarding the conversation between N.P. and Sahagian.[4] Sahagian plainly *did not* threaten N.P. by expressing a willingness to "fabricate evidence" for Cho. To the contrary, Sahagian offered to *assist* N.P. *against* Cho, stating: "If you need me to write an

---

[4] CUNY has filed two audio recordings of the conversations characterized in plaintiffs' AC. *See* D'Antonio 7/6/21 Dec., at Exs. B, C, D; *see also* AC, ¶¶ 96, 106, 107 and 200. This Court may properly consider such recordings in assessing the sufficiency of the AC, because they were integral to plaintiffs' allegations in the AC. *See Collins v. City of New York*, 156 F. Supp. 3d 448, 455 n.4 (S.D.N.Y. 2016) ("[T]he court may . . . consider [a document] where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint") (citation omitted). Courts routinely consider the entirety of audio or video recordings which are referenced in challenged pleadings. *See, e.g.*, *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 380 (S.D.N.Y. 2013) (considering recordings on dismissal motion, and reasoning, "It is clear that the recordings form a significant basis for much of the factual information contained in the Complaint, and…are an integral component of the allegations as to how the hour-long incident unfolded"); *Condit v. Dunne*, 317 F. Supp. 2d 344, 357 (S.D.N.Y. 2004) (same); *see also Feibleman v. Trs. of Columbia Univ.*, 2020 U.S. Dist. LEXIS 31499 (S.D.N.Y. Feb. 24, 2020). Access to the actual recordings is particularly appropriate in light of plaintiffs' penchant for seriously mischaracterizing their content in the AC.

affidavit saying that Dan [Cho] is guilty, I don't care 'cuz I'll do it." D'Antonio 7/6/21 Dec., Ex. B at 17:27. The recording further establishes that Sahagian *did not* threaten to dig up information about N.P.'s sexual history. Rather, Sahagian stated that *Cho's private investigator asked Sahagian* for the name of N.P.'s past boyfriend. Ex. B at 1:17:38 ("he says that right now they're trying to get the name of your ex-boyfriend"). As their conversation winds down, N.P. returns to the issue of what Cho's investigator said, establishing that N.P. well knew—but did not fairly describe in the AC—what Sahagian said to her. *See, e.g.*, Ex. B at 2:14:40 ("what else about me…did the investigator say?"), at 2:20:00 (similar inquiry), and at 2:21:22 (similar inquiry).

Not only do plaintiffs misrepresent these particulars, they also mischaracterize the overall tone and focus of the July 15, 2017 Sahagian-N.P. discussion. The allegations in the AC imply that Sahagian initiated a brief, furtive discussion with the intent to threaten N.P. But in fact the recording establishes that N.P. and Sahagian spoke for well over 2 hours, about a variety of subjects which included their political leanings, their understanding of "the literature" regarding sexual predators, and intimate details about themselves. Ex. B. N.P., for instance, described the details of the sexual assault by Cho, and Sahagian shared sensitive facts about prior drug use and childhood parental abuse. When N.P. became visibly shaken after recounting the details of the Cho sexual assault, Sahagian repeatedly attempted to comfort her. Ex. B at 49:45.

Two days after this two-plus hour session with Sahagian, plaintiff N.P. alleges that she met with Dean Howard to report that "she is afraid of Sahagian" and that he "was tampering with her as a witness in Cho's criminal matter and this was all because she made a complaint about Cho." AC, ¶¶ 98-99. Plaintiffs further allege that the Dean subsequently informed N.P. that she and CUNY Law School's Public Safety Director had reviewed the audio regarding and agreed Sahagian was trying to intimidate her, but took "no action to protect Plaintiff N.P. against Sahagian for witness tampering." *Id.*, ¶¶ 103, 106.

The content of the audio file plainly establishes the implausibility of plaintiffs' assertion that Sahagian was seeking to intimidate N.P. Moreover, plaintiffs in the AC do not identify any particular request for protection made by N.P. related to this alleged "tampering" event, nor any measure the University could have legally taken to prohibit Sahagian from participating in a criminal prosecution outside the province of the University.

Plaintiffs, finally, allege that as a result of N.P.'s July 15, 2017 interaction with Sahagian she became "scared to study alone," and studied exclusively thereafter with her good friend, plaintiff Arete. AC, ¶¶ 104-105. Plaintiffs do not describe how this study arrangement differed from how she otherwise would have studied, nor whether N.P. advised CUNY that she had allegedly altered her study arrangements due to "fear of further action from Sahagian."

**Sahagian's July 30, 2017 "Cease and Desist" Letter**

Sahagian told N.P. repeatedly on July 15 that he had concluded several law students were harassing him because they believed he intended to testify in Cho's defense at the criminal trial. Ex. B at 5:14. On July 30, 2017, Sahagian sent a "Cease and Desist" letter by email to the five plaintiffs and three other law students, copying CUNY administrators. The email stated, in pertinent part:

> This letter serves as notice to you to immediately cease and desist all harassing and intimidating activities against me. You do not have my consent to access my documents, files, emails, texts, phone calls, or roaming location, nor to contact my landlord, professors, friends, family, internships, employers or potential future employers, nor to record audio or video or take pictures of me, nor to act in a harassing intimidating way against me through third parties.

