UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____
N.P., JACK JASKARAN, AVERY TOLEDO,
PETER ARETE, R.L.,

                       Plaintiff(s),

        -against-

THE CITY UNIVERSITY OF NEW YORK,
CHERYL HOWARD, Individually, RODNEY
PEP-SOUVENIR, Individually

                  Defendant(s).
_____

**MEMORANDUM & ORDER**
**20-CV-3059 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs N.P., Jack Jaskaran, Avery Toledo, Peter Arete, and R.L. filed a complaint against the City University of New York ("CUNY"), Cheryl Howard, then CUNY Law School Associate Dean of Student Affairs, and Rodney Pepe-Souvenir, then CUNY Law School Title IX Director. Plaintiffs have asserted a Title IX sexual discrimination claim under a theory of deliberate indifference and a Title IX retaliation claim against CUNY under Title IX of the Education Amendments of 1972 ("Title IX"). They have also asserted claims under 42 U.S.C. §§ 1981, 1983, the New York State Executive Law (the "New York State Human Rights Law" or the "NYSHRL"), and the New York City Administrative Code (the "New York City Human Rights Law" or "NYCHRL") against Howard and Pepe-Souvenir. Plaintiffs seek compensatory and punitive damages. Each Defendant moves to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons stated below, Defendants' motions to dismiss are GRANTED in part and DENIED in part.

## I.   BACKGROUND

Plaintiffs N.P., Jack Jaskaran, Avery Toledo, Peter Arete, and R.L. attended CUNY Law School from 2015 to 2018. (Am. Compl.

(Dkt. 28) ¶¶ 3-7.) This action arises out of CUNY's responses to alleged misconduct by Jamie Sahagian, another CUNY Law School student, and CUNY's responses to alleged misconduct by the Plaintiffs.

On August 27, 2016, a former CUNY Law School student and non-party to this suit, Daniel Cho, sexually assaulted Plaintiff N.P. (*See id.* ¶ 49.) Shortly after the assault, N.P., with the help of Plaintiff Arete, reported the incident to CUNY. (*See id.* ¶ 50.) CUNY promptly initiated a Title IX investigation. (*See id.* ¶ 53.) CUNY interviewed Sahagian about the matter, but he indicated that he had no information about the incident. (*See id.* ¶¶ 56-57.) CUNY also received information from Plaintiff Jaskaran. (*See id.* ¶¶ 51-52.) He proved to be more helpful. (*See id.*)

Jaskaran recorded a conversation with Cho, in which Cho admitted to assaulting N.P. (*See id.* ¶¶ 51-52.) Jaskaran provided the recording to CUNY, CUNY's Office of General Counsel, the Yonkers Police Department, and the Westchester District Attorney's Office. (*See id.* ¶ 52.) Cho was arrested and took a leave of absence from CUNY. (*See id.* ¶¶ 54-55.) In September 2016, CUNY completed the Title IX investigation and found in N.P.'s favor. (*See id.* ¶¶ 53-54.) Cho, though no longer at CUNY, remained a criminal defendant. (*See id.* ¶¶ 54-55.)

In February 2017, Jaskaran began to make complaints about Sahagian's allegedly "unwelcome" and unlawful behaviors towards his classmates. (*See id.* ¶¶ 58, 62, 147, 154, 157, 165, 168.) He simultaneously assisted three women (R.L. and two non-parties to this case) in making complaints about Sahagian's alleged behavior. (*See id.* ¶¶ 64, 77, 85.) These behaviors allegedly included stalking and sexual harassment. (*Id.* ¶ 147.) CUNY failed to open any investigation into Sahagian after the abovementioned complaints were made. (*Id.* ¶ 169.)

On July 15, 2017, Sahagian approached N.P. and asked her if they could speak privately. (*See id.* ¶ 87.) N.P. agreed, but she

recorded the conversation out of fear for her safety. (*See id.* ¶ 88.) Sahagian told N.P. that he was approached by Cho's private investigator to collect information about her, including information about her "sexual history" and that he believed there was a "group of students out to get him." (*Id.* ¶¶ 89-91.) During their conversation, Sahagian informed her that "he [was] going to be a witness for the defense in the Cho criminal case" and that he "was willing to fabricate evidence in the criminal case against Cho." (*Id.* ¶¶ 93, 97.)

Two days later, N.P. met with then-Dean Howard. (*Id.* ¶ 95.) She reported the interaction, turned over the recording, stated that she felt Sahagian approached her in this way "because she made a complaint about Cho," and requested that Sahagian be kept away from her. (*Id.* ¶¶ 96-99.) After that meeting, N.P. studied only with Arete, her mock trial teammate and co-Plaintiff, in a private study room. (*Id.* ¶ 105.) N.P. does not allege that she interacted with Sahagian after their conversation. CUNY still did not open an investigation into Sahagian after this report.

On July 30, 2017, two weeks after N.P. and Sahagian's conversation, Sahagian sent a cease-and-desist email to the five Plaintiffs and three other CUNY students, and he copied Howard, the Dean of CUNY Law School, CUNY Law School's Director of Public Safety, Cho's criminal defense attorney, and Cho's private investigator on the email. (*Id.* ¶¶ 118-19.) Sahagian alleged that the eight CUNY students (including Plaintiffs) were taking photographs of him and unlawfully accessing his email, texts, phone calls, and roaming location. (*Id.* ¶ 120.) He demanded that they "cease and desist" these actions because they "harassed and intimidated him" and ultimately "caused him to seek removal from the witness list" in Cho's criminal case. (*Id.*) The following day, Cho's criminal defense attorney emailed a letter to Howard reporting that Sahagian indicated he was "being harassed and

intimidated by certain students and others in connection with his potential testimony." (*Id.* ¶ 122.)