> [Y]ou are participating in a campaign of harassment and intimidation against me for the purpose of discouraging my participation as a witness for the defense in the criminal trial of Dan Cho. I will not allow you to defame or discredit me. I will not allow my career, housing, relationships, or peace of mind to be threatened by your actions….I want my life back.

> On July 15, 2017, I sent an email to the administration at CUNY School of Law and to Mr. Cho's defense attorney stating that I no longer want to be a witness for

10

the defense in the trial of Dan Cho. In addition, I asked Mr. Cho's attorney to please remove me from the witness list.

D'Antonio 7/6/21 Dec., at Ex. A; *see also* AC, ¶¶ 118-120.

Plaintiffs allege that Sahagian sent this communication in retaliation for their prior complaints about his misconduct. AC, ¶ 134. Other allegations in the AC, however, squarely contradict plaintiffs' assertion that Sahagian's Cease-and-Desist email was a retaliatory act:

- The Cease-and-Desist email was directed not only to plaintiffs, but to "three other law students," none alleged to have made any reports, to anyone, regarding Sahagian.

- Nothing about the text of the Cease-and-Desist email plausibly suggests retaliation by Sahagian. Sahagian in that letter states his motive explicitly: "I hope that by sending this cease and desist letter, your harassment and intimidation will stop." D'Antonio 7/6/21 Dec., Ex. A.

The AC additionally asserts that at unidentified times, plaintiffs complained to Dean Howard about this "Cease and Desist" email. *Id.*, ¶ 134. When they allegedly told the Dean they believed Sahagian's email could adversely affect their careers (*id.*, ¶ 135), she assured them it contained "mindless ravings in the wind," not be taken seriously. *Id.*, ¶ 137. The AC does not identify any harm caused by Sahagian's "mindless ravings."

**Plaintiff Jaskaran's Alleged Safety Concerns**

At unidentified times "[d]uring the month of August 2017," plaintiff Jaskaran allegedly advised Dean Howard that he feared Sahagian. AC, ¶¶ 141, 142 (Jaskaran "is concerned about his safety within the law school because, in his opinion…Sahagian is psychologically unstable and is a threat to the law school community"). The AC claims that Jaskaran's opinion was influenced by certain experiences, including: (a) Sahagian's belief "there was a conspiracy against him that involved a group of students in the law school who would whisper about him (Sahagian) in the hallways" (AC., ¶ 144); (b) Sahagian's assertion that "the rape of a woman is not a crime unless the perpetrator was holding a gun to the woman" (*id.*, ¶ 145); (c) Sahagian's assertion that "there

11

is nothing wrong with the crime of pedophilia" (*id.*, ¶ 146); and (d) Sahagian's alleged "sexual harassment and stalking of female students." *Id.*, ¶ 147. The other plaintiffs claim they "felt similarly" with regard to the "safety concerns," although the AC does not describe any basis for these purportedly shared concerns. *Id.*, ¶ 149. Plaintiffs also do not allege they were victimized or threatened by Sahagian at any time at or after Jaskaran's August 2017 report to the Dean.

**CUNY's Investigation into Complaints about the "CUNY 5"**

Throughout August, September, and October of 2017, the AC claims that Jaskaran followed up repeatedly with Dean Howard (and Public Safety Director Steve Katz) to determine why CUNY was not investigating the reports of Sahagian's prior misconduct against female students. AC, ¶¶ 157-170. Plaintiffs do not allege, however, that any of those female victims took part in these meetings between plaintiff Jaskaran and the Dean, or that any female victim followed up with CUNY. *Id.* Although plaintiffs appear to believe that CUNY needed to engage in a more substantive dialogue with Jaskaran, federal laws including FERPA prohibited the University from sharing protected information with him about other students. And those other students, not Jaskaran, were the decision-makers regarding any requests for investigation or discipline.

The AC next claims that in October 2017, plaintiffs N.P. and Arete met with Dean Howard "to discuss their mock trial team." AC, ¶ 171. During this meeting, the Dean allegedly advised them that Sahagian "went over [her] head" and "filed a Title IX Retaliation complaint against the CUNY 5" with CUNY's Central Office. *Id.* Plaintiffs further allege that "[t]his was later determined to be false because Sahagian never made any such complaint to CUNY's Central Office." *Id.*, ¶ 172. Plaintiffs allege that CUNY commenced a retaliatory investigation "as a result of their complaints that their sex discrimination complaints have gone uninvestigated by CUNY." *Id.*, ¶ 180. However:

- Sahagian's July 30, 2017 e-mail, copied to several CUNY administrators, explicitly

complained of "a campaign of harassment and intimidation against me." (D'Antonio 7/6/21 Dec., Ex. A);

- The AC does not identify *any* report made by plaintiff Toledo at any time prior to the commencement of this so-called "retaliatory" investigation by CUNY;

- Plaintiff Arete had assisted in making *just one* report, in the fall of 2016—more than a full year before CUNY commenced the so-called retaliatory investigation;

- Plaintiff N.P. last made a report to CUNY regarding Sahagian's purported misconduct on July 17, 2017—three months before CUNY commenced the "retaliatory" investigation;

- Plaintiff R.L. had made a Title IX report to Dean Howard in the fall of 2016, to which the Dean had responded promptly and properly; R.L.'s next report, related to Sahagian, occurred sometime in "early February 2017" (p. 12 of AC) (*id.*, ¶ 63)—again, *months* before the alleged retaliation.