Sahagian's email caused Plaintiffs significant apprehension. Jaskaran and Toledo separately contacted and met with Howard about their concerns, including whether the accusations could impact their character and fitness evaluation for the New York State Bar (the "bar exam"). (*Id.* ¶¶ 139-41.) Howard assured Toledo and his co-Plaintiffs in an email after the meeting that they did not have anything to worry about so long as the situation remained the same. (*Id.* ¶ 140.)

Around October 2017, however, Plaintiffs learned that CUNY had opened a Title IX investigation into all eight students who had received Sahagian's cease-and-desist email. (*See id.* ¶¶ 171-74.) Howard informed N.P. and Arete during a meeting for their mock trial team that the five Plaintiffs, along with three other recipients of the Sahagian email, were under a Title IX investigation. (*Id.* ¶ 171.) Dean Howard asked that N.P. and Arete share the information with the others. (*See id.* ¶ 171.) It is not clear precisely how long before that meeting the investigation had begun. Pepe-Souvenir, as Title IX Director, investigated the students for the next year and a half. (*Id.* ¶ 177.)

Over that year, Plaintiffs did not interact with Sahagian who was arrested in April 2018 for an off-campus sexual assault. (*Id.* ¶ 239.) CUNY suspended Sahagian, and he did not graduate. (*Id.* ¶ 246.)

Notwithstanding the ongoing investigation, the students could apparently continue to take advantage of all school activities and opportunities that were available to other students. All five Plaintiffs graduated on time in May 2018. (*Id.* ¶ 268.) They were permitted to use the CUNY Law School building and reserve study rooms in order to prepare for the bar exam. (*Id.* ¶ 274.) While they waited for their bar exam results, they received the

investigation results. (*Id.* ¶¶ 346-47.) CUNY found that the allegations against Plaintiffs were "unfounded." (*Id.* ¶ 347.) Sometime thereafter, Plaintiffs N.P., R.L., Toledo, and Arete learned that they failed the bar exam. (*Id.* ¶ 391.)

About two years later, Plaintiffs brought this lawsuit. They allege that the investigation was opened against them in retaliation, after they submitted, or helped other students submit, complaints about Sahagian's alleged misconduct. (*Id.* ¶¶ 411-14, 420.) They allege that CUNY was deliberately indifferent to their complaints. (*Id.* ¶ 447.) And Plaintiffs—who are men and women who identify as either Asian, Indian-American, Native-American, or Hispanic-American—allege that Howard and Pepe-Souvenir deprived them of their civil rights and discriminated against them on the basis of their sexes and races. (*See, e.g., id.* ¶¶ 465-66, 495.)

In addition to the facts set forth above, additional facts related to Plaintiffs R.L. and Jaskaran are set forth below.

## A. R.L.

R.L. was not involved with the Cho incident nor the ancillary investigation. However, she did interact with Sahagian, and did so earlier than most, if not all, of her co-Plaintiffs. (*See id.* ¶ 61.) The nature of R.L. and Sahagian's relationship is not entirely clear, but Sahagian informed CUNY that he had been intimate with R.L. and asked her to marry him. (*Id.* ¶ 388.) Whether or not that is true, they were not friendly by December 2016. (*See id.* ¶ 58.) At that point, R.L. told Sahagian to "just stop texting me, I am physically afraid of you." (*Id.* ¶ 59.) She went to Jaskaran for advice on what to do. (*Id.* ¶ 61.)

Jaskaran advised R.L. to make a complaint with Howard. (*Id.* ¶ 62.) In or around February 2017, R.L. did so, asking Howard "to protect her from Sahagian," informing Howard that Sahagian

was "obsessed" with her, and showing Howard their text messages. (*Id.* ¶¶ 64, 66-67.) She told Howard that Sahagian had subjected her to sexual harassment, and that he "committed the crimes of stalking and aggravated harassment against her." (*Id.* ¶ 64.) A few months later, around April 2017, Jane Doe 1 confided in R.L. that Sahagian had stalked and sexually harassed her. (*See id.* ¶¶ 71-74.) R.L. then introduced Jane Doe 1 to Jaskaran to assist with making a complaint. (*See id.* ¶ 75.)

### B. Jack Jaskaran

Jaskaran, a former New York City Police officer, does not allege that he is a victim of sexual harassment. (*See, e.g., id.* ¶¶ 64, 75-77.) However, he was involved in most of the events described in the Amended Complaint since he helped several women who endured alleged misconduct. He recorded Cho's admission of sexually assaulting N.P.; he assisted R.L. and non-party Jane Doe 1 in meeting with Howard to inform her about Sahagian's alleged sexual harassment; and he independently reported that Sahagian had engaged in unwelcome behavior toward non-party Jane Doe 2. (*See id.* ¶¶ 52, 64, 77, 85.)

After Jaskaran assisted N.P., R.L., and Jane Does 1 and 2, he continually followed up with CUNY Public Safety Director Steve Katz and Howard for updates about the investigations. (*Id.* ¶ 154.) Howard and Katz variously responded by informing him that they could not share information about Jaskaran's fellow classmates, stating that steps were being taken "behind the scenes," claiming that nothing could be done because formal complaints had not been made, or asserting that CUNY would need something akin to "probable cause" to act. (*Id.* ¶¶ 155-56, 164, 166, 169.)

On July 30, 2017, Jaskaran received the cease-and-desist email from Sahagian. (*Id.* ¶ 118.) Jaskaran met with Howard on multiple occasions, including to discuss the Sahagian email and the

possibility of transferring. (*See id.* ¶¶ 141-49, 163-65.) He continued to follow up with Howard, asking for investigation updates and specifically about potential sexual harassment investigations into Sahagian. (*See id.* ¶¶ 157, 163-64.) He also accused Howard and Katz of violating the law by failing to address the complaints of the female students. (*See id.* ¶¶ 164-68.) Sometime thereafter, he learned that he and the other seven students who received Sahagian's email had been placed under a Title IX investigation for retaliation. (*See id.* ¶¶ 171-74.)