Indeed, only plaintiff Jaskaran is alleged to have made reports to CUNY regarding Sahagian's alleged misconduct near the time of the alleged retaliatory investigation, and only plaintiff Jaskaran is alleged to have threatened CUNY for "outing" its alleged non-compliance with Title IX. *Id.*, ¶¶ 168-171. These facts belie the assertion that CUNY's investigation into Sahagian's complaint was an act of retaliation against the plaintiffs.

**<u>Fantasy and Fact Regarding N.P. and Arete's Spring 2018 Meeting with Dean Howard</u>**

In the spring of 2018, plaintiffs N.P. and Arete met with Dean Howard—the alleged mastermind of CUNY's "retaliation." N.P. made a surreptitious audio recording of this meeting as well. In relevant part, the AC alleges: "Howard states, on an audio recording, that prior to Title IX, *she was able to 'sweep [claims of sexual assault] under the rug' but Title IX 'clamped down'* and has created 'more of a pain in the ass.'" AC, ¶ 107 (emphasis supplied). "True to her word," they next allege, the Dean failed to fulfill her Title IX obligations. *Id.*, ¶ 108.

Plaintiffs badly misstate Dean Howard's words. N.P.'s audio recording confirms that Dean Howard actually stated: "I'm going to tell you what happened. They tightened up on Title IX stuff. And really *I understand*, because *schools were really like sweeping stuff under the rug.*"

D'Antonio 7/6/21 Dec., Ex. D. N.P. herself confirms she understood Dean Howard's comment to refer to *other schools* (not CUNY), by interjecting, "*like Columbia*" when Dean Howard referenced these other schools. *Id.* As the recording makes plain, Dean Howard did not admit or even suggest that she—or anyone else at CUNY—swept anything under the rug. In fact, she affirmed her concurrence with the increased focus on Title IX compliance.[5]

The AC includes several additional serious mischaracterizations of this conversation with the Dean. During their meeting, Dean Howard: (a) apologizes to N.P. and Arete for the length of the investigation into Sahagian's complaint; (b) counsels them to focus on their Bar preparation because she was "not getting an inkling this [investigation] is going anywhere;" (c) explains that CUNY was required to complete its investigation in compliance with Title IX; and (d) promises to write a letter on their behalf to the "character and fitness" board if needed. Ex. C. These students also were joking and laughing about the situation. N.P., in particular, makes light of Sahagian's so-called harassment—acts she makes plain *were not* sexual in nature. D'Antonio 7/6/21 Dec., Ex. C at 9:33 (jokingly regarding Sahagian, "[W]ho's there like, I'm going to blow you up with a propane gas tank").

**<u>Sahagian's Suspension and Plaintiffs' Graduation</u>**

The police arrested Sahagian on April 24, 2018 for an alleged off-campus sexual assault of a CUNY student, referenced as Jane Doe 3. AC, ¶ 239. CUNY suspended Sahagian and prohibited him from graduating. *Id.*, ¶ 246. Plaintiffs allege that Sahagian subsequently pleaded guilty, "but to a lesser charge"—i.e., not sexual assault—and that the matter was sealed. *Id.*, ¶ 351.

In May of 2018, plaintiffs completed their studies, and graduated. AC, ¶ 268. They allege, however, that the "retaliatory" investigation by CUNY "hung over their heads" for the remainder

---

[5] Plaintiffs' blatent mischaracterization of these recorded facts in a self-serving effort to bolster their narrative is, simply stated, sanctionable misconduct.

of their time at CUNY, and "caused severe anxiety and had an adverse impact on their schooling." AC, ¶ 183. Plaintiffs also allege that this so-called "retaliatory investigation" adversely impacted plaintiff Jaskaran's ability to study for the Bar Examination (*id.*, ¶¶ 309-310); prevented him from applying for a specific job following graduation (*id.*, ¶¶314-319); and caused plaintiffs N.P., Arete, R.L., and Toledo to fail the New York bar examination. *Id.*, ¶ 391.

## PROCEDURAL HISTORY

Plaintiffs commenced this action on July 9, 2020, by filing a 72-page, 502-paragraph Complaint. After defendants identified numerous deficiencies in that pleading through multiple pre-motion letters (Dkt. 19, 23, 24), plaintiffs elected to amend their Complaint (Dkt. 25)—ostensibly to address defendants' stated concerns. Chief among these concerns was the length and prolixity of the Complaint, and its failure to specify the particular allegations that related to each particular plaintiff.

Plaintiffs filed their AC on April 16, 2021. Rather than streamlining and sharpening the averments, the AC ballooned to an even more unwieldy 81-page, 522-paragraph behemoth. The modifications in the AC, more importantly, did *nothing* to address the concerns articulated in defendants' pre-motion letters. Thus, this dismissal motion promptly followed.

## ARGUMENT

### POINT I

### SOVEREIGN IMMUNITY BARS MOST OF THE CLAIMS AGAINST CUNY

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000). Parties asserting subject matter jurisdiction—in this case the plaintiffs—must prove that subject matter jurisdiction exists. *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003). Where, as here, sovereign immunity attaches to certain claims, those claims

will be dismissed for want of jurisdiction. *Chichester v. N.Y. State Dep't of Educ.*, 2017 U.S. Dist. LEXIS 93248, *20 (E.D.N.Y. June 15, 2017) (court lacked jurisdiction due to Eleventh Amendment sovereign immunity).