Despite this investigation, Jaskaran remained a normal student. Though Jaskaran attended his graduation ceremony, Jaskaran claimed that he did not invite his family to attend because he feared that Sahagian would attend and "engage in violence." (*Id.* ¶¶ 268, 70.) CUNY Law School security staff and Public Safety Officers managed the ceremony to protect against this possibility. (*See id.* ¶ 269.) At this point, Sahagian had been suspended and was not permitted to graduate, and Jaskaran does not allege that Sahagian was there.

Jaskaran also asserted that he was treated differently from other students during the summer leading up to the bar exam. (*See id.* ¶¶ 273-77.) Per its policy, CUNY opened its doors to its recent graduates to study for the bar exam. (*Id.* ¶ 272-74.) Jaskaran took advantage of this opportunity. (*Id.* ¶ 275.) But he claims that he was required to move study rooms several times throughout the summer, while other students did not have to move. (*See id.* ¶¶ 275-77.)

## II. STANDARD OF REVIEW

On a motion to dismiss, the court accepts all allegations of facts made by the plaintiffs as true and draws all reasonable inferences in plaintiffs' favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## A. Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a district court must dismiss a complaint when the court "lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).[1]

## B. Federal Rule of Civil Procedure 12(b)(6)

A court will dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) if the complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. DISCUSSION

The court spent considerable time making sense of the lengthy and legally confusing Amended Complaint, which largely failed to clarify the original Complaint.[2] However, the court is obligated to construe the pleadings in Plaintiffs' favor and view all allegations as true. The court does so here, but requests that in all

---

[1] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

[2] Plaintiffs are within striking distance of dismissal pursuant to Federal Rule of Civil Procedure 8. *See* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). The Amended Complaint largely failed to clarify the original Complaint, and it remains difficult to determine which facts are being used to support which claims because Plaintiffs attempt to "incorporate[] and reiterate[] each and every paragraph above as though fully set forth herein." (*See generally* Am. Compl. ¶ 441, 456, 464, 468, 472, 479, 492, 497, 504, 511, 518.) The threshold adopted by the Second Circuit for dismissing pursuant to Rule 8 has been a consistently high one. *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004) ("Dismissal pursuant to [Rule 8] is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.") Plaintiffs have therefore narrowly satisfied Rule 8's pleading requirements.

future briefing the links between each claim and its supporting facts be more clearly delineated. Defendants' motions to dismiss succeed on certain claims and fail on others. The court addresses each claim as to each Plaintiff below.

## A. Title IX Deliberate Indifference[3]

Plaintiffs voluntarily abandoned their Title IX deliberate indifference claims against Defendants Howard and Pèpe-Souvenir. (*See* Opp'n (Dkt. 37-11) at 19.) Thus, Plaintiffs' deliberate indifference claim is limited to Defendant CUNY. For the reasons stated below, Defendants' motions to dismiss are GRANTED.

### 1. Legal Framework

A plaintiff may bring a Title IX damages claim against a school in cases of student-on-student harassment only when the school is deliberately indifferent to the sexual harassment. *See Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). To establish a harassment claim of this type, the plaintiff must sufficiently allege four elements: (1) the defendant had "substantial control over both the harasser and the context in which the known harassment occurs"; (2) the harassment was severe and discriminatory; (3) the defendant had actual knowledge of the harassment; and (4) deliberate indifference, or in other words, the defendant's response was "clearly unreasonable in light of the known circumstances." *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665-66 (2d Cir. 2012).[4]

---

[3] Plaintiffs style Count I as a claim for "Sex Discrimination." (*See* Am. Compl. at 68.) Based the contents of the pleading, the court understands Plaintiffs to be asserting a claim for deliberate indifference under Title IX. (*See id.* ¶¶ 447, 454.)

[4] Although *Zeno* concerned a Title VI deliberate indifference claim, the Second Circuit explained that it was applying the Title IX deliberate indifference standard to *Zeno's* Title VI claim. *Zeno*, 702 F.3d at 665 n.10.

All harassment is objectionable, but "not all harassment is action-able." *Id.* at 665. To satisfy the second element and plead an actionable claim, the plaintiff must demonstrate that the sexual harassment was of a magnitude that was "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victims are ef-fectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 631. *Zeno* provides an exam-ple—albeit an extreme one—of misconduct that satisfies this prong. *See* 702 F.3d at 666-67. There, over a three-and-one-half year period, the student was subjected to daily racial slurs, ex-plicit and implied threats, including references to lynching, and physical attack. *See id.* The student eventually left school and ac-cepted a less prestigious form of a high school diploma. *See id.* at 667. Relying on the duration, frequency, magnitude, and impact of the harassment, the court held that a jury could have reason-ably found the peer-to-peer harassment to be sufficiently "severe, pervasive, and objectively offensive," such that it deprived the plaintiff of equal access to educational opportunities. *See id. Zeno* demonstrates what factors a court may consider when determin-ing whether harassment is actionable. *See id.* at 666-67.

Since *Zeno*, the Second Circuit has provided further guidance on what constitutes actionable harassment for the purposes of a Ti-tle IX or Title VI deliberate indifference claim. For example, in *Lachaab v. State Univ. of New York Bd. of Trs.*, the Second Circuit held that "Lachaab's description of a single incident in which his classmates made disparaging comments against Muslims, alt-hough unfortunate, [was] insufficient to show the severe and discriminatory harassment necessary for Title VI liability." 715 F. App'x 73, 74 (2d Cir. 2018) (summary order).

---

Therefore, it is appropriate to use the same deliberate indifference stand-ard for both Title VI and Title IX.

### 2. Application

Plaintiffs fail to allege severe and pervasive harassment that deprived them of equal access to educational opportunities. Each Plaintiff is considered in turn.