The Eleventh Amendment bars suits against a state, absent waiver of sovereign immunity or congressional abrogation of that immunity. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). The Second Circuit has squarely held that CUNY, as an "arm of the state," enjoys such Eleventh Amendment immunity. *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79, 83 (2d Cir. 2004) (suits against CUNY are effectively suits against the State, "barred by the Eleventh Amendment").[6]

Congress, in enacting 42 U.S.C. §§ 1981 and 1983, did not abrogate state sovereign immunity, nor has New York waived its immunity with respect to those statutory claims. *Ripa v. Stony Brook Univ.*, 808 Fed. Appx. 50, 51 (2d Cir. June 9, 2020) (Section 1983 claims dismissed pursuant to Eleventh Amendment); *Wang v. Office of Prof'l Med. Conduct*, 354 Fed. Appx. 459, 460 (2d Cir. 2009) (court "correctly determined that [plaintiff's] § 1981 claim was precluded by Eleventh Amendment immunity"); *accord*, *Blamah v. New York*, 2020 U.S. Dist. LEXIS 62319, at *10 (S.D.N.Y. April 8, 2020) (collecting cases). This rationale has supported dismissal of numerous claims against CUNY, on sovereign immunity grounds. *See, e.g.*, *Bryan v. City Univ. of N.Y.*, 2020 U.S. Dist. LEXIS 51180, at *4 (S.D.N.Y. Mar. 23, 2020) (dismissing § 1983 claims); *Weiss v. City Univ. of N.Y.*, 2019 U.S. Dist. LEXIS 43869, at *13 (S.D.N.Y. Mar. 18, 2019) (Section 1981 and 1983 claims dismissed). Thus, plaintiffs' Section 1981 and 1983 claims against CUNY are barred.

Eleventh Amendment immunity also bars claims against CUNY for violations of the New

---

[6] This is so because CUNY is a State taxpayer-supported public institution organized pursuant to New York Education Law §§ 6201-6203; *see also* AC, ¶ 9 ("The City University of New York School of Law…is a senior college under the umbrella of CUNY").

York State and City Human Rights Laws. *Hoffman v. City Coll.*, 2021 US. Dist. LEXIS 62594, at *12 (S.D.N.Y. Mar. 30, 2021) (NYSHRL and NYCHRL claims against CUNY barred by sovereign immunity) (collecting cases); *Stinson v. City Univ. of N.Y.*, 2019 U.S. Dist. LEXIS 121517, at *9 (S.D.N.Y. July 19, 2019); *Weiss*, 2019 U.S. Dist. LEXIS 43869, at *13.

For these reasons, as against CUNY, Counts III through XI of the AC must be dismissed.[7]

### POINT II

### THE CLAIMS BARRED BY SOVEREIGN IMMUNITY FAIL FOR ADDITIONAL REASONS

While this Court need not look beyond the jurisdictional deficit arising from CUNY's sovereign immunity, even if it does the claims barred by sovereign immunity still fail. Plaintiffs purport to plead, for instance, a claim for retaliation in violation of 42 U.S.C. § 1981 on the ground that the University "retaliated" against them for their "protected complaints" of "*sex discrimination*[.]" AC, ¶ 473. But alleged retaliation for complaints of "sex discrimination" is not actionable under Section 1981. "[T]o be actionable under § 1981, the retaliation must have been in response to the claimant's assertion of rights that were protected by § 1981." *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998). Sex discrimination is not proscribed by Section 1981, and thus retaliation for a report of sex discrimination is not an actionable § 1981 claim. *See Walker v. N.Y. City. Dep't of Corr.*, 2008 U.S. Dist. LEXIS 97109, at *31 (S.D.N.Y. Nov. 18, 2008) (claims of gender discrimination are beyond § 1981's scope, which deals with discrimination based on "race or alienage") (*quoting Hawkins*, 163 F.3d at 693). To the extent plaintiffs also allege discrimination "due to their race and ethnicity" (Dkt. 28, ¶ 475), they fail to plead facts that would even begin to support this conclusory assertion and the composition of their

---

[7] "Congress expressly abrogated the states' sovereign immunity for Title IX claims[.]" *Vega v. State Univ. of N.Y. Bd. of Trustees*, 67 F. Supp. 2d 324, 340 (S.D.N.Y. Sept. 28, 1999); *see* 42 U.S.C. § 2000d-7. Thus, grounds for dismissing Counts I (Title IX deliberate indifference) and II (Title IX retaliation) are addressed in Points III and IV at 19-28, *infra*.

group—two "Indian American," one "Hispanic American," a "Citizen of China," and a "Native American" (*id.*, ¶¶ 3-7) belies the claim.

Moreover, pleading such a claim requires plaintiffs to allege that their race was the *but for* cause of the alleged adverse act, and they plead themselves out of this claim by alleging multiple motivating factors (e.g., race, sex, and retaliation for protected complaints). *Comcast Corp. v. Nat'l Association of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (but for causation, not "motivating factor causation," must be plausibly pleaded to state a claim under § 1981).