#### a. N.P.

N.P.'s deliberate indifference claim is dismissed because she does not allege facts that plausibly constitute severe, pervasive, and objectively offensive sexual harassment that would be actionable under Title IX. Her single conversation with Sahagian was their only alleged interaction. This one-time, non-sexual, non-physical event is not actionable under Title IX because it could not be considered pervasive. For this reason, N.P.'s deliberate indifference claim fails.

#### b. R.L.

Although R.L.'s claims against Sahagian are very serious, her deliberate indifference claim fails because she has not pleaded sufficient facts. R.L. alleges that she was terrified of Sahagian because of his "unwelcomed behavior towards her, which included aggravated harassment, sexual harassment and harassment." (Am. Compl. ¶ 58.) She also alleges that Sahagian was obsessed with her. (*Id.* ¶ 67.) R.L. has recited a series of legal conclusions but fails to allege specific facts to support those conclusory allegations. See *Twombly*, 550 U.S. at 557. Accordingly, she fails to state a claim for deliberate indifference. However, the Court recognizes that the treatment R.L. alleges that she was subjected to by Sahagian is repugnant. R.L is free to seek leave from the court to amend the Amended Complaint and plead factual allegations that support the legal claims she asserts.

#### c. Toledo, Jaskaran, and Arete

There are no facts within the Amended Complaint that specifically suggest Toledo, Arete, or Jaskaran endured Title IX harassment. Neither Arete nor Toledo state that they interacted

directly with Sahagian at all. Jaskaran describes feeling physically scared of Sahagian but makes no allegations that he himself endured sexual or sex-based harassment from Sahagian. (*See id.* ¶¶ 145, 149-152.) Therefore, Toledo, Jaskaran, and Arete fail to state claims for deliberate indifference.

## B. Title IX Retaliation

Plaintiffs voluntarily abandoned their Title IX retaliation claims against Defendants Howard and Pepe-Souvenir. (See Opp'n at 19.) Thus, Plaintiffs bring their remaining retaliation claims against only Defendant CUNY. For the reasons stated below, Defendants' motions are DENIED as to Plaintiffs N.P., R.L., and Jaskaran and GRANTED as to Plaintiffs Toledo and Arete.

### 1. Legal Framework

Title IX provides a cause of action for retaliation. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005). When reviewing Title IX retaliation claims, courts use the same legal standard as they do for Title VII retaliation claims.[5] *See Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 248 (2d Cir. 1995). Under this standard, a plaintiff must allege plausible facts that meet four elements: (1) the plaintiff engaged in protected activity; (2) the defendant had knowledge of the protected activity; (3) there was an adverse school-related action; and (4) there was a causal connection between the plaintiff's protected activity and the defendant's adverse action. *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011).

To satisfy the fourth element, a plaintiff can allege a plausible causal connection either directly or indirectly. *See Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). Direct causation requires the plaintiff to show "evidence of retaliatory

---

[5] For this reason, the court uses Title IX and Title VII cases interchangeable in its analysis.

animus directed against the plaintiff by the defendant." *Id.* Indirect causation requires the plaintiff to either (1) demonstrate that "the protected activity was followed closely by discriminatory treatment," or (2) point to "other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Gordon*, 232 F.3d at 117. "Close temporal proximity between the plaintiff's protected action and the adverse action" may alone suffice to satisfy causation, *Papelino*, 633 F.3d at 91, but should be considered in the context of a particular case. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 127-28 (2d Cir. 2013).

For example, in *Summa*, the court held that a lapse of seven months between the protected activity and the adverse action was sufficient to establish causation. *See id.* There, the manager of the school's football team complained about incidents that occurred during the Fall football season. *See id.* at 120-21. When she was not re-hired for the spring season, she filed suit. *See id.* at 122-23. The court held that there was sufficient temporal proximity to establish causation because the start of the spring season was the first instance in which the coaches could retaliate against her. *See id.* at 127-28. In reaching this decision, the court explained that it has declined to "draw[] a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Id.* at 128; *accord Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (holding that "five months is not too long to find the causal relationship"). This flexibility allows the court "to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Summa*, 708 F.3d at 108. Put simply, the context of the temporal proximity matters when determining causation. Whether alleging a plausible casual connection directly or indirectly, a plaintiff "need only establish that impermissible

retaliation was one motive behind [the adverse action]—not that it was the sole reason." *Papelino*, 633 F.3d at 93.

To survive a motion to dismiss, the plaintiff need not allege facts that definitively establish each element of a prima facie case. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83-84 (2d Cir. 2015). Rather, the plaintiff must simply provide enough facts that "give plausible support to a minimal inference of discriminatory motivation." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). To be plausible, the allegation does not have to be probable, but it must be more than conceivable. *See Twombly*, 550 U.S. at 570. And conclusory allegations will not do. *See id.* at 557. The plaintiff must therefore provide at least some factual support. *See id.*

### 2. Application

Plaintiffs Jaskaran, N.P., and R.L. all plausibly allege facts showing (1) they engaged in one or more protected activities, (2) CUNY had knowledge about said protected activity, (3) CUNY took adverse school-related action against them, and (4) there is a minimal inference of discriminatory motivation required to allege causation under the Second Circuit's Title IX and Title VII retaliation jurisprudence. Thus, the motions to Dismiss their claims of retaliation under Title IX are DENIED.

Plaintiffs Toledo and Arete, on the other hand, both fail to allege plausible claims of Title IX retaliation for reasons discussed below. Accordingly, the motions to dismiss Arete's Title IX retaliation claim and Toledo's Title IX retaliation claim are GRANTED.

#### a. *Jaskaran*

Defendants' motions to dismiss Plaintiff Jaskaran's claim of retaliation fail because Plaintiff Jaskaran plausibly alleges all four elements of a retaliation claim under Title IX.