Plaintiffs also fail to state a Section 1983 claim. To state a Section 1983 claim, "a plaintiff must allege: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, (2) by a person acting under color of state law." *Transitional Servs. of N.Y. for Long Island, Inc. v. N.Y. State Ofc. of Mental Health*, 91 F. Supp. 3d 438, 442 (E.D.N.Y. Mar. 20, 2015); *see also Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999). Section 1983 "does not itself create substantive rights; it offers 'a method for vindicating federal rights elsewhere conferred.'" *Transitional Servs.*, 91 F. Supp. 3d at 442 (*quoting Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004)).

Plaintiffs do not state a separate federal claim to which Section 1983 liability could attach. *See* Points III and IV, at pp. 19-28, *infra.* Nor is their conclusory assertion that CUNY maintained "'official and un-official' policies of gender discrimination and retaliation through its agents" (Dkt. 28, ¶ 471) sufficient to plausibly state such a claim. *Jordan v. City of New York*, 2017 U.S. Dist. LEXIS 112625, at * 10-11 (S.D.N.Y. July 17, 2017) (dismissing Section 1983 claim based merely on conclusory assertion that defendant maintained a custom or policy); *see generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1977).

With respect to discrimination claims brought under either the State or City Human Rights Laws, it is axiomatic that plaintiffs must allege, as a predicate, that the acts complained of were

motivated by *particular discriminatory animus. See Kajoshaj v. City of New York*, 2013 U.S. Dist. LEXIS 9138, at *2 (E.D.N.Y. Jan. 23, 2013), *aff'd sub nom. Kajoshaj v N.Y. City Dept. of Educ.*, 543 Fed. App'x 11, 14 (2d Cir 2013). But the AC contains only a few conclusory allegations, none supporting plaintiffs' HRL claims. To the extent these statutory claims allegedly arise from sex-based discrimination, they cannot survive separate and apart from plaintiffs' Title IX claims. *See Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 372 (S.D.N.Y. Mar. 24, 2017) ("Because [plaintiff] fails to state a claim under Title IX, he likewise fails to state claims under the New York Human Rights Law"); *see generally* Points III and IV at 19-28, *infra.*

With respect to their race-based claims, plaintiffs allege simply that CUNY ignored their reports because they were "minority students" asserting claims "against the White student, Sahagian," yet CUNY purportedly "chose to investigate the CUNY 5, and three other law students, all of whom are minority students." AC, ¶ 432; *see also id.*, ¶¶ 433-440. These allegations are insufficient to plausibly state a race-based discrimination claim. *Kajoshaj*, 2013 U.S. Dist. LEXIS 9138, at *2 ("naked allegation" that plaintiffs were "treated differently from non-Muslim, non-Albanians" insufficient to plausibly allege racial discrimination); *Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 437 (S.D.N.Y. 2015) (allegations of disparate treatment of similarly situated persons of differing races necessary to "render plausible the inference" that national origin, rather than "any number of other considerations," dictated employment action).

For these additional reasons, even if Counts III through XI were not barred by sovereign immunity (they are), those Counts fail to state a claim, and as to CUNY must be dismissed.

## POINT III

### PLAINTIFFS FAIL TO STATE A CLAIM FOR TITLE IX DELIBERATE INDIFFERENCE

On a Rule 12(b)(6) motion, although the Court will accept well-pleaded averments of fact as true, the presumption of truth does not extend to pure "labels and conclusions" or "formulaic

recitation[s] of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor does that presumption extend to allegations "contradicted by more specific allegations or documentary evidence." *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379 (S.D.N.Y. 2014). Moreover, as this Court has aptly observed, prolixity does not equate to quality, and in many instances (as here) that prolixity is self-defeating. *Powell v. Merrick Acad. Charter Sch.*, 2018 U.S. Dist. LEXIS 32810, at *20 (E.D.N.Y. Feb. 28, 2018) (Garaufis, J.) ("Plaintiff's prolix and frequently hard-to-follow pleading is not only replete with extraneous allegations irrelevant to her claims…but also with allegations that actually undermine the inference that she was fired for discriminatory reasons"). This is just such a case.

Title IX of the Education Amendments of 1972 provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX liability may arise where an educational institution is "'deliberately indifferent to sexual harassment, of which [it] had actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" *Welcome v. N.Y. City Dep't of Educ.*, 2018 U.S. Dist. LEXIS 190716, at *13 (E.D.N.Y. Nov. 5, 2018) (*quoting Davis v. Monroe County Board of Education*, 526 U.S. 629, 650 (1999)).

The claim here allegedly arises from the University's purported deliberate indifference to various acts by Sahagian against plaintiffs, either individually or collectively, as described below. For the reasons that follow, no Title IX deliberate indifference claim is stated because no actionable underlying Title IX violation by Sahagian is alleged.

Despite the bulk of the AC, it completely lacks heft with respect to the deliberate indifference element of plaintiffs' Title IX claim. CUNY and this Court instead are left to guess

which of Sahagian's acts, in plaintiffs' view, form the basis for a deliberate indifference claim, which in this case is asserted on behalf of all five plaintiffs. If plaintiffs contend that conduct directed at them *as a group* forms the predicate to a deliberate indifference claim, they must identify how conduct directed against a group of three men and two women could possibly constitute *gender*-based conduct. *See, e.g., D.S. v. Rochester City Sch. Dist.*, 2020 U.S. Dist. LEXIS 223647, at *33-34 (W.D.N.Y. Nov. 30, 2020) ("Plaintiffs have not identified any harassment that arose because of [plaintiff's] gender. Two of the principal antagonists…were male, but another was a female classmate"). If plaintiffs instead contend that separate acts directed at them individually form the predicate to their deliberate indifference claims, then each plaintiff must identify *gender*-based misconduct. Neither iteration of their claim can survive this analysis.