Between August 2016 and August 2017, Jaskaran took a series of actions that constituted protected activity. First, in August or September 2016, Jaskaran provided evidence that Cho had been sexually harassing Plaintiff N.P. to CUNY officials, the police, and the District Attorney. (Am. Compl. ¶ 52.) Then, in or around February 2017, Jaskaran assisted R.L with making a Title IX complaint. (*Id.* ¶¶ 62-65.) Next, on April 18, 2017, Jaskaran assisted non-party Jane Doe 1 with making a complaint about stalking and sexual harassment by Sahagian to a CUNY official, including by accompanying her to make the complaint. (*Id.* ¶ 77.) Throughout the summer and up until and including at a meeting on September 5, 2017, Jaskaran allegedly continued to work to further the sexual harassment complaints made by his classmates against Sahagian, through repeated inquiries with the administration. (*Id.* ¶¶ 147, 154, 157, 160, 163, 165.) On September 5, 2017, Jaskaran specifically accused the administration of violating Title IX and other legal obligations by failing to address the sexual harassment complaints against Sahagian. (*Id.* ¶ 167.)

In *Jackson v. Birmingham Bd. of Educ.*, the Court held that a third party engages in protected activity under Title IX when that third party reports the sexual harassment endured by others. *See* 544 U.S. at 176. Jaskaran appears to have repeatedly done exactly that. Jaskaran's complaints were made directly to CUNY officials, so CUNY's knowledge is not in question. Regardless of whether the court ultimately finds that the adverse action was motivated by retaliatory animus, CUNY took an obviously adverse action against Jaskaran by opening a Title IX investigation into him.

Jaskaran succeeds in plausibly alleging the causation element because his allegations support both (1) a plausible claim of direct causation evidenced by a minimal inference that CUNY possessed retaliatory animus towards him and (2) a plausible claim of indirect causation, evidenced by temporal proximity between

Jaskaran's protected activities and CUNY's adverse school-related action against him.

Taking the facts presented in the Amended Complaint as true, Jaskaran appears to have become a sort of thorn in the administration's side during this period. It is plausible that CUNY was irritated with Jaskaran's repeated queries and involvement with other students' complaints and that what began as mild irritation eventually became retaliatory animus. Jaskaran criticized Howard and Katz for their responses to the allegations that he helped bring to light. He also followed up with CUNY numerous times seeking updates on the various investigations despite being told by Howard that she could not disclose any updates. Based on these facts, although Jaskaran's actions appear well intended, it is plausible that CUNY perceived Jaskaran to be stirring up trouble unnecessarily, and that this perception was a but-for cause of CUNY's decision to begin the investigation once they received allegations from Sahagian.

Furthermore, direct causation need not be alleged. Indirect causation, for which proof of retaliatory animus is not a prerequisite, can suffice. *Papelino*, 633 F.3d at 90-91. Indeed, such indirect causation can be plausibly alleged by providing evidence of temporal proximity, particularly when context clues support said allegation. *See, e.g., Birkholz v. City of N.Y.*, No. 10-CV-4719 (NGG) (SMG), 2012 WL 580522, at *10 (E.D.N.Y. Feb. 22, 2012) ("The temporal proximity between these events, *coupled with the history of animus directed at Plaintiff*, is sufficient to support an inference of causation." (emphasis added)).

Plaintiffs allege that Jaskaran's repeated sexual assault and sexual harassment-related reports and inquiries began as early as August or September 2016 and continued through at least September 5, 2017. Plaintiffs also alleged that in October 2017 a CUNY official "ask[ed] Plaintiffs N.P. and Arete to inform [the

other three plaintiffs, including Jaskaran] that they were all under a Title IX Retaliation investigation" (Am. Compl. ¶ 174.) This timeline suggests the Title IX investigation into Jaskaran and others began shortly after Jaskaran's September 5, 2017 inquiry.

When the court steps back to consider the context around the timeline in this case, it finds causation plausible. The administration allegedly failed to open any investigation in response to Jaskaran's numerous attempts to report Sahagian's inappropriate behavior. On July 30, 2017, in the midst of Jaskaran's inquiries, Sahagian sent a cease-and-desist email alleging that he was "being harassed and intimidated by certain students and others," including Jaskaran. (*Id.* at ¶¶ 118-19, 122.) That email was sent to eight students, including the five plaintiffs in this lawsuit, and copied the Dean of CUNY Law School, the CUNY Law School Director of Public Safety, Howard, CUNY Law School's Title IX Coordinator, Cho's criminal defense attorney, and Cho's private investigator. (*See id.*) Further amplifying the effect of this email, Cho's criminal defense attorney emailed a letter to Howard the next day reporting (and repeating) Sahagian's allegations of harassment against Jaskaran, among others. (*See id.* ¶ 122.) These emails could plausibly have provided the opportunity, by serving as a convenient pretext, for the administration to investigate Jaskaran, had the administration wished to do so.

Soon thereafter, sometime before October 2017, CUNY opened a Title IX retaliation investigation against Plaintiffs and the three other CUNY students that received Sahagian's cease-and-desist email. That context strengthens the plausibility of the causation element, as shown by temporal proximity.

Therefore, Jaskaran plausibly alleges of all four elements of a Title IX retaliation claim. Defendants' motions to dismiss this claim are DENIED.

### a. N.P.

Plaintiff N.P.'s retaliation claim also survives Defendants' motions to dismiss. N.P., a student who had been the victim of a sexual assault reported to the CUNY administration in the past, made a report about Sahagian to a CUNY Law administrator just two to three months before the plausibly retaliatory investigation is alleged to have begun. This July 2017 informal complaint to Howard straddles the line of what is and is not a protected activity pursuant to Title IX. Defendants imply that because N.P.'s complaint to Howard focused in part on her belief that Sahagian was "witness tampering" by trying to intimidate her with regard to Cho's trial, and "witness tampering" is not in itself a violation of Title IX, her informal complaint about her conversation with Sahagian was not protected activity. (*See* Mot. (Dkt. 37-1) at 8.) Although Defendants are correct that "witness tampering" is not inherently a violation of Title IX, the subject matter of the trial and of the conversation between Sahagian and N.P. matters. The trial in question was a criminal trial regarding Cho's sexual assault of N.P., and when N.P. reported what she saw as intimidation relating to that trial, she was describing what she might plausibly have perceived to be an infringement on her right to pursue justice for the harm she suffered as a result of the sexual assault. Defendants further argue that because the conversation between N.P. and Sahagian was lengthy and wide-ranging, it could not have been perceived as intimidating. The court is not sufficiently persuaded by that argument.