## A. Conduct Toward the Group Does Not Support a Deliberate Indifference Finding

To the extent plaintiffs contend conduct against them *as a group* forms the basis for a Title IX deliberate indifference claim, the analysis must focus on Sahagian's acts directed at the "CUNY 5," collectively. The AC, however, identifies only Sahagian's July 2017 "Cease-and-Desist" email. AC, ¶¶ 118-121. For several reasons, this fails to support a Title IX deliberate indifference claim.

### 1. Sahagian's "Cease-and-Desist" Letter is Not Gender-Based Conduct

To survive pre-answer dismissal, a Title IX plaintiff must plausibly allege deliberate indifference to harassment perpetrated "*because of gender.*" *See, e.g., D.S.*, 2020 U.S. Dist. LEXIS 223647, at *31; *Feibleman*, 2020 U.S. Dist. LEXIS 120835, at *19. Plaintiffs appear to be trying to allege that Sahagian's July 30 Cease-and-Desist email constitutes gender-based conduct because plaintiffs claim he sent the letter in "retaliation" for their alleged Title IX reports *against him*; thus, CUNY's alleged failure to investigate this so-called "gender-based retaliation," in their view, could give rise to a deliberate indifference claim. This illogical proposition fails to hold water, for several reasons.

First, as noted the "CUNY 5" are not a gender monolith—there are three men and two women in the group. One therefore is hard pressed to see how it is even possible for an email to the group to be gender-motivated. *See Nungesser*, 244 F. Supp. 3d at 363 (dismissing deliberate indifference claim because "the SAC specifically alleges that it was because of his conduct toward her…and her resulting personal animus against him, not because of his status as a male").

Second, Sahagian's letter does not even mention any report made to CUNY by plaintiffs. Instead, Sahagian's email refers to the group's "harassing and intimidating activities" against him, including disparaging contacts with numerous different persons in an effort to discourage his participation as a witness in the Daniel Cho criminal trial. *See* D'Antonio 7/6/21 Dec., Ex. A.

Finally, Sahagian directed this Cease-and-Desist letter not only to the "CUNY 5," but to three other male and female students who *are not parties* to this action—none of whom are alleged in the AC to have made Title IX reports against Sahagian. The AC pleads *no facts* to plausibly support the conclusory assertion that Sahagian sent the letter in retaliation for plaintiffs' reports to CUNY. For these several reasons, any Title IX claim premised upon plaintiffs' alleged mistreatment as a group is baseless. *See, e.g.*, *Nungesser*, 244 F. Supp. 3d at 363; *Eskenazi-Mcgibney v Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 233 (E.D.N.Y. Feb. 6, 2015) (dismissing disability discrimination claim because facts alleged indicate bullying resulted from personal animus, not from plaintiff's disability).

### 2.  Sahagian's "Cease-and-Desist" Letter is Not Severe and Pervasive Conduct

To support a Title IX claim, the predicate harassment allegedly ignored by CUNY must be both gender-motivated *and* "severe, pervasive, and objectively offensive." *Davis*, 526 U.S. at 650. "Courts assessing the severity and pervasiveness of student-on-student sexual harassment have found, with few exceptions for extreme conduct such as rape, that a *single incident of harassment* is not sufficiently severe to state a cause of action under Title IX." *AA v. Hammondsport Cent.*

*Sch. Dist.*, 2021 U.S. Dist. LEXIS 52999, at *15-16 (W.D.N.Y. Mar. 22, 2021) (collecting cases) (emphasis supplied). Sahagian's single email, which does not constitute an act of sexual harassment, as a matter of law cannot constitute "severe and pervasive" harassment. Plaintiffs' Title IX deliberate indifference claim fails for this reason as well.

### 3. Sahagian's "Cease-and-Desist" Letter Did Not Cause Educational Deprivation

Finally, to state a claim premised on the Cease-and-Desist letter, plaintiffs must plausibly allege that it was "serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." *Davis*, 526 U.S. at 652; *accord Nungesser*, 244 F. Supp. 3d 345, 370-71 (S.D.N.Y. Mar. 24, 2017) (dismissing deliberate indifference claim where plaintiff failed to plausibly allege "concrete, negative, and systemic effect" on educational opportunity); *D.S.*, 2020 U.S. Dist. LEXIS 223647, at *31 (same).

Plaintiffs do not allege that Sahagian's letter caused *any* educational deprivation, nor can they plausibly do so where they timely completed their courses, and graduated on time. AC, ¶ 268. *Compare D.S.*, 2020 U.S. Dist. LEXIS 223647, at *31 (no plausible allegation of educational deprivation where plaintiff "remained at School No. 58"), *with AA*, 2021 U.S. Dist. LEXIS 52999, at *20 (concrete allegations of negative effect of encounters which "drove [plaintiff] to withdraw from school entirely and enroll elsewhere," plausibly alleged denial of educational opportunity).