Although the most common form of protected activity is the filing of a Title IX complaint with school officials, "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint." *Grant v. Hazelett Strip-Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir. 1989). Courts have regularly held that "pursuing a criminal proceeding against an alleged harasser is protected activity". *DeWitt v. Lieberman,* 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999); *see also Patrick v. Local Union No. 282,* No. 99-

CV-8314 (NGG) (SMG), 2005 WL 2179415, at *4 (E.D.N.Y. Sept. 9, 2005) (holding that plaintiff "engaged in protected activity" by "pursuing criminal charges" against his co-worker); *Borrero v. Collins Bldg. Servs, Inc.*, No. 01-CV-6885 (AGS), 2002 WL 31415511, at *14 (S.D.N.Y. Oct. 25, 2002) (finding that plaintiff engaged in a protected activity when she called the police to report harassment by a co-worker). If initiating or participating in a criminal proceeding relating to one's own sexual assault by another student is a protected activity, it follows logically that reporting attempted infringements upon that right to a CUNY Title IX mandatory reporter might also constitute protected activity.

Furthermore, to qualify as protected activity, "the plaintiff need not establish that the conduct he opposed was in fact a violation of Title [IX]." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F. 2d 590, 593 (2d Cir. 1988). Instead, the plaintiff must make a showing that there was a "good faith, reasonable belief that the underlying challenged actions . . . violated the law." *Id.* Sahagian approached N.P. and engaged in what N.P. alleges she perceived to be an attempt to intimidate her prior to Cho's criminal sexual assault trial. N.P. could reasonably have believed that reporting this behavior constituted protected activity. The court reviewed the recording of this conversation and found that it is consistent with N.P.'s claim that she could plausibly have believed Sahagian was attempting to intimidate her.[6] The mere

---

[6] The court considers this recording as it was incorporated by reference in the Amended Complaint. Although the recording was not attached to the Amended Complaint and was instead received as part of later briefing, there were multiple references to and discussions of the recording within the Amended Complaint, which in the court's view, constitutes "a clear, definite, and substantial reference." *Trump v. Vance,* 977 F.3d 198, 210 n.8 (2d Cir. 2020) (holding that two brief quotations from a New York Times article in the Second Amended Complaint, which did not include the title

fact that N.P. chose to report this to the same authority figure to whom she had reported a past Title IX violation, indicates that she held that "reasonable, good faith belief." At this stage, the court need not definitively decide whether an underlying Title IX violation had occurred.

Since this informal complaint was made directly to a CUNY official, institutional knowledge is not in question. And like Jaskaran, N.P. was then the subject of a Title IX retaliatory investigation, undoubtedly an adverse school-related action. Although it seems unlikely that N.P.'s reporting of her conversation with Sahagian was the sole motive for opening the investigation, it need not have been. See *Papelino*, 633 F. 3d at 92 ("In a retaliation case, a plaintiff is only required to prove that a retaliatory motive played a part in adverse actions toward him, whether or not it was the sole cause.").

Finally, N.P.'s plausibly protected activity took place a mere two months prior to the opening of the investigation against her. This temporal proximity, set against a backdrop in which the administration may well have been becoming increasingly irritated with the plaintiffs' many complaints, leaves room for a plausible finding of indirect causation. Thus, Defendants' motion to dismiss N.P's retaliation claim are DENIED.

### b. R.L.

Plaintiff R.L.'s retaliation claim also narrowly survives Defendants' motions to dismiss. She alleges facts that permit a minimal inference that CUNY retaliated against her because she complained about Sahagian and assisted another woman in making

---

or date of the article, allowed the panel to consider the entire article because the reference '[wa]s far more substantial than a mere passing reference"); *see also Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (holding that two documents were incorporated by reference to the complaint where the complaint "explicitly refer[red] to and relie[d] upon" them).

complaints about Sahagian. Like Jaskaran, she easily meets the first three elements. She took action that constituted protected activity when she lodged a sexual harassment complaint with a CUNY administrator. Having received the complaint directly, CUNY had definite knowledge of the protected activity. And CUNY took an adverse action against R.L. by naming her in the Title IX investigation relating to Sahagian's complaints.

With respect to the fourth element, she pleads facts that indirectly indicate CUNY retaliated against her for complaining about Sahagian and/or helping another student make a complaint about him. Although the time frame set forth in the Amended Complaint is imprecise, R.L. appears to have complained about Sahagian's sexual harassment to Howard in February 2017. (*See* Compl. ¶¶ 64, 66-67.) Two months later, in April 2017, R.L. helped Jane Doe 1 meet with Jaskaran, who then explained how to file a complaint to Jane Doe 1. (*See id.* ¶ 75.) The alleged retaliatory investigation opened seven to eight months after R.L.'s own complaint and five to six months after she assisted Jane Doe 1 with making her complaint. (*See id.* ¶¶ 171-74.) While the extent to which CUNY was aware of R.L.'s role in assisting Jane Doe 1 is currently unclear, facts regarding CUNY's knowledge of R.L.'s role could be ascertained through reasonable discovery. Further, the extent to which the CUNY administration may have viewed R.L.'s complaint about Sahagian as part of a *series* of complaints, including Jaskaran's continued inquiries, that continued into the Fall of 2017, is as of yet unknown. Moreover, there is no bright line rule as to how much time must have passed to survive a motion to dismiss or a motion for summary judgment, *see Summa*, 708 F.3d at 128, though "several months" tends to be the upper limit at the motion for summary judgment stage. *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 104 (2d Cir. 2020); *see also Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005). ("This Court has not established a

specific delay between protected activity and adverse employment action that defeats an inference of causation. We have in the past held that a delay of three months was fatal to a showing of causation, and that a delay of eight months supported a showing of causation.")