Plaintiffs actually allege that CUNY's "retaliatory" investigation—not Sahagian's letter—caused an "adverse impact on their schooling." AC, ¶ 183 (investigation "caused severe anxiety and had an adverse impact on their schooling"); *id.*, ¶ 233 (plaintiff Jaskaran "had a mental and emotional breakdown" because "CUNY was treating him as though he were a perpetrator"); *see generally id.*, ¶¶ 192, 313-328, 391, 392. Thus, plaintiffs again plead themselves out of their deliberate indifference claim, by affirmatively alleging that their purported educational deprivation stemmed from something other than the conduct underlying their deliberate indifference claim.

*See Feibleman*, 2020 U.S. Dist. LEXIS 120835, at *18 ("the Court cannot draw any conceivable causal connection between those losses and Doe's [alleged sexual harassment]" because the alleged educational deprivation flowed "from Feibleman's [misconduct] and the punishment that Columbia imposed").

### B.  The Three Male Plaintiffs Do Not Individually State Viable Title IX Claims

Simply put, the three male plaintiffs—Jaskaran, Toledo, and Arete—do not allege any gender-based harassment by Sahagian directed at them as individuals. They therefore must rely on the July 2017 Cease-and-Desist letter to have any hope of pleading a viable deliberate indifference claim. But that email is of no avail, for the many reasons set forth in Point III(A), at 21-23, above.

### C.  R.L. Does Not Individually State a Claim

Plaintiff R.L. alleges, in the most conclusory fashion, that she "became terrified" of Sahagian due to his "unwelcomed behavior towards her, which included aggravated harassment, sexual harassment and harassment." AC, ¶ 58. She also alleges that Sahagian later indicated that he was "obsessed" with her, *id.*, ¶ 67, although the AC does not claim he voiced this obsession to R.L., or that it was made known at any point to CUNY. Such conclusory allegations do not plausibly plead severe and pervasive conduct. Absent from the AC are *factual* averments that would permit the Court to assess whether the conduct even approaches a severe and pervasive level. *Garcia v. Clovis Unified Sch. Dist.*, 2009 U.S. Dist. LEXIS 83352, at *29 (E.D. Cal. Sep. 14, 2009) (allegation that plaintiff was "taunted, harassed, and retaliated against" is "conclusory legal allegation" insufficient to plead Title IX deliberate indifference claim); *see generally Twombly*, 550 U.S. at 555.

Specific factual allegations of regular and pervasive misconduct are required to support a Title IX claim; even serious, but limited, misbehaviors will not do. *See R.S. v. Bd. of Educ.*, 371 Fed. Appx. 231, 233 (2d Cir. 2010) (three email messages with profane and disparaging language,

"a crude sexual request," and an explicit declaration of author's intent to have sex with plaintiff was "well short of the kind of harassment found actionable under Title IX"); *Feibleman*, 2020 U.S. Dist. LEXIS 120835, at *17 (limited number of physical, sexually-related acts not sufficiently severe and pervasive to state a Title IX claim); *see also Carabello v. New York City Dep't of Educ.*, 928 F. Supp. 2d 627, 643 (E.D.N.Y. Feb. 19, 2013) (single act of alleged "sexual abuse" insufficient to plausibly plead severe and pervasive misconduct). These pleading deficiencies doom R.L.'s Title IX deliberate indifference claim to dismissal.

### D. N.P. Also Does Not Individually State a Title IX Claim

Plaintiff N.P. allegedly reported misconduct by two separate actors: Cho and Sahagian. The AC asserts no Title IX claim stemming from the Cho incident, however, nor could any viable claim could arise under the pleaded circumstances. The AC makes clear that CUNY immediately responded to N.P.'s complaint about Cho, and resolved that complaint in N.P.'s favor. In all events, to the extent N.P. seeks to assert a claim based upon the Cho incident, her claim would be time-barred because her Fall 2016 report falls well outside the applicable three-year limitations period. *See, e.g., Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 439 (S.D.N.Y. 2014).

That leaves Sahagian's alleged misconduct. N.P.'s alleged reports focus upon their July 15, 2017 encounter, during which Sahagian allegedly threatened her as a means of "witness tampering." As noted above, that claim fails factually because the actual audio recording of the conversation does not support plaintiffs' sanctionable mischaracterization of its content. *Compare* Ex. D with AC, ¶¶ 199-201. But *even if* plaintiffs' fictional tale were accurate (and most assuredly it is not), the July 15 conversation between N.P. and Sahagian—a non-sexual, one-time event—does not constitute severe and pervasive conduct sufficient to state a Title IX claim. *See, e.g.*, Point III(C) at 24, *supra*; *see also R.S.*, 371 Fed. Appx. 231, 233; *Feibleman*, 2020 U.S. Dist. LEXIS 120835, at *17; *Carabello*, 928 F. Supp. 2d 627, at *643.