Finally, further scrutiny must be postponed until later stages of the instant litigation. "[A]t the pleading stage, "the facts required by Iqbal to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse action was attributable to the discrimination . . . rather, the facts need only give plausible support to a minimal inference of discriminatory motivation." *Doe v. Sarah Lawrence Coll.*, 453 F. Supp. 3d 653, 667-668 (S.D.N.Y. 2020) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)).

As such, R.L. pleads facts sufficient to overcome the plausibility requirement for the causation element. Therefore, a minimal inference of retaliatory motive has been pleaded, and Defendants' motions to dismiss R.L.'s retaliation claim are DENIED.

### c. Toledo

The Amended Complaint does not make sufficiently clear whether Plaintiff Toledo engaged in protected activity or whether CUNY would have known about said activity. It makes only one reference to Toledo assisting R.L. in reporting Sahagian's alleged misconduct, while the complaint as a whole suggests otherwise. In the section outlining R.L.'s circumstances, Toledo is not mentioned at all. To the contrary, it indicates that R.L. went to Jaskaran—not Toledo—for assistance. Thus, it is unclear what exactly Toledo's involvement was, if any, and whether CUNY would have known about that involvement. Thus, Defendants' motions to dismiss Plaintiff Toledo's retaliation claim are GRANTED.

### d. Arete

Plaintiff Arete has also not sufficiently pleaded the element of causation for a Title IX retaliation claim. The facts alleged neither directly nor indirectly suggest his protected activity caused CUNY to open an investigation against him. Arete accompanied Plaintiff N.P. to report the Cho incident in Fall 2016. Although doing so was likely a protected activity, it lacked temporal proximity to the later investigation. Arete alleges no facts that connect him personally to making the complaints against Sahagian, and there are no facts that could lead this court to plausibly infer that CUNY harbored any retaliatory animus towards Arete for his involvement in the Cho incident. Therefore, Defendants motions to dismiss Arete's retaliation claim is GRANTED.

*      *      *

For the reasons discussed above, Defendants' motions to dismiss Plaintiffs' deliberate indifference claims under Title IX are GRANTED, and Defendants' motions to dismiss Plaintiffs' retaliation claims under Title IX are GRANTED in part and DENIED in part.

### C. Claims Under New York State and New York City Human Rights Laws

Plaintiffs assert claims under the NYSHRL and NYCHRL in Counts VI, VII, VIII, IX, X, XI of the Amended Complaint. *See* N.Y. Exec. L. § 296; N.Y.C. Admin. Code § 8-107. Plaintiffs voluntarily abandoned their non-Title IX claims against Defendant CUNY, including those brought under the State and City human rights laws. (*See* Opp'n at 19-20.) They do so in acknowledgment that these claims are barred by the Eleventh Amendment, as the Second Circuit has held that CUNY is an instrumentality of the State. *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79, 83 (2d Cir. 2004). As the State has not waived its Eleventh Amendment immunity here, Counts III through XI (the "non-Title IX claims,") including

the NYSRL and NYCHRL claims, are therefore barred as against CUNY.

The remaining NYSHRL and NYCHRL claims—against Defendants Howard and Pepe-Souvenir in their individual capacities—also cannot continue. In the Second Circuit, individuals can be held liable under the NYSHRL and NYCHRL under an aider and abettor theory. Courts in this circuit have consistently held that when "Plaintiffs cannot state a claim against CUNY under NYSHRL and NYCHRL because the claims are barred by the Eleventh Amendment, Plaintiffs also cannot state a claim against the [defendants who are employees of CUNY] in their individual capacities as aiders and abettors." *Soloviev v. Goldstein,* 104 F. Supp. 3d 232, 253 (E.D.N.Y. 2015); *see also DeWitt,* 48 F. Supp. 2d at 293 ("[T]here is . . . a requirement that liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor"); *Ren Yuan Deng v. N.Y. State Office of Mental Health,* No. 13-CV-6801 (ALC), 2015 WL 221046, at *5 (S.D.N.Y. Jan. 15, 2015) (noting that principal liability is a predicate for aider and abettor liability under both NYSHRL and NYCHRL). As such, Defendants' motions to dismiss Plaintiffs' NYSHRL and NYCHRL claims are GRANTED.

### D. Claims Under 42 U.S.C. § 1983

Plaintiffs initially brought claims under 42 U.S.C. § 1983 against all Defendants, but Plaintiffs voluntarily abandoned these claims as against Defendant CUNY. (*See* Opp'n at 19-20.)[7] Therefore, of

---

[7] Though Plaintiffs also purport to bring Count III against Howard and Pepe-Souvenir in their official capacities, this type of claim is barred by the Eleventh Amendment. *See, e.g., Browdy v. Karpe,* 131 F. App'x. 751, 752-53 (2d Cir. 2005) (summary order) (affirming dismissal of § 1983 claims against state officials in their official capacity because they are barred by the Eleventh Amendment); *Marino v. City Univ. of N.Y.,* 18 F. Supp. 3d 320, 335 (E.D.N.Y. 2014) (dismissing § 1983 claims against CUNY officials

the § 1983 claims detailed in Counts III and IV of the Amended Complaint, only those against Defendants Howard and Pepe-Souvenir in their individual capacities remain.

1. Legal Framework

Under § 1983, an individual plaintiff may file a claim against a person "who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected . . . to the deprivation of any rights, privileges or immunities secured by the Constitution." 42 U.S.C. § 1983. To state a § 1983 claim, a plaintiff must allege two elements: (1) the plaintiff's rights secured by the Constitution or laws of the United States were violated, and (2) the "violation was committed by a person acting under color of state law." *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996). "Section 1983 is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Conklin v. Cnty. of Suffolk*, 859 F. Supp. 2d 415, 438 (E.D.N.Y. 2012). Thus, to bring a claim under § 1983, a plaintiff must assert the violation of some federal right. *See Blessing v. Freestone*, 520 U.S. 329, 340 (1997).

2. Application

Plaintiffs make passing reference to violations of the First and Fourteenth Amendments but fail to develop any argument on these claims. Thus, they have not shown that they suffered an injury resulting from a constitutional violation.

Throughout the Amended Complaint, Plaintiffs allege that their federal statutory rights have been violated under (1) Title IX and (2) the Family Educational Rights and Privacy Act ("FERPA"). (*See, e.g.*, Am. Compl. ¶¶ 402, 413.) The passing references to

---

in their official capacities because such suits are barred by the Eleventh Amendment).

FERPA do not establish any deprivation of rights under that statute. The allegations of deprivation of federal statutory rights under Title IX (i.e., the right to have their Title IX complaints investigated and to not be retaliated against for making Title IX complaints) are pleaded in significantly greater detail throughout the Amended Complaint. In *Fitzgerald v. Barnstable School Committee*, the Supreme Court acknowledged that the Equal Protection Clause of the Fourteenth Amendment offers different, though overlapping, "substantive rights and protections" than Title IX. 555 U.S. 246, 256 (2009). Plaintiffs are able to bring § 1983 claims invoking Fourteenth Amendment rights, alongside a claim for relief under Title IX. *Fitzgerald*, 555 U.S. at 259. However, they are not permitted to use § 1983 as a vehicle to bring a Title IX claim. *See generally Fitzgerald*, 555 U.S. at 252.

Plaintiffs' *Monell* claim for municipal liability suffers from the same deficiencies: Plaintiffs fail to assert the deprivation of a constitutional right, so the claims are similarly without merit. Therefore, Defendants' motions to dismiss Plaintiffs' § 1983 claims are GRANTED.

### E. Race Discrimination Claims Under 42 U.S.C. § 1981

In Count V, Plaintiffs attempt to make a race-based discrimination claim under 42 U.S.C. § 1981. Here too, the claim was initially brought against all Defendants, but Plaintiffs have since voluntarily abandoned the claim as to Defendant CUNY. Thus, this claim is now asserted only as against Howard and Pepe-Souvenir in their individual capacities.

#### 1. Legal Framework

In *Jett v. Dallas Independent School District*, the Supreme Court held that actions for damages arising out of violations of § 1981 must be brought through the "remedial provisions of § 1983." 491 U.S. 701, 731 (1989). In 2018, the Second Circuit "reaffirm[ed] *Jett*'s ongoing viability" within the Circuit, stating

unequivocally that "§ 1981 does not provide a separate private right of action against state actors." *Duplan v. City of N.Y.*, 888 F.3d 612, 620-21 (2d Cir. 2018) ("Because § 1983 already provides a remedy against state actors, there is no reason to infer from the rights-conferring language of § 1981(c) that it creates an additional, and duplicative, remedy."). "Moreover, the holding in *Jett* has been interpreted to encompass not only governmental entities but also individuals sued in their individual capacities who are 'state actors.'" *Roddini v. City Univ. of N.Y.*, No. 02-CV-4640 (LAP), 2003 WL 435981, at *5 (S.D.N.Y. Feb. 21, 2003); *see also Jett*, 491 U.S. at 731–35; *Whaley v. City Univ. of N.Y.*, 555 F. Supp. 2d 381, 400-01 (S.D.N.Y. 2008).

## 2. Application

Plaintiffs do not plead their § 1981 claim through the remedial vehicle provided by § 1983 as required. In fact, Plaintiffs make no mention whatsoever of § 1983 in Count V and attempt to have their § 1981 claim stand alone. Under *Duplan*, it cannot proceed in this manner. *See generally Duplan*, 888 F.3d at 620-21.

While this could, on first blush, appear to be a mere technicality, the case law is clear – courts in this Circuit routinely dismiss § 1981 claims for this reason. *See, e.g., Smalls v. Collins*, 10 F.4th 117, 144-45 (2d Cir. 2021); *Ortiz v. City of N.Y.*, 755 F. Supp. 2d 399, 402-03 (E.D.N.Y 2010); *Lall v. City of N.Y.*, No. 17-CV-3609 (WFK), 2021 WL 848851, at *5 (E.D.N.Y. Mar. 5, 2021); *Walker v. City of N.Y.*, No. 11-CV-2941 (KPF), 2014 WL 1244778, at *8 n.6 (S.D.N.Y. Mar. 26, 2014); *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 576 (S.D.N.Y. Mar. 25, 2011). It is well settled that when "Defendants are all state actors, § 1983 supplies the exclusive remedy." *Lall*, 2021 WL 848851, at *5.

Therefore, Defendants' motions to dismiss Plaintiffs' § 1981 claim are GRANTED.

*     *     *

For the reasons stated above, Defendants' motions to dismiss Plaintiffs' retaliation claims under Title IX are GRANTED in part and DENIED in part. Defendants' motions to dismiss Plaintiffs' Title IX deliberate indifference claims, Plaintiffs' NYSHRL and NYCHRL claims, Plaintiffs' § 1983 claims, and Plaintiffs' § 1981 claim are GRANTED.

**IV. CONCLUSION**

Defendants' Motions to Dismiss are GRANTED in PART and DE-NIED in part.

SO ORDERED.

Dated:     Brooklyn, New York
           September 8, 2022

                                         s/Nicholas G. Garaufis
                                    _____
                                    NICHOLAS G. GARAUFIS    )
                                    United States District Judge