Nor does N.P. plausibly allege that the July 15, 2017 conversation with Sahagian caused her any educational deprivation. At most, she alleges that she was "scared to study alone" (AC, ¶ 104), and thus "isolate[d] herself to a small study room in the law school" where "she only studied [ ] with Plaintiff Arete, in fear of further action from Sahagian." *Id.*, ¶ 105. But N.P. does not claim that she otherwise would have studied differently, or more effectively; that studying with a partner adversely affected her educational opportunities; or that her educational outcome was impacted negatively. Nor does N.P. allege that there otherwise was the "concrete, negative, and systemic" educational deprivation necessary to state a viable Title IX claim. *See Nungesser*, 244 F. Supp. 3d at 368-69; *HB v. Monroe Woodbury Cent. Sch. Dist.*, 2021 U.S. Dist. LEXIS 141252, *54 (S.D.N.Y. Sep. 27, 2012) ("Plaintiffs have not plausibly pleaded that the Girls' bullying deprived LB of educational opportunities. At most they assert that LB's grades and performance on her soccer team declined [ ], which is insufficient for Title IX purposes").

For the foregoing reasons, plaintiffs (as a group, or as individuals) fail to state a claim for Title IX deliberate indifference, requiring dismissal of Count I in its entirety.

## POINT IV

### PLAINTIFFS ALSO FAIL TO STATE A CLAIM FOR TITLE IX RETALIATION

A Title IX retaliation claim has four elements: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action. *Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011). Causation may be established by showing that the retaliatory act was "close in time to the plaintiff's protected action, that similarly situated employees were treated differently, or by direct proof of retaliatory intent." *Carpenter v. City of Mt. Vernon*, 2018 U.S. Dist. LEXIS 176195, at *14-15 (S.D.N.Y. Oct. 11, 2018) (citations omitted). However, "a substantial time lag between the protected activity and the adverse…action

suffices to defeat an inference of retaliatory animus. Claims of retaliation are routinely dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation." *Allen v. St. Cabrini Nursing Home, Inc.*, 198 F. Supp. 2d 442, 450 (S.D.N.Y. 2002). Thus, where a Complaint does not contain plausible allegations of a retaliatory action occurring "very close" in time, and where "nothing in the plaintiff's pleadings, even liberally construed, otherwise suggests a plausible causal connection" between more temporally remote events, "the complaint fails plausibly to allege a retaliation claim." *Perry v. NYSARC, Inc.*, 424 Fed. App'x 24, 26 (2d Cir. 2011); *see also*, *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990).

Here, the AC asserts that CUNY pursued a "sham investigation" into Sahagian's complaints about plaintiffs—and others—in retaliation for "[plaintiffs'] complaints that their sex discrimination complaints have gone uninvestigated by CUNY." AC, ¶ 180. This conclusory allegation, however, ignores the following:

- Certain subjects of Sahagian's complaint—Edward Carrasco, Michael Perez and Samara Yousif—were not members of the "CUNY 5," and plaintiffs do not allege in the AC that these individuals made any Title IX complaints (or any other complaints) to CUNY. *See* D'Antonio 7/6/21 Dec. at Ex. A.

- N.P.'s August 2016 complaint against Cho was investigated, and the Title IX proceedings "conclude[d] in Plaintiff N.P.'s favor" in September 2016. AC, ¶ 53.

- Neither Jane Doe 1 or Jane Doe 2—the two law students being "assisted" by plaintiff Jaskaran in or around April 2017—were alleged to have made a complaint or sought any investigative or corrective action by CUNY. AC, ¶¶ 70-86.

- The various incidents that were the subject of plaintiffs' complaints to CUNY—such as N.P.'s August 2016 Title IX complaint against Cho, R.L.'s December 2016 concerns about Sahagian, and the Spring 2017 events related to the two Jane Does, occurred well prior to the date the "sham investigation" commenced. AC, ¶¶ 49-50, 58-63, 77-85.

For these several reasons, the requisite causal connection between the alleged Title IX activities and the purportedly "retaliatory" CUNY investigation into Sahagian's complaint is not plausibly

pleaded. *Perry*, 424 Fed. App'x at 26; *Allen*, 198 F. Supp. 2d at 450.

Plaintiffs' claim that the investigation into Sahagian's claims occurred even though he had not made a complaint to CUNY's "Central Office," and that CUNY "has yet to inform Plaintiffs of any valid reason for placing them under a Title IX retaliation investigation," are specious. AC, ¶¶ 129, 171-172. The AC itself identifies two written complaints about misconduct allegedly directed toward Sahagian—his July 30, 2017 "Cease and Desist" letter, and a letter sent the following day by Cho's defense attorney, Michael Romano—that complain of "harassment and intimidation" by "students and others." *See* AC, ¶¶ 118-120, 122. While the Romano letter is alleged to mention "no particular student by name," the AC specifically identifies among the subjects of Sahagian's email complaint N.P., R.L., Arete, Toledo and Jaskaran.

In short, the AC itself identifies the legitimate, non-discriminatory grounds upon which CUNY pursued the investigation, and it belies the assertion that this investigation was either a "sham" or retaliatory. Count II of the AC does not survive this motion.

## CONCLUSION

For the reasons set forth above, CUNY's motion in all respects should be granted, and all claims as against the University should be dismissed.

Dated: July 6, 2021

**WARD GREENBERG HELLER & REIDY LLP**

By:   s/Thomas S. D'Antonio
          Thomas S. D'Antonio
          Joshua M. Agins

1800 Bausch & Lomb Place
Rochester, New York  14604
Telephone:  (585) 454-0700
Facsimile:  (585) 423-5910
tdantonio@wardgreenberg.com
jagins@wardgreenberg.com

*Attorneys for defendant The City University of New York*

